## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>UNITED STATES DEPARTMENT OF ENERGY, and CHRIS WRIGHT, Secretary of Energy, UNITED STATES DEPARTMENT OF ENERGY,<br><br>　　　　　Respondents. | PETITION FOR REVIEW |

Pursuant to Rule 15 of the Federal Rules of Appellate Procedure, Circuit Rule 15-1, and section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), the State of Washington hereby petitions this Court for review of the following order issued by Respondents, Chris Wright, Secretary of Energy, and the United States Department of Energy (Respondents): Order No. 202-25-11, issued December 16, 2025, ("Centralia Order") attached as Exhibit A, and any amendments or modifications thereto. The Centralia Order was issued under section 202(c) of the Federal Power Act, 16 U.S.C. § 824a(c), and is subject to the rehearing and judicial review provisions of 16 U.S.C. § 825*l*. *See* 42 U.S.C. § 7192(a).

1

The prerequisites for this petition are met. On January 13, 2026, the State of Washington filed a timely request to Respondents to intervene and sought rehearing of the Centralia Order. Exhibit B. Thirty days have now lapsed since Washington's application for rehearing, and Respondents have issued a Notice of Denial. *See* Order No. 202-25-11A, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, issued February 20, 2026, attached as Exhibit C; *see also* 16 U.S.C. § 825*l*(a) (providing that an application for rehearing is deemed denied if not acted upon within thirty days). This petition comes within sixty days from denial of Washington's application for rehearing and, as a party aggrieved by the Centralia Order, Washington may file this petition for review pursuant to 16 U.S.C. § 825*l*(b). Because the Centralia Order applies to a facility owned and operated in Lewis County, Washington, jurisdiction and venue are proper. 16 U.S.C. § 825*l*(b) (petitions may be brought in "the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business").

Washington respectfully requests that this Court hold unlawful, vacate, and set aside the Centralia Order and grant such further relief as may be deemed just and proper.

2

RESPECTFULLY SUBMITTED this 3rd day of March, 2026.

NICHOLAS W. BROWN
Attorney General of Washington

*/s/ Kelly T. Wood*
Kelly T. Wood, WSBA No. 40067
Senior Counsel
Christopher H. Reitz, WSBA No. 45566
Talia O. Thuet, WSBA No. 62793
Assistant Attorneys General
Ecology Division
Kelly.Wood@atg.wa.gov
Chris.Reitz@atg.aw.gov
Talia.Thuet@atg.wa.gov

Cristina Sepe, WSBA No. 53609
Deputy Solicitor General
Cristina.Sepe@atg.wa.gov

Tad G. O'Neill, WSBA No. 37153
Alexandra Kory, WSBA No. 49889
Assistant Attorneys General
Public Counsel Unit
Tad.ONeill@atg.wa.gov
Alexandra.Kory@atg.wa.gov

Megan Sallomi, WSBA No. 58016
Assistant Attorney General
Environmental Protection Division
Megan.Sallomi@atg.wa.gov

Washington Office of the Attorney General
1125 Washington St. SE
P.O. Box 40100
Olympia, Washington 98504
360-586-6770

3

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2026, I electronically filed the foregoing Petition for Review and all attachments, and the United States Court of Appeals for the Ninth Circuit Form 3, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system. I further certify that I have on this day caused copies of the foregoing to be served via certified mail, return receipt requested, upon the following:

U.S. Department of Energy
1000 Independence Ave. SW
Washington, D.C. 20585

Chris Wright
Secretary of Energy
U.S. Department of Energy
1000 Independence Ave. SW
Washington D.C. 20585

I have also served a copy of the foregoing on all parties to the proceeding before the Department of Energy via first-class certified mail and electronic mail:

TransAlta Centralia Generation, LLC
c/o United Agent Group INC
707 W. Main Avenue #B1
Spokane, WA 99201
Nancy_Brennan@transalta.com
Andrea_Sam@transalta.com

Marcus H. Chong Tim
General Counsel
Bonneville Power Administration
905 NE 11th Ave.
Portland, OR 97232
mhchongtim@bpa.gov

4

Roger Collanton
General Counsel
California ISO
P.O. Box 639014
Folsom, CA 95630
rcollanton@caiso.com


Michael Lenoff
Jennifer Yun
Patti Goldman
Nico Wedekind
Earthjustice (Counsel for NW
Energy Coalition, Washington
Conservation Action, Climate
Solutions, and Public Citizen)

1250 I (Eye) St NW, Fourth Floor
Washington, DC 20005
mlenoff@earthjustice.org
jyun@earthjustice.org
pgoldman@earthjustice.org
nwedekind@earthjustice.org


Ted Kelly
Tomás Carbonell
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
tcarbonell@edf.org
tekelly@edf.org


Gregory E. Wannier
Rose Monahan
Sierra Club Environmental
Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
greg.wannier@sierraclub.org
rose.monahan@sierraclub.org

Travis Lindsey
Avista Corporation
1411 E Mission Ave, MSC-33
Spokane, WA 99202
Travis.lindsey@avistacorp.com
Stephen.spina@morganlewis.com
Patrick.pennella@morganlewis.com


Dated: March 3, 2026.


Respectfully submitted,

*/s/ Kelly T. Wood*
Kelly T. Wood

# EXHIBIT A



**Department of Energy**
Washington, DC 20585

**Order No. 202-25-11**

Pursuant to the authority vested in the Secretary of Energy by section 202(c) of the Federal Power Act (FPA),[1] and section 301(b) of the Department of Energy Organization Act,[2] and for the reasons set forth below, I hereby determine that an emergency exists within the Western Electricity Coordinating Council (WECC) Northwest assessment area due to a shortage of electric energy, a shortage of facilities for the generation of electric energy, and other causes, and that issuance of this Order will meet the emergency and serve the public interest.

*EMERGENCY SITUATION*

In its 2025–2026 Winter Reliability Assessment, NERC finds that the WECC Northwest region, which includes Montana, Oregon, Washington, and parts of northern California and northern Idaho, is at elevated risk during periods of extreme weather.[3] The assessment notes that "there is sufficient capacity in the area for expected peak conditions; however, [balancing authorities] are likely to require external assistance during extreme winter weather that causes thermal plant outages and adverse wind turbine conditions for area internal resources. External assistance may not be available during region-wide extreme winter conditions. Winter peak demand for the area is forecast to be 2.9 GW higher (9.3%) compared to last year."[4]

In a September 2025 report evaluating Resource Adequacy in the Pacific Northwest, Energy + Environmental Economics (E3) determined that "[a]ccelerated load growth and continued retirements create a resource gap beginning in 2026 and growing to 9 GW by 2030"[5] and that "[l]oad growth and retirements mean the region faces a power supply shortfall in 2026."[6] E3 reported that nearly 9000 MW of new capacity will be needed in the region by 2030, but currently only 3000 MW of projects for new capacity are in active development.[7] Overall, E3 found that "[p]referred resources such as wind, solar and batteries make only small contributions to meeting resource adequacy needs" and "[t]imely development of all resources is extremely challenging due to permitting and interconnection delays, federal policy headwinds, and cost pressures."[8]

TransAlta Centralia Generation ("Centralia") is an electric generating facility in Centralia,

---

[1] 16 U.S.C. § 824a(c).

[2] 42 U.S.C. § 7151(b).

[3] *NERC 2025-2026 Winter Reliability Assessment*, at 6 (November 2025), https://www.nerc.com/globalassets/our-work/assessments/nerc_wra_2025.pdf.

[4] *Id.*

[5] E3, *Resource Adequacy and the Energy Transition in the Pacific Northwest: Phase 1 Results*, at 2 (Sept. 22, 2025), https://www.utc.wa.gov/sites/default/files/2025-10/Revised%20V3%20E3%20Presentation%20RA%20Study%20September%2022%20WA%20RA%20Meeting.pdf. *See also id.* for the list of E3's study sponsors, which include certain "regional utilities and generation owners."

[6] *Id.* at 10.

[7] *Id.*

[8] *Id.* at 2.

Washington. Centralia is owned and operated by the TransAlta Centralia Generation LLC ("TransAlta"). Centralia consists of one remaining coal-fired generation unit, Unit 2, with a nameplate capacity of 729.9 MW.[9] Unit 2 began operations in 1973 and is slated to cease operations in December 2025. Unit 1 was retired in 2020. Unit 2 is slated to cease operation in December 2025, based on a 2011 Washington law[10] and a subsequent agreement between TransAlta and the State of Washington.[11] TransAlta has announced plans to convert the unit to natural gas by 2028.[12]

More broadly, Executive Orders issued by President Donald J. Trump on January 20, 2025, and April 8, 2025, underscored the dire energy challenges facing the Nation due to growing resource adequacy concerns. President Trump declared a national energy emergency in Executive Order 14156, "Declaring a National Energy Emergency," in which he determined that the "United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[13] The Executive Order adds: "Hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets."[14] In a subsequent Executive Order 14262, "Strengthening the Reliability and Security of the United States Electric Grid," President Trump emphasized that "the United States is experiencing an unprecedented surge in electricity demand driven by rapid technological advancements, including the expansion of artificial intelligence data centers and increase in domestic manufacturing."[15]

Further, the Department detailed the myriad challenges affecting the Nation's energy systems in its July 2025 "Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid," issued pursuant to the President's directive in Executive Order

---

[9] U.S. Energy Information Administration, Form EIA-860, Schedule 3: Generator Data (2024) (2024 Form EIA-860), https://www.eia.gov/electricity/data/eia860/.

[10] Act of Apr. 29, 2011, Ch. 180, 2011 Wash. Laws, https://lawfilesext.leg.wa.gov/biennium/2011-12/Pdf/Bills/Session%20Laws/Senate/5769-S2.SL.pdf#page=1.

[11] *See* MOA (Dec. 23, 2011), https://ecology.wa.gov/getattachment/858591f6-dd25-47be-ba1d-0f58264ca147/20111223TransAltaMOA.pdf ("D. In exchange for the benefits of entering into an MOA with the State pursuant to RCW 80.80.100, the Company will . . . (5) permanently cease power generation operations of one Boiler in 2020 and the other Boiler in 2025, which dates are prior to the 2035 end of their expected useful lives . . . ."); *see also* First Amendment to MOA (July 13, 2017), https://fortress.wa.gov/ecy/ezshare/AQ/PDFs/TransAltaMOAAmend1-20170713.pdf. As a coal-fired facility, it would be difficult for the Centralia Plant to resume operations once it has been retired. Specifically, any stop and start of operation creates heating and cooling cycles that could cause an immediate failure that could take 30-60 days to repair if a unit comes offline. In addition, other practical issues, such as employment, contracts, and permits may greatly increase the timeline for resumption of operations. Further, if TransAlta were to begin disassembling the plant or other related facilities, the associated challenges would be greatly exacerbated. Thus, continuous operation is required in such cases so long as the Secretary determines a shortage exists and is likely to persist.

[12] *TransAlta Signs Long-Term Agreement for 700 MW at Centralia Facility Enabling Coal to Natural Gas Conversion* (Dec. 9, 2025), https://transalta.com/newsroom/transalta-signs-long-term-agreement-for-700-mw-at-centralia-facility-enabling-coal-to-natural-gas-conversion/.

[13] Executive Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) (Declaring a National Energy Emergency), https://www.federalregister.gov/documents/2025/01/29/2025-02003/declaring-a-national-energy-emergency.

[14] *Id.*

[15] Executive Order No. 14262, 90 Fed. Reg. 15521 (Apr. 8, 2025) (Strengthening the Reliability and Security of the United States Electric Grid), https://www.federalregister.gov/documents/2025/04/14/2025-06381/strengthening-the-reliability-and-security-of-the-united-states-electric-grid.

14262. The Department concluded that "[a]bsent decisive intervention, the Nation's power grid will be unable to meet projected demand for manufacturing, re-industrialization, and data centers driving artificial intelligence (AI) innovation."[16]

## *ORDER*

FPA section 202(c)(1) provides that whenever the Secretary of Energy determines "that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy," then the Secretary has the authority "to require by order . . . such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest."[17] This statutory language constitutes a specific grant of authority to the Secretary to require the continued operation of Centralia Unit 2 when the Secretary has determined that such continued operation will best meet an emergency caused by a sudden increase in the demand for electric energy or a shortage of generation capacity.

Such is the case here. As described above, the emergency conditions resulting from increasing demand and accelerated retirement of generation facilities will continue in the near term and are also likely to continue in subsequent years. This could lead to the potential loss of power to homes, businesses, and facilities critical to the national defense in the areas that may be affected by curtailments or power outages, presenting a risk to public health and safety.

I have also made the determination that, to best meet the emergency arising from increased demand, determined shortage, and other causes, and serve the public interest under FPA section 202(c), Centralia Unit 2 shall be made available for operation until March 16, 2026.

Based on my determination of an emergency set forth above, I hereby order:

A. From December 16, 2025, TransAlta shall take all measures necessary to ensure that Centralia Unit 2 is available to operate at the direction of either Bonneville Power Administration (BPA) (in its role as Balancing Authority) or the California Independent System Operator Corporation Reliability Coordinator West[18] (in its role as the Reliability Coordinator). Following the conclusion of this Order, sufficient time for orderly ramp down is permitted, consistent with industry practices.

B. To minimize adverse environmental impacts, this Order limits operation of Centralia Unit

---

[16] U.S. Department of Energy, *Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid*, at 1 (July 2025), https://www.energy.gov/sites/default/files/2025-07/DOE%20Final%20EO%20Report%20%28FINAL%20JULY%207%29.pdf.

[17] Although the text of FPA section 202(c) grants this authority to "the Commission," section 301(b) of the Department of Energy Organization Act transferred this authority to the Secretary of the Department of Energy. *See* 42 U.S.C. § 7151(b).

[18] *See* NERC list of acronyms for Reliability Coordinators at https://www.nerc.com/programs/bulk-power-system-awareness/reliability-coordinators. On the official NERC Compliance Registry, CAISO is listed as the Reliability Coordinator. *See* NERC Compliance Registry at https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.nerc.com%2Fglobalassets%2Fprograms%2Fregistration%2Fcompliance-registry-files%2Fnerc_compliance_registry_matrix_excel.xlsx&wdOrigin=BROWSELINK.

2 to the times and within the parameters established in paragraph A. TransAlta shall provide a daily notification to the Department (via AskCR@hq.doe.gov) reporting whether Centralia Unit 2 has operated in compliance with this Order.

C. All operations of Centralia Unit 2 must comply with applicable environmental requirements, including but not limited to monitoring, reporting, and recordkeeping requirements, to the maximum extent feasible while operating consistent with the emergency conditions. This Order does not provide relief from any obligation to pay fees or purchase offsets or allowances for emissions that occur during the emergency condition or to use other geographic or temporal flexibilities available to generators.

D. By December 30, 2025, TransAlta is directed to provide the Department of Energy (via AskCR@hq.doe.gov) with information concerning the measures it has taken and is planning to take to ensure the operational availability of Centralia Unit 2 consistent with this Order. TransAlta shall also provide such additional information regarding the environmental and operational impacts of this Order and its compliance with the conditions of this Order, in each case as requested by the Department of Energy from time to time.

E. TransAlta is directed to file with the Federal Energy Regulatory Commission tariff revisions or waivers to effectuate this Order, as needed. Rate recovery is available pursuant to 16 U.S.C. § 824a(c).

F. BPA is directed to facilitate transmission service, as needed, to effectuate this Order.

G. This Order shall not preclude the need for Centralia Unit 2 to comply with applicable state, local, or Federal law or regulations following the expiration of this Order.

H. Because this Order is predicated on the shortage of facilities for generation of electric energy and other causes, Centralia Unit 2 shall not be considered a capacity resource.

I. This Order shall be effective from 11:59 PM Eastern Standard Time (EST) on December 16, 2025, and shall expire at 11:59 PM Eastern Daylight Time (EDT) on March 16, 2026, with the exception of applicable compliance obligations in paragraph D.

Issued in Washington, D.C. at 5:20PM EST on this 16th day of December 2025.

_Chris Wright_
Chris Wright
Secretary of Energy

# EXHIBIT B

UNITED STATES OF AMERICA
BEFORE THE UNITED STATES DEPARTMENT OF ENERGY

| | |
|---|---|
| Federal Power Act Section 202(c) Emergency Order TransAlta Centralia Generation | Order No. 202-25-11 |

**MOTION TO INTERVENE, REQUEST FOR REHEARING,
AND MOTION TO STAY BY STATE OF WASHINGTON**

I.     INTRODUCTION ...................................................................................4

II.    STATEMENT OF ISSUES AND SPECIFICATIONS OF ERROR ...................6

III.   MOTION TO INTERVENE AND INTERVENOR'S INTEREST .....................9

IV.   BACKGROUND .................................................................................16

    A.   The Long-Planned Retirement of TransAlta's Coal-fired Units .................16

        1.   The TransAlta Centralia coal-fired power plant ..................................16

        2.   Agreement reached over a decade ago to transition TransAlta away from Coal ........................................................................................17

        3.   TransAlta coal-to-gas conversion project ...........................................19

    B.   Washington Recently Assessed and Confirmed Resource Adequacy in Our Region .......................................................................................20

    C.   DOE's Historical Use of Section 202(c) .......................................................24

    D.   White House Strategy to Prop Up the Coal Industry ...............................30

    E.   DOE's Section 202(c) Orders Preventing the Retirement of Fossil Fuel Power Plants Issued in 2025.......................................................................32

    F.   DOE Publishes its Methodology and Reliability Standard to Guide Future Section 202(c) "Reliability Interventions" ...............................................33

G.  DOE's 202(c) Emergency Order to TransAlta Requiring It To Continue To Be Available as a Coal-Fired Power Plant ....................................................35

H.  Impacts of Continued Coal Operations at Centralia....................................37

    1.  Deferred maintenance and upgrades make running Centralia as a coal plant difficult, expensive, and less reliable..........................................37

    2.  Running Centralia results in health and environmental impacts .........39

V.  MOTION FOR CLARIFICATION ....................................................................41

VI.  REQUEST FOR REHEARING .........................................................................44

A.  DOE's Order Is Unlawful Because It Fails to Establish the Predicate Existence of an Emergency as Defined by Section 202(c) of the Federal Power Act or DOE's Own Section 202(c) Regulations ..............................44

    1.  Because section 202(c) authority is extraordinary, Congress carefully cabined its use to wartime and *actual* "emergencies" ..........................44

    2.  DOE's own section 202(c) regulations and prior actions make clear that a 202(c) order is limited to true emergencies.......................................47

    3.  DOE lacks discretion to bypass congressionally-imposed limits on section 202(c) authority ......................................................................49

B.  DOE's Order Violates Section 202(c) Which Does Not Allow DOE to Usurp Local Authority to Address Both Short- and Long-Term Resource Planning ................................................................................................................50

C.  DOE's Order is Arbitrary and Lacks Substantial Evidence Supporting Its Determination That an Emergency Exists in the Northwest .......................56

    1.  Generalized, unsupported statements in executive orders do not support DOE's finding of an emergency here ................................................57

    2.  DOE misreads and misrepresents the sources it cites to conclude an emergency exists pursuant to section 202(c) ......................................58

        a.  The 2025-2026 Winter Resource Reliability Assessment............59

        b.  The E3 PowerPoint presentation .................................................60

2

3.  DOE's July Resource Adequacy Report, even with significant flaws, directly contradicts the Order ............................................................... 62

4.  WECC Northwest has sufficient existing capacity resources to cover the winter months without Centralia ............................................................ 65

D.  DOE's Order is Arbitrary and Capricious and Contrary to Law ................. 69

1.  The Order directs entities to act that have no authority to order TransAlta Centralia to run ........................................................................................ 70

2.  The Order fails to comply with section 202(c)'s requirement to craft terms that "best meet the emergency and serve the public interest" and arbitrarily fails to consider reasonable alternatives ............................. 71

3.  The Order's statement regarding "continuous operation" is arbitrary, capricious, and contrary to law .............................................................. 75

4.  The Order will destabilize the very energy grid it purports to protect. .............................................................................................................. 79

5.  The Order is an unlawful pretext for buttressing the President's policy goal of supporting the coal industry ..................................................... 83

E.  The Order Will Undermine the Northwest's Energy Market, Increase Electricity Rates, and Harm Consumers ...................................................... 88

1.  DOE's Order will cause immediate disruption to the Northwest energy market because it could force curtailment of cheaper and abundant hydropower. ......................................................................................... 89

2.  The Order will cause long-term disruption to the Northwest energy market because it will delay conversion of the TransAlta plant to natural gas which is integral to the region's long term resource planning ...... 92

3.  The inevitable outcome of DOE's Order is increased electricity rates that will be borne by Americans already facing an affordability crisis .............................................................................................................. 93

4.  Continuing to run Centralia will release toxic air pollutants that otherwise would not have been released, resulting in negative human health impacts ..................................................................................... 94

F.  DOE's Order Fails to Comply With NEPA ................................................ 97

3

VII.   REQUEST FOR STAY .........................................................................98

    A.   Washington State Will Suffer Irreparable Injury Without A Stay ..............98

    B.   A Stay Would Not Substantially Harm Other Parties ...............................101

    C.   A Stay is in the Public Interest .................................................................101

VIII.  CONCLUSION.....................................................................................102

Pursuant to section 313 of the Federal Power Act ("the Act"), 16 U.S.C. § 825*l*, the State of Washington, by and through the Washington State Attorney General, Nicholas W. Brown, moves to intervene and for a stay, and requests that the Department of Energy ("DOE") grant rehearing of Order No. 202-25-11 (December 16, 2025) (the "Order"), attached hereto as Exhibit 1.

## I.   INTRODUCTION

For well over a decade, the State of Washington and TransAlta Centralia Generation LLC have worked to implement a carefully orchestrated agreement transitioning TransAlta's aging Centralia Coal Plant ("TransAlta Centralia" or "Centralia") away from coal by December 31, 2025. Rather than shuttering Centralia, however, TransAlta plans to reengineer the plant as a natural gas facility, significantly reducing its pollution load to the surrounding environment and significantly increasing both its utility and capacity for servicing the region's power needs. DOE's Order issued mere days before the final cessation of coal operations to transition to gas—commands Centralia to continue its outdated life as a coal plant throws these efforts into chaos, all for reasons that defy both the law and common sense.

DOE should immediately withdraw the Order. As set out below, DOE's Order is unlawful, internally inconsistent, misguided, and based on incorrect assertions about the

Northwest's power infrastructure and operation. DOE's assertions of unfettered authority to usurp state and regional power planning based largely, if not entirely, on generalized long-range concerns directly conflict with the Federal Power Act. That Act, confirmed by decades of DOE's own exercise of authority under the Act, expressly limits DOE's authority to *actual* emergency situations involving war or the sudden and unexpected loss of power. Neither situation exists here. DOE's Order renders Congress's clear guardrails on this power effectively meaningless.

It also does so for reasons untethered from any actual immediate or even long-range problem with the Pacific Northwest's grid. DOE's order presents no legitimate factual basis— let alone substantial evidence—to support its claim that maintaining Centralia as a coal-fired facility is necessary to "meet" any emergency. In fact, DOE's Order is detrimental to the public interest by undermining the very grid stability it purports to protect in a way that will be enormously detrimental to the Northwest's rate payers. In doing so, DOE both misreads and misrepresents the sources it cites as support for an emergency—to the point that DOE's Order can only be explained as aimed to benefit the coal industry rather than at any true "emergency" in the Northwest.

Even putting aside the Order's failure to comply with the Federal Power Act's threshold limitation on emergency use, the Order is arbitrary and capricious and contrary to law. It fails to properly identify or clarify the appropriate entities that have any authority to direct TransAlta Centralia's operation, fails to comply with section 202(c)'s directives to "best" meet the emergency and public interest, and is internally inconsistent, arbitrary, and unlawful in its statement that "continuous operation" is necessary. More than that, the Order

5

throws TransAlta Centralia's planned upgrades in power capacity and functionality into chaos, in direct conflict with the region's *real* energy needs in 2028.

For these, and a host of other reasons detailed below, DOE should withdraw the Secretary's Order immediately.

## II.      STATEMENT OF ISSUES AND SPECIFICATIONS OF ERROR

As set out in detail in Section VI below, Washington submits the following statement of issues and specifications of error:

A.      The Order is arbitrary, capricious, and contrary to law because section 202(c) and DOE's implementing regulations do not authorize emergency actions based on hypothetical scenarios, long-term forecasts, and/or generalized, unsupported statements about the nation's energy system – the only basis for this Order. Section 202(c) applies only in cases of wartime or actual emergencies involving unforeseen and imminent losses of power. DOE's regulations and past practice reflect that understanding. DOE's Order deviated from it. Further, the DOE Secretary does not have the discretion to bypass these statutory and regulatory limits. 16 U.S.C. § 824a(c); 10 C.F.R. § 205.371; *Richmond Power and Light v. FERC*, 574 F.2d 610, 615 (D.C. Cir. 1978) (noting that section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances"); *Otter Tail Power Co. v. Fed. Power Comm.*, 429 F.2d 232, 233-34 (1970). *See infra* § VI.A.; Ex. 35 at 29-31 (States' Request for Rehearing, August 6, 2025).

B.      The Order is arbitrary, capricious, and contrary to law because:

- It seeks to do that which Congress has expressly reserved to states and regional planning authorities: address generalized short- and long-term resource adequacy concerns. Section 202(c) does not grant DOE the regulatory authority over resource adequacy, allow DOE to issue orders based on *future* energy needs, or provide a mechanism for DOE to advance the President's policy preference for coal. Any finding otherwise is an absurd construction of the Federal Power Act that does not survive scrutiny, *Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315 (1938), especially given that the Order springs from "an unheralded power representing a transformative expansion in its regulatory authority." *W. Virginia v. EPA*, 597 U.S. 697, 724-25 (2022) (cleaned up); 16 U.S.C. § 824(a). *See infra* § VI.B; Ex. 35 at 31-34.

6

- It was issued pursuant to an unlawful "protocol" and methodology for section 202(c) orders. That protocol, and DOE's Order here, is inconsistent with existing regulations and was not developed after public notice and an opportunity to comment. DOE's regulations and past practice direct a case-by-case analysis of specific, temporary shortages in particular situations, considering the imminent projected load and power sources in a given region, and based on a detailed application. *See* 10 C.F.R. §§ 205.371, 205.373, 205.375; *see generally* §§ 205.370 - 205.379. Here, DOE issued this Order *sua sponte*, based on its flawed methodology that has never been subjected to public comment, and on long-range supply and demand forecasts or hypothetical future events. *See* Exec. Order No. 14262, 90 Fed. Reg. 15521, 15521 (Apr. 8, 2025); 5 U.S.C. §§ 553, 706; *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99–100 (1995); *Children's Health Care v. Centers for Medicare & Medicaid Servs.*, 900 F.3d 1022, 1025 (8th Cir. 2018). *See infra* § VI.A(2) (explaining that DOE's "emergency" finding is inconsistent with past regulations); B (explaining that DOE's current practice exceeds the bounds of section 202(c) and DOE's historical understanding); Ex. 35 at 34-38 (explaining that DOE's new standards and definition of emergency violates the APA's notice-and-comment requirement).

C. The Order is arbitrary, capricious, and not based on substantial evidence because:

- The Order relies on statements in a North American Electric Reliability Corporation ("NERC") Winter Reliability Assessment that are taken out of context and misrepresented.

- The Order relies on a PowerPoint presentation from Energy + Environmental Economics ("E3 PowerPoint") that does not describe an emergency or find that no other source could meet a potential energy shortfall. DOE also fails to examine or disclose the assumptions, data, or methods used in creating the E3 PowerPoint.

- The Order is arbitrary and capricious because DOE relied in part on its flawed methodology, published in July 2025, which suffers from numerous analytical, mathematical, and empirical flaws. DOE's methodology also ignores reasonable alternatives, or in some cases actively prevents viable alternatives with no explanation, such as expanding interregional transmission, batteries, renewable energy, incorporating data centers flexibly into load, and the existing resource adequacy mechanisms that are used by states and regional grid operators to assess reliability and respond to resource adequacy needs.

7

- DOE failed to reasonably explain why its methodology supports issuing an emergency order here, when the methodology found the system in the Northwest was currently reliable and Washington meets DOE's reliability standard in the short and long-term.

- DOE relies on generalized and unsupported presidential statements in executive orders, which are not evidence and which direct action that violates the Administrative Procedure and Federal Power Acts.

None of these documents are reasoned, evidentiary bases to find that an emergency exists. *See* 16 U.S.C. § 825*l*(b); 5 U.S.C. § 706(2)(E); *Emera Maine v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017) (same and noting that Federal Power Act orders must also be either "consistent with past practice or adequately justified"); *see also, e.g., Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). *See infra* § C; Ex. 35 at 21-38 (explaining problems in DOE's methodology).

The Order is also arbitrary, capricious, contrary to law, and unsupported by substantial evidence in violation of the Administrative Procedure and Federal Power Acts because:

- It fails to resolve ambiguity and creates confusion with regard to the entities that have authority to order TransAlta Centralia to run. *See infra* § D(1).

- It fails to comply with section 202(c)'s requirement to craft terms that "best meet the *emergency* and serve the public interest," 16 U.S.C. § 824a(c)(1), or to examine reasonable alternatives to issuing an emergency order, *see Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021). Those alternatives include energy imports and exports, existing reliability planning mechanisms, or alternative energy sources. *See infra* § D.2, D.4; Ex. 35 at 22-25.

- DOE failed to consider the operational status of Centralia, its limitations to meeting peak energy needs, or its environmental and economic constraints. DOE also *failed* to consider other evidence that conflicts with its findings that an emergency exists, including state regulators' response and assessment of the NERC Winter Reliability Assessment and E3 PowerPoint, the availability of hydroelectric power, existing capacity resources in the WECC Northwest, or utilities' Integrated Resource Plans. *See infra* § C.4, D.2, D.4. E.1.

- In *stating* a need for "continuous operation," DOE fails to account for the fact that Centralia's power has no current customers or section 202(c)'s temporal and environmental limitations. *See* 16 U.S.C. § 824a(c)(2). *See infra* § D.3.

- It *risks* destabilizing the grid it purports to protect because it interferes with and disrupts utilities' existing resource plans. *See infra* §§ D.3-4, E.

- It pursues an extra-statutory motive of preserving aging and uneconomic coal-fired *power* plants at consumer expense, which contradicts the Federal Power Act's express goal of preserving just and reasonable rates and preventing undue discrimination or preference. The Order also establishes an unlawful preference for coal-fired power over other alternatives, including but not limited to natural gas, in violation of the Federal Power Act's prohibition on undue discrimination or preference. The Administration's energy actions, when viewed collectively, also demonstrate that DOE has prejudged the outcome of this proceeding and intended its analysis to reach only one result: preventing the retirement of fossil-fueled power plants. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019); *Gresham v. Azar*, 950 F.3d 93, 104 (D.C. Cir. 2020), *vacated as moot*, *Becerra v. Gresham*, 142 S. Ct. 1665 (2022); *see infra* § D(5); Ex. 35 at 27-29.

D.  The Order is arbitrary, capricious, and contrary to law because DOE failed to consider important factors affecting the public interest or explain why its order serves the public interest notwithstanding these factors. Specifically, DOE's order undermines the Northwest's energy market, leading to increases in electricity rates and harm to consumers. The Order could force curtailment of cheaper and abundant hydropower. It will also derail the long-planned conversion of TransAlta Centralia to natural gas, which utilities have determined to be the best way to meet the region's future energy needs. Running Centralia will also result in significant air pollution, harming human health and the environment. 16 U.S.C. § 824a(c)(1); *Michigan v. EPA*, 268 F.3d 1075, 1981 (D.C. Cir. 2001). *See infra* § E.

E.  In failing to assess the environmental consequences of a major federal action significantly affecting the human environment, the Order violates the National Environmental Policy Act. 42 U.S.C. § 4321, *et seq*.

### III.    MOTION TO INTERVENE AND INTERVENOR'S INTEREST

The State of Washington moves to intervene in this proceeding and become a party for purposes of Section 313*l* of the Act, 16 U.S.C. § 825*l*. *See* RCW 43.10.030(1). *See also City of Seattle v. McKenna*, 172 Wash. 2d 551, 259 P.3d 1087 (2011) (noting that RCW 43.10.030(1) grants the Attorney General discretionary authority to act in any forum "on a matter of public concern" (internal quotations and citations omitted). The TransAlta

Centralia Plant is located in the State of Washington, and the State is aggrieved by the Order in several ways.

First, Washington has a direct contractual interest in the retirement of Centralia on December 31, 2025. In 2011, the Washington Legislature passed the Coal-Fired Electric Generation Facilities Bill, SB 5769. S.B. 5769, 62nd Leg., (Wash. 2011). That Act directed Centralia to comply with the state's greenhouse gas emission performance standards by the end of 2020 for its first boiler and the end of 2025 for the second. RCW 80.80.040(c). It also directed the Governor to enter into a Memorandum of Agreement with the owners of Centralia. RCW 80.80.100. The State and TransAlta signed the Memorandum of Agreement in 2011, which was amended in 2017 to specify that Centralia could continue to generate power, so long as it was not coal-fired power. Ex. 5 (2011 MOA); Ex. 6 at section 1 (amending Subsection D(5) of the MOA) (2017 MOA Amendment).

The Memorandum of Agreement required Centralia to permanently cease coal power generation from one boiler in 2020, and the other boiler in 2025. Ex. 5; Ex. 6. In exchange for that commitment, the State of Washington confirmed that the facility met the greenhouse gas emissions performance standards and other environmental requirements of the State, guaranteed the ability of TransAlta to enter into long-term power contracts for the sale of electricity from Centralia, and promised to maintain sales and use tax exemptions for the plant. Ex. 5. The State of Washington kept those promises, sacrificing tax revenue and granting TransAlta flexibility with regard to operational controls in exchange for Centralia ceasing coal operations by the end of 2025. *See, e.g.*, RCW 82.08.811 (exempting the sale of coal from the state Retail Sales Tax); RCW 82.12.811 (exempting coal from the state Use Tax);

RCW 70A.65.080(7)(c) (exempting Centralia from the greenhouse gas limits of the Climate Commitment Act); RCW 19.405.030 (allowing Centralia to recover its decommissioning and remediation costs in rates).[1] Because the Order deprives Washington of the benefit of its bargain under the Memorandum of Agreement, Washington suffers distinct harms as a result of the Order.

Second, Washington has a direct regulatory interest in Centralia's retirement by the end of 2025 because continued coal-fired operations will directly violate state law as well as a regulatory order issued by the Department of Ecology. Centralia is subject to Washington's emissions performance standard (EPS) for baseload electric generation in the state, RCW 80.80.040. The EPS is essentially a carbon intensity standard, limiting the volume of greenhouse gas emissions that an electric generating facility may emit per megawatt-hour of power produced. RCW 80.80.040(1), (3). This standard cannot generally be met by coal-fired plants without employing carbon sequestration technology.[2] The application of this standard was delayed for TransAlta until the scheduled shutdown of its two boilers at the end of 2020 and 2025. RCW 80.80.040(3)(c) ("A coal-fired baseload electric generation facility in Washington that emitted more than one million tons of greenhouse gases in any calendar year

---

[1] *See e.g.* RCW 82.08.811 (exempting the sale of coal from the state Retail Sales Tax); RCW 82.12.811 (exempting coal from the state Use Tax); RCW 70A.65.080(7)(c) (exempting Centralia from the greenhouse gas limits of the Climate Commitment Act); RCW 19.405.030 (allowing Centralia to recover its decommissioning and remediation costs in rates).

[2] The emission performance standard is currently set at 876 GHG/MWh. WAC 173-407-130 (setting forth EPS standard in Ecology's EPS rules). *See* RCW 80.80.040(1)(providing procedures for setting standard); RCW 80.80.050 (setting out Washington Department of Commerce's role to set standard); WAC 194-26-020 (Washington Department of Commerce setting standard).

prior to 2008 must comply with the lower of the following greenhouse gas emissions performance standard such that one generating boiler is in compliance by December 31, 2020, and any other generating boiler is in compliance by December 31, 2025: [referencing process for setting standard].").

TransAlta relied on the 2025 retirement of its last coal-fired boiler as its means of complying with Washington's emissions performance standard. Ex. 7 at 2, §D(a)(1) (2011 BART Order) ("The plant owner, the Governor's office, and environmental organizations anticipate that compliance with this requirement will be accomplished by decommissioning the [coal-fired] units."). Further, the Washington Department of Ecology issued Centralia a regulatory order imposing Best Available Retrofit Technology ("BART") requirements pursuant to its authority under the Washington Clean Air Act and the visibility and regional haze programs of the Federal Clean Air Act. The BART order specifically requires TransAlta to "permanently cease burning coal" and decommission both coal-fired units at the plant by 2025. Ex. 7 at 4, condition; Ex. 8 at 3, condition 3 (2020 BART Order, Revision 2). Thus, continued operations of TransAlta's coal-fired boilers, without substantial investment in new emissions-lowering technology, will directly violate Washington's Emission Performance Standard and BART order.

Third, Washington residents will suffer health and environmental harms because of the Order, with costs to the State resulting from the heightened burden on state-provided insurance and public hospitals. As detailed below in Section IV(H)(2), continuing coal operations at Centralia will increase air pollution in Washington, harm Washingtonians' health imposing direct harms on the State and its agencies, and impair visibility at

12

Washington's iconic natural areas such as the Mount Rainer National Park. Ex. 10 at ¶ 7 (Declaration of Gary Palcisko).

Fourth, these environmental harms will frustrate the Washington State's regulatory interests, harm the State's public trust resources, and pose a financial burden to the State. For example, Centralia is the highest source of greenhouse gas emissions in Washington. Ex. 12 (Top 10 Stationary Sources of GHG Emissions in WA, 2022); Ex. 13 (Top Washington Greenhouse Gas Emissions Sources, 2023). By mandating the continued operation of the Centralia Coal Plant, the Order will make it harder for Washington to meet its statutory greenhouse gas emissions reduction requirements. RCW 70A.45.020. And continued burning of coal will also hinder Washington's investigation and cleanup of the site under the Model Toxics Control Act (MTCA). *See* Ex. 52 at ¶ 16 (Declaration of Thomas Middleton). Under MTCA, the Washington Department of Ecology is responsible for investigating contamination, developing cleanup action plans, and identifying potentially liable parties (PLPs) for sites contaminated with hazardous substances. *Id.* at ¶ 4-14.

A series of investigations at Centralia found six hazardous substances in the soil, nine contaminants for groundwater, and nine substances in the sediment at the Site above MTCA cleanup levels. *Id.* at ¶ 7. The Order will prolong the contamination of the Site, exacerbating the time and resources the State must expend to investigate and plan its cleanup. *Id.* at ¶ 14. The Order will also cause continued aerial emissions of hazardous substances, which have the potential to settle on and contaminate thousands of properties and create thousands of potentially liable parties under MTCA. *Id.* at ¶ 14. Determining liability and cleanup responsibility for so many sites is resource-intensive for the State. *Id.* Finally, the Centralia

13

Coal Plant uses settling ponds containing byproducts from burning coal, many of which are also hazardous substances subject to MTCA. *Id.* at ¶ 15. The Order will require TransAlta to continue using the settling ponds, preventing the Washington Department of Ecology from performing cleanup of the ponds, and potentially posing risks related to groundwater contamination. *Id.*

Fifth, Washington's electricity grid will be less reliable because of the Order. In addition to the direct interest in grid reliability to power state buildings, public schools, and hospitals, Washington has a regulatory interest in maintaining grid reliability.[3] Centralia experiences extended periods of non-operation. In the years 2023-2025, the Centralia Plant Unit #2 shut down 29 times, 25 of which were forced outages. Ex. 11 at ¶ 7 (Declaration of Clinton Lamoreaux). Additionally, when coal-powered generation facilities do shut down, they have a longer start-up time than natural-gas-powered facilities, which makes them less responsive to fluctuating energy demands. Ex. 14 (Owen Comstock, *About 25% of U.S. power plants can start up within an hour,* U.S. ENERGY INFO. ADMIN., November 19, 2020). This is especially true for "cold" startups, where the facility must start up after an extended period of nonactivity. Cold startups take longer than startups following a briefer outage where the facility components are still warm from recent operation. Ex. 11 at ¶ 8. It took Centralia anywhere from 11 to 18 hours to reach its operational capacity during the six cold startups

---

[3] The Washington Utilities and Transportation Commission (UTC) is tasked with regulating IOUs such that any services rendered are "adequate and efficient," RCW 80.28.010(2), (11); RCW 19.405.080(2)(a) (reporting requirements concerning reporting on meeting load, reliability standards, and resource adequacy); RCW 80.28.130 (granting UTC authority to order an electric utility to make improvements to their system to "secure adequate service or facilities").

14

from the fourth quarter of 2024 through the third quarter of 2025. *Id.* Plus, because Centralia is likely overdue for maintenance, it could face more frequent shutdowns than in previous years. Ex. 11 at ¶ 10-11.

This will be exacerbated by the apparent staffing shortages Centralia faces. Ex. 11 at ¶ 12. Finally, aside from in limited circumstances, Washington utilities are prohibited from purchasing power from coal plants after December 31, 2025. RCW 19.405.030. Because of these frequent shutdowns, the length of time needed to start up the plant, the uncertainties around maintenance and staffing, and the legal barriers to purchasing power from Centralia, coal operations at Centralia are less reliable, efficient, or economical than other alternatives. However, the Order will force ratepayers to pay for Centralia's operations rather than investing in alternatives, resulting in a loss of capacity and flexibility for Washington's electricity grid.

Sixth, Washington agencies, households, and businesses will likely pay higher electricity bills because of the Order, and Washington has a regulatory interest in keeping electricity rates fair and affordable.[4] Under the most recent Power Purchase Agreement (PPA) which expired on December 31, 2025, the price from Centralia's coal is significantly higher than the wholesale energy market price, at $62.04 per MWh versus the wholesale market price of $54.32 per MWh. Ex. 41 at ¶ 15 (Declaration of Callahan Moriyasu). It is also unclear whether Centralia will be safe to operate. Recent inspections and the most recent quarterly

---

[4] *See e.g.* RCW 80.28.010(1) (The UTC is also tasked with regulating IOUs in the public interest and ensuring rates for "any service rendered" are "just, fair, reasonable, and sufficient."); The Clean Energy Transformation Act requires utilities to achieve targets at the "lowest reasonable cost," RCW 19.405.040(6)(a)(i), -.050(3)(a),-.060(1)(c)(ii), -.080(2)(b).

report indicate that Centralia's pollution control technology requires maintenance or repairs. Ex. 11 at ¶ 10-11. Further, recent staffing shortages may have led to the violations that Centralia was noticed for in December. Ex. 11 at ¶ 12. TransAlta will likely have to expend resources to quickly hire and train new staff to operate the facility. TransAlta will no doubt seek to recover those costs through its rates. Although the precise amount of the costs is not yet known, by ordering the continued operation of TransAlta's Centralia Coal Plant, the Order ensures that Washington ratepayers will see unreasonably higher electricity bills, in contradiction with Washington's statutory mandate to secure rates that are "just, fair, reasonable, and sufficient." RCW 80.28.010(1).

## IV. BACKGROUND

### A. The Long-Planned Retirement of TransAlta's Coal-fired Units

#### 1. The TransAlta Centralia coal-fired power plant

The Centralia generating plant is a coal-fired power plant located just east of Centralia in Lewis County, Washington that is owned and operated by TransAlta Generating LLC ("TransAlta Centralia" or "Centralia"). Centralia was built in the late 1960s and originally consisted of two coal-fired boilers. Ex. 15 (The Daily Chronicle, *Plant Job Underway*, June 14, 1968); Ex. 17 at 2 (2021 Title V Air Operating Permit Basis Statement). The first boiler went into operation in 1971 and the second in 1972. The first boiler, known as "Unit 1" was retired in 2020, and the second boiler, "Unit 2," was scheduled to retire by December 31, 2025. Ex. 17 at 2 (2021 Title V Air Operating Permit Basis Statement). Centralia currently has a nameplate generating capacity of 729.9 MS and a net capacity of 670 MW. Ex. 18 at "Operating" tab, row 5359, plant name "TransAlta Centralia Gen LLC" (U.S.

16

Energy Information Administration, Form EIA-860, Schedule 3: Generator Data (2024) (2024 Form EIA-860).

TransAlta Centralia generates electricity by combusting pulverized coal in a boiler to generate pressurized steam to drive a turbine. Ex. 17 at 2 (2021 Title V Air Operating Permit Basis Statement). This produces emissions of sulfur dioxide (SO2), oxides of nitrogen (NOx), particulate matter (PM), carbon monoxide (CO), volatile organic compounds (VOCs), and certain hazardous air pollutants including mercury. Ex. 17 at 2. TransAlta Centralia has been one the largest historical sources of NOx and $SO_2$ in Washington, annually emitting over 5,000 tons of NOx and 1,500 tons of SO2 in 2011–18. Ex. 19 at 74 (2022 Visibility SIP). Since closure of Unit 1 of Centralia in 2020, emissions have decreased by approximately half, but these emissions still rank amongst the highest in the State for a single source. Ex. 19 at 74. TransAlta Centralia is also the largest single stationary source of greenhouse gas emissions in the state with, over 3.9 million metric tons of annual CO2 emissions in 2022, and over 4.5 MMT CO2 in 2023. Ex. 12; Ex. 13. These pollutants have significant adverse health and environmental impacts. Ex. 10 at ¶¶ 7–14. TransAlta Centralia's emissions of particulate matter, $SO_2$, and nitrogen oxides (NOx) also impair visibility in Washington's iconic natural areas, including at Mount Rainer National Park, located only 50 miles from the plant. Ex. 19 at 172 (2021 Visibility SIP).

### 2. Agreement reached over a decade ago to transition TransAlta away from Coal

In 2011, Washington, TransAlta, environmental groups, and the local community worked together to establish a plan to transition Centralia away from coal towards cleaner fuels. Ex 20 (TransAlta Power Plant, Department of Ecology). The Washington Legislature

passed the Coal-Fired Electric Generation Facilities Act, Engrossed Second Substitute S.B. 5769, Ch. 180, Wash. Laws of 2011, requiring TransAlta Centralia to comply with the state's greenhouse gas emission performance standards beginning at the end of 2020 for Unit 1 and the end of 2025 for Unit 2. Ch. 180, Wash. Laws of 2011 § 103; RCW 80.80.040(1), (3)(c). The Washington Department of Ecology then issued a Best Available Retrofit Technology (BART) order to TransAlta pursuant to its authority under the Washington Clean Air Act and the visibility and regional haze programs of the Federal Clean Air Act. The BART Order recognized that TransAlta Centralia would comply with the greenhouse gas emissions standards through the phased retirement of its coal-fired boilers. Ex. 7 at 2 §D(a). The BART order further specifically requires TransAlta to "permanently cease burning coal" and decommission both coal-fired units at the plant by 2025. Ex. 7 at 4, condition 4; Ex. 8 at 3, condition 3. By the end of 2011, the State and TransAlta signed a Memorandum of Agreement, as required by SB 5769, in which TransAlta formally agreed to the phased shutdown of both coal-fired boilers by the end of 2020 and 2025 respectively. Ex. 5 at 1 (Recital D) (TransAlta agreed to "permanently cease power generation operations of one Boiler in 2020 and the other Boiler in 2025.").

In 2017, the MOA was amended to, among other things, change the scope of power generation activities that TransAlta Centralia was required to cease in 2020 and 2025. While the 2011 MOA originally requiring cessation of all "power generation operations" in the two boilers, the amendment signed in 2017 narrowed this to requiring cessation of only "*coal-fired* power generation operations" of each boiler. Ex. 6 at Section 1 (amending Subsection D(5) of the MOA). This would allow TransAlta to continue generating electricity at Centralia upon

18

the conversion of its boilers to cleaner fuels such as natural gas. Ecology's 2020 revision to TransAlta's BART Order reflected this, acknowledging the possibility of continued operation of the Centralia plant with cleaner fuels. Ex. 9 at 3 (2020 Bart Order TSD at 3) ("If power generation of the coal plant is replaced with a different form of combustion power generation (e.g., natural gas), the impact to regional haze would have to be analyzed separate from this BART order modification.").

### 3. TransAlta coal-to-gas conversion project

TransAlta has now developed a plan to convert TransAlta Centralia to natural gas.[5] On December 9, 2025, TransAlta announced a long-term agreement with Puget Sound Energy to perform a coal-to-gas conversion on Centralia's Unit 2 facility with a planned contracted capacity of 700 MW to deliver power to Puget Sound Energy ("PSE") through 2044. Ex. 20 at 1 (Press Release from TransAlta dated Dec 9, 2025,). TransAlta expects to invest approximately $600 million in capital expenditures in the project, and is targeting late-2028 to begin commercial operations, which will reduce emissions by approximately 50%. *Id*. TransAlta's President and Chief Executive Officer, John Kousinioris explained that TransAlta was "pleased to extend the useful life of this asset and support the ongoing reliability needs of PSE and, by extension, its customers." *Id*.

---

[5] The State cites to the announced conversion to natural gas in keeping with industry practice of including announced planned additions to generation. To finalize those plans, TransAlta will need numerous permits and approvals from the State for the conversion to occur. Nothing within this filing should be interpreted as any agency or arm of the State presupposing or otherwise commenting on the merits of those permits or approvals.

After conversion, TransAlta Centralia will operate only when there is high demand, with the majority of its hours of operation expected to be at half load (~350 MW) or at minimum stable generation load (~190 MW), but with the ability to quickly ramp up to high loads when needed by the grid. Ex. 21 at 1-1 (December 2025 TransAlta PSD Permit application). Conversion of Centralia to natural gas will dramatically reduce TransAlta Centralia's emissions of almost all pollutants, including large and fine particulate matter, nitrogen oxides (NOx), carbon monoxide (CO), sulfur dioxide ($SO_2$), lead, and carbon dioxide ($CO_2$). Ex. 21 at 3–4 (Table 3-1).

**B.      Washington Recently Assessed and Confirmed Resource Adequacy in Our Region**

Existing regulatory mechanisms govern both federal requirements for reserve margins and state resource adequacy determinations. Indeed, in its July 2025 resource adequacy report, DOE wrote, "DOE acknowledges that the resource adequacy analysis that was performed in support of this study could benefit greatly from the in-depth engineering assessments which occur at the regional and utility level….entities responsible for the maintenance and operation of the grid have access to a range of data and insights that could further enhance the robustness of reliability decisions, including resource adequacy, operational reliability, and resilience." Ex. 4 at i (DOE 2025 Resource Adequacy Report).

In this, DOE is correct, and Washington's Utilities and Transportation Commission does precisely that, and held three meetings in 2025 in conjunction with Washington's Department of Commerce to consider information from industry experts from Washington utilities, regional planning organizations, transmission operators, reliability experts, and the public. Ex. 53 ¶¶ 4-6 (Declaration of Brian Rybarik, Chair of the Washington Utilities and

20

Transportation Commission). As a matter of best practice, resource adequacy is an integral part of prudent, least-cost, utility planning in every state and region of the country. *See* Ex. 55 (*Best Practices in Integrated Resource Planning,* Synapse Energy Economics & Lawrence Berkeley National Laboratory (Nov. 2024). Following this best practice, the Washington Utilities and Transportation Commission, and the November 2025 Winter Readiness Resource Adequacy meeting, Washington planners invited presentations from NERC, the Western Electricity Coordinating Council, Arne Olson, the author of the E3 PowerPoint, as well as from Washington utilities. Ex. 22 (Nov. 19, 2025 Letter Re: Summary of the 2025 Long-term Resource Adequacy Meeting) (The meeting agendas, recordings of each meeting, and presentation materials are available on the Department of Commerce webpage and the Utilities and Transportation Commission webpage.

By contrast, DOE plays no role in the complex proceedings to determine either reserve margins or specific resource adequacy conclusions. And, as far as Washington can determine, DOE failed to attempt consultation with any of the local, regional, or national reliability experts in issuing its emergency order regarding TransAlta. Using the information from the entities responsible for maintenance and operation of the grid, in November 2025, Washington's utility regulators confirmed the adequacy of generation resources for our state's electricity grid. Ex. 22. In a letter summarizing the September meeting, Washington state utility regulators assessed resource adequacy as follows:

> Reliability assessments presented at the September 22 meeting indicated that the Northwest's electric grid meets national resource adequacy criteria over the near and medium terms under a broad range of operating conditions. As a region assessed as "normal risk," the Northwest has a low likelihood of electricity supply shortfall.

However, "normal risk" is not the same as "no risk." Although areas categorized as normal risk are expected to have sufficient resources for plausible extreme conditions, they are not immune to the effects of high-impact, low frequency weather events that affect demand and generation simultaneously. Presentations also indicated that normal conditions are shifting with the impacts of climate change, large new electricity uses like data centers and building and vehicle electrification. If significant new electricity usage materializes and more extreme weather continues, the grid could face reliability challenges. Presentations emphasized that no electric system is 100% resource adequate, and there is no resource that provides perfect capacity. We also underscore that it is important to incorporate risks associated with fossil generating resources, including fuel supply risk and weather-driven forced outages.

Ex. 22 at 1–2. Washington's utility planners also considered Washington's winter readiness, reporting that:

Winter reliability assessments, presented by regional resource adequacy experts, the North American Electric Reliability Corporation and Western Electricity Coordinating Counsel, indicate the Northwest's electric grid meets national resource adequacy criteria under normal conditions with winter. Extreme weather poses and elevate risk of short-duration outages absent additional measures, such as utilities following their emergency policies and procedures for firing up their backup generators. The Bonneville Power Administration and Washington utilities do not forecast outages this winter.

At the November 4 Meeting, the Bonneville Power Administration and utilities shared steps they are taking in preparation for the season. This includes daily monitoring of weather conditions, regular calls with reliability coordinators and fuel suppliers, maintenance of the system, and updates to their operations and emergency planning procedures. Utilities reported they have maximized hydro and natural gas storage ahead of winter and ensured facilities are operating properly. Some, such as Seattle City Light and Puget Sount Energy, noted voluntary customer curtailment programs intended to help offset electricity demand if needed.

Ex. 50 at ¶ 10 (Declaration of Andrew Reeves); Ex. 50-4 (Summary of 2025 Winter Preparedness Meeting). The Chair of the Washington Utilities and Transportation Commission reviewed DOE's emergency order in light of his industry experience, his review of resource adequacy plans filed with the Commission, the information from national, and

22

regional experts and concluded, "I do not find that DOE's Order's conclusions that an energy emergency exists in the coming winter months credible, nor do I agree that action under the DOE order (keeping the Centralia coal plant available) will assist in solving the unlikely extreme conditions that could lead to an energy emergency." Ex. 96 at 3.

Tellingly, DOE's flawed July 2025 Resource Adequacy Report found that even assuming all firm planned retirements, including TransAlta, and assuming minimal resource additions the Washington region faces no significant long term reliability risk:

Figure 3. Mean Annual NUSE by Region (2030) -Plant Closures

Ex. 4 at 6 (DOE 2025 Resource Adequacy Report). The deep methodological flaws in DOE's report are discussed at greater length below. But for the purposes of this review, all information agrees; even under DOE's worst case scenario analysis, the Washington region is one of the few regions in the country in which reliability is not a concern before 2030. The

23

reality is that there is no reasonable dispute that there is no energy emergency in the Washington to justify an order to keep TransAlta available as a coal plant.

## C.       DOE's Historical Use of Section 202(c)

Prior to 2025, DOE has used section 202(c) sparingly, and only in response to concrete, particularized emergencies subject to limitations to ensure that DOE's reach extends no further than necessary to address the emergency at hand.

As discussed below, section 202(c) of the Federal Power Act, 16 U.S.C. § 824a(c), grants the Secretary of Energy the authority to issue orders that require the "temporary connection[]" of power plants and the "generation, delivery, interchange, or transmission of electric energy" in order to "best meet the emergency and serve the public interest." 16 U.S.C. § 824a(c)(1). The law also effectively immunizes noncompliance with "any Federal, State, or local environmental law or regulation" associated with an action or omission necessary to comply with a 202(c) order." 16 U.S.C. § 824a(c)(3). However, the Act also imposes significant limits on any 202(c) order that "may result in a conflict" with a pollution control requirement, including limiting the hours of operation of such facilities and limiting the order to 90-days, with extension possible. 16 U.S.C. § 824a(c)(2) and (4).

That authority originated as a wartime power granted in 1935 to what was then the Federal Power Commission in order to guard against energy-related shortages that were viewed as hampering national security during World War I. *See* Benjamin Rolsma, *The New Reliability Override*, 57 CONN. L. REV. 789, 798-802 (2025). The then-Federal Power Commission did not invoke its emergency authority until the United States entered World War II. *See id.* at 803. Section 202(c) orders were issued repeatedly during the war, primarily

24

to order interconnection between utilities, but the provision was rarely invoked once the war ended. These "interconnection" orders between utilities were more necessary at a time when America's electric grid was more fragmented, monopolized, and less diversified than it is today. *Id.* at 802-804. Interconnection was seen as a powerful means to increase grid reliability, but the federal government largely lacked regulatory power over the electric sector at the time. *Id.* at 801-802. A number of organizational changes ensued in the decades following the War and the provision's authority eventually came to rest with the Secretary of Energy. *Id.* at 803-04; 42 U.S.C. § 7151(b).

DOE has historically invoked its 202(c) emergency sparingly to respond to clear-cut and imminent emergencies to avoid immediate significant blackouts. *See* Rolsma, *supra*, at 805-509. Between enactment of the Department of Energy Organization Act in 1977, Pub. L. No. 95-91, and the end of 2024, DOE appears to have used section 202(c) twenty times, not counting amendments and extension orders, prior to 2025. *See* Ex. 23-1 through 23-20. DOE's first usage of section 202(c) came in response to the California Energy Crisis in 2000. Ex. 23-1 (DOE, *Order Pursuant to Section 202(c) of the Federal Power Act*, December 14, 2000). Since then, by far the most common usage—comprising 14 of 20 instances—has been in response to extreme weather events such as hurricanes, extreme cold, and extreme heat. *See* Exs. 23-2 and 23-3 (DOE Order Nos. 202-05-1 & -2, September 28, 2005) (response to Hurricane Rita); Ex. 23-4 (DOE Order No. 202-08-1, September 14, 2008) (Hurricane Ike); Ex. 23-5 (DOE Order No. 202-20-1, August 27, 2020) (Hurricane Laura); Ex. 23-13(DOE Order No. 202-24-1, October 9, 2024) (Hurricane Milton); *See* Ex. 23-7 (DOE Order No. 202-21-1, February 14, 2021) (extreme cold); Ex. 23-11 (DOE Order No. 202-22-3 (December 23, 2022)

25

(extreme cold); Ex. 23-12 (DOE Order No. 202-22-4, December 24, 2022) (extreme cold); Ex. 23-6 (DOE Order No. 202-20-2, September 6, 2020) (extreme heat in California); Ex. 23-8 (DOE Order No. 202-21-2, September 10, 2021) (extreme heat, wildfires and drought in California); Exs. 23-9, 23-10 (DOE Order Nos. 202-22-1 & 2, September 2022) (same).

In each of these weather-driven cases, the exercise of emergency power was requested by the relevant system operator or responsible utility, or both. And, in each, DOE carefully limited its remedy to ensure that generation facilities were only ordered to run in circumstances necessary to address the emergency and in a manner so as to minimize any conflict with environmental requirements. DOE also limited the duration of those orders to the minimum period necessary to address the emergency, typically lasting for a period of days to weeks. *See* Rolsma, at 839-42 tbl.1 (chronicling all section 202(c) orders issued "after dissolution of the Federal Power Commission").

The typical process for issuing a section 202(c) order is outlined by DOE implementing regulations at 10 C.F.R. §§ 205.370-379. In the normal course, requests for section 202(c) orders originate with a grid operator or utility facing an acute and unforeseen emergency that normal processes including demand response mechanisms are incapable of addressing, though they may be issued by DOE unprompted as well. *See* 10 C.F.R. § 205.370. Applications for section 202(c) orders made by outside entities are to include specific details to "be considered by DOE in determining that an emergency exists" and the appropriate intervention. 10 C.F.R. § 205.373. This includes "[d]aily peak load and energy requirements for each of the past 30 days and projections for each day of the expected duration of the

26

emergency," "[a] description of the situation and a discussion of why this is an emergency, . . . includ[ing] any contingency plan of the applicant and the current level of implementation," and "[a] description of efforts made to obtain additional power through voluntary means and the results of such efforts." 10 C.F.R. §§ 205.373(a)-(o).

Prior to 2025, DOE has used section 202(c) on only three occasions to delay the retirement of generation facilities[6]. These cases had key features in common. In each: (i) the order was requested by a system operator or governmental body; (ii) the generation facility had ceased or would soon cease operation due to an inability to comply with environmental laws; (iii) the request aimed to address a concrete and particularized emergency threatening an imminent loss of load; and, (iv) DOE tailored its order to go no further than necessary to address the emergency.

The first such instance came in 2004, when the District of Columbia's Public Service Commission requested an order directing the continued operation of a power plant located in Alexandria, Virginia, owned by the Mirant Corporation (Mirant). After its state regulator found the plant to be out of compliance with its air permit, Mirant abruptly announced that the plant would close. Ex. 23-1 at 1 (DOE Order No. 202-05-3, December 20, 2005) (explaining that Mirant provided emissions information to its state regulator on August 19, 2005, the regulator demanded immediate action that same day, and Mirant decided to cease operations on August 24). The D.C. Public Service Commission, supported by the local utility,

---

[6] Nor did the DOE's predecessor agency, the Federal Power Commission, use section 202(c) to delay retirement of any generation units between the section's enactment in 1935 and the formation of DOE in 1977. *See* Rolsma, 57 U. Conn. L. Rev. at 843-46.

27

PEPCO, explained that the Mirant facility directly powered downtown D.C. and that, without it, critical federal infrastructure faced an unacceptable risk of blackout.[7] *Id*. at 2. Before acting on the request, the Department commissioned an analysis from the Oak Ridge National Laboratory that confirmed the threat that the plant's closure would pose to reliability in D.C. *Id*. at 3–4. Based on that study, and based on the severity of the harm that could result from a prolonged power outage to downtown D.C., the Department issued an order directing the continued operation of the Mirant facility. *Id*. at 5–8. The Department took pains, however, to limit its order to go no further than necessary to address the emergency. The Department directed Mirant to maintain the facility's capacity to respond when needed, but only ordered it to run when one or both of the 230 kV transmission lines serving downtown D.C. were out of service. *Id*. at 10–11.

Twelve years later, in 2017, the Department received a request from the Grand River Dam Authority (GRDA), an Oklahoma state agency, to direct the continued operation of Unit No. 1 at the Grand River Energy Center. GRDA explained that the Grand River Energy Center was needed to provide dynamic reactive power support to the local grid, a fact confirmed by the region's Reliability Coordinator, the Southwest Power Pool (SPP). GRDA explained, however, that it would be unable to provide reactive power without action from ENERGY. Unit No.1, the subject of the request, had been ordered to close by an Administrative Order of the Environmental Protection Agency. Unit No. 2 had been struck by lightning and was under

---

[7] This incident eventually led to the statute's 2015 amendment, adding the provisions explicitly waiving environmental liability due to compliance with a section 202(c) order, leading the statute to read as it does today. *See* Rolsma, *supra*, at 806-08 (citing DEP'T OF ENERGY, ORDER NO. 202-05-3, December 20, 2005); 16 U.S.C. § 824a(c)(3)-(5).

repair. And, construction of the new Unit No. 3 had been delayed because flooding in Louisiana interfered with the fabrication of essential project materials. Ex. 24 (Letter Request of Grand River Dam Authority). The Department granted GRDA's request, ordering Unit No. 1 to remain in operation for 90 days or until Unit No. 2 or Unit No. 3 were brought online, whichever came first. Ex. 23-15 at 2 (DOE Order No. 202-17-1). The Department strictly limited its remedy, directing GRDA only to provide "dynamic reactive power support and not real power generation, and only when called upon by SPP for reliability purposes." *Id*.

Later that year, the Department received a pair of requests from PJM and Dominion Virginia (Dominion) to direct the continued operation of Units 1 and 2 of the Yorktown Power Station. PJM and Dominion explained that, based on PJM load flow studies, these units were necessary to prevent uncontrolled power disruptions and shedding of critical loads in the North Hampton Roads area east of Richmond. Ex. 23-16 at 1 (DOE Order No. 202-17-2). DOE issued an order directing Dominion to maintain operation at the two units, but to dispatch those units "only when called upon by PJM for reliability purposes." *Id*. at 2. DOE later extended the order several times due to the delayed completion of the transmission line needed to resolve the reliability issue. In doing so, DOE cited the "imminent" risk of load-shedding in the North Hampton Roads area absent extension of the order. Ex. 23-17 at Summary of Findings (DOE Order No. 202-17-4, Sept. 14, 2017). In its extension order, the Department continued to limit dispatch of the units only when called upon by PJM for reliability purposes and, further, directed PJM and Dominion to exhaust available resources, including demand response and behind-the-meter generation resources, prior to operating the units. Ex. 23-17 at 2 (DOE Order No. 202-17-4, September 14, 2017).

29

**D.** **White House Strategy to Prop Up the Coal Industry**

Since the 2025 Inauguration, the White House and DOE have sought to radically transform how section 202(c) of the Federal Power Act is applied—departing in almost every material respect from the longstanding approach described above. On January 20, 2025, his first day in office, President Trump issued Executive Order 14156, titled "Declaring a National Energy Emergency." 90 Fed. Reg. 8433. That unilateral declaration did not provide any factual support for its assertion that emergency conditions had overtaken the electricity grid.[8] *See Id.* (providing no factual support for claimed emergency).

On April 8, 2025, President Trump issued Executive Order 14262, titled "*Strengthening the Reliability and Security of the United States Electric Grid.*" 90 Fed. Reg. 15521 (April 14, 2025). The Executive Order was issued concurrently with three other executive actions aimed at supporting the coal industry that were announced at a White House political event explicitly focused on that objective. Ex. 56 (New York Times, *Trump Signs Orders Aimed at Reviving a Struggling Coal Industry*, April 8, 2025); Executive Order 14261, *Reinvigorating Americans Beautiful Clean Coal Industry and Amending Executive Order 14241*, 90 Fed. Reg. 15517 (April 14, 2025); Executive Order 14260, *Protecting American Energy from State Overreach*, 90 Fed. Reg. 15513 (April 14, 2025); *Regulatory Relief for Certain Stationary Sources To Promote American Energy*, 90 Fed. Reg. 16777 (April 21, 2025). This event, and the related Executive Orders, are part of several in a series of public

---

[8] That declaration is subject to a pending legal challenge by multiple states. *See* Complaint, *Washington v. Trump*, NO. 2:25-cv-00869 (W.D. WA May 9, 2025).

actions by the Administration aimed at reversing coal plant retirements and promoting fossil fuel generation.

Executive Order 14262 directs DOE to, among other things, streamline and expedite the issuance of emergency orders under section 202(c), specifically in order to "safeguard the reliability and security of the United States' electric grid during periods when the relevant grid operator forecasts a temporary interruption of electricity supply [that] is necessary to prevent a complete grid failure." Executive Order 14262 at section 3(a). It also directs DOE to take a subsequent series of actions related to national resource adequacy, including mandating:

- the development of a uniform methodology for assessing reserve margins and identifying "at-risk" regions;
- of a process by which the developed methodology and any analysis results are regularly assessed; and,
- of a protocol to identify generation resources within a region that are critical to system reliability, a mechanism under section 202(c) to ensure such generation resources are appropriately retained and, for resources over 50MW, are prevented from leaving the bulk-power system or converting their source of fuel.

Executive Order 14262 section 3(b), (c).

Executive Order 14262 states that it is intended to help address the national energy emergency declared in the earlier-issued Executive Order 14156, *Declaring a National Energy Emergency*. Executive Order 14262, § 2. In fact, this order is part of a broader pattern in which the Administration has expansively invoked emergency powers to achieve long-standing political objectives, rather than respond to genuine, unforeseen crises. President Trump has declared eight national emergencies in the first seven months of 2025 alone, and has invoked this power more in the first 100 days in office than any other President in modern

31

history. *See* Ex. 57 (Brennan Center for Justice, *Declared National Emergencies Under the National Emergencies Act*).

**E.      DOE's Section 202(c) Orders Preventing the Retirement of Fossil Fuel Power Plants Issued in 2025**

Since January 20, 2025, DOE has issued orders to eight facilities under section 202(c) of the Federal Power Act, a sharp uptick from the less than one order per year issued on average from 2017-2024. *See* Ex. 23 (2025 DOE 202(c) orders). In late May 2025 DOE issued a pair of section 202(c) orders requiring fossil fuel generation facilities in Michigan and Pennsylvania that were each slated to retire the very next business day to remain on-line. Ex. 27 (U.S. Dep't of Energy, Order No. 202-25-3 (Campbell Order); *See* Ex. 28 (U.S. Dep't of Energy, Order No. 202-25-4 (Eddystone Order). Both the Campbell and Eddystone Orders have now been extended twice. Ex. 58 (Campbell Order First Extension, DOE No. 202-25-7, August 20, 2025); Ex. 36 (Campbell Order, Second Extension, DOE No. 202-25-9, November 18, 2025); Ex. 59 (Eddystone Order, First Extension, DOE No. 202-25-8, August 28, 2025); Ex. 63 (Eddystone Order, Second Extension, DOE No. 202-25-10, November 25, 2025). These orders represent a marked shift in how section 202(c) has historically been used.

For example, the orders for the J.H. Campbell Generating Station in Michigan and the Eddystone Plant in Pennsylvania, both previously slated for retirement, cited general concerns about resource adequacy and not any imminent emergency. In Michigan, regulators warned that the Campbell order would place upward pressure on ratepayers, particularly in Consumers Energy's service territory, where decommissioning costs were already being recovered through base rates. One Michigan regulator estimated that the costs of complying with DOE's

32

order for 90 days would approach $100 million. *See, e.g.*, Ex. 29 (Ella Nilsen, *The Trump Admin Ordered a Coal Power Plant to Stay On Past Retirement. Customers in 15 States Will Foot the Bill*, CNN (June 6, 2025). Consumers Energy disclosed that continued operation of the plant in the first five weeks since the Order was issued resulted in a net financial impact of $29 million. *See* Ex. 30 (CMS Energy Corp., Quarterly Report (Form 10-Q), July 31, 2025); *See also* Ex. 31 (NRDC, *Trump Administration's DOE Is Forcing Coal Plants to Stay Open. Michigan Is the First Target*, June 16, 2025).

## F.     DOE Publishes its Methodology and Reliability Standard to Guide Future Section 202(c) "Reliability Interventions"

On July 7, 2025, DOE published its "Report on Evaluating U.S. Grid Reliability and Security," which set forth the methodology and reliability standard that the Executive Order on grid reliability had mandated. Ex. 4 (U.S. Department of Energy, *Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid*, July 2025). DOE published this report without proving any public notice or comment period and without any apparent consultation with any grid operator or State. *See* Ex. 4 at i (acknowledging lack of data from regional and utility levels). Other than the statements in the Report, DOE has not made the underlying data or models available to allow the public to reproduce or test DOE's analysis. Nor has DOE opened any administrative proceeding to otherwise involve the public in DOE's methodology and DOE has not published the Report in the Federal Register.

Nevertheless, DOE confirmed in the report that it would rely on the Resource Adequacy Report to justify future section 202(c) orders, consistent with the Executive Order's mandate. *See* Ex. 4 at vi (explaining that DOE's standard will be used to "guide reliability interventions"); *id.* at 1 (emphasizing the need for DOE's "decisive intervention" in energy

33

markets); *id*. at 10 (analyzing ERCOT because "FPA Section 202(c) allows DOE to issue emergency orders to ERCOT"). As explained in an accompanying fact sheet, DOE would use the methodology to "prevent [] generation resources from leaving the bulk-power system." Ex. 32 (U.S. DEP'T OF ENERGY, *Fact Sheet: The Department of Energy's Resource Adequacy Report Affirms The Energy Emergency Facing The U.S. Power Grid*, 2025); *see also* Ex. 33 (Press Release, U.S. Dep't of Energy, Department of Energy Releases Report on Evaluating U.S. Grid Reliability and Security, July 7, 2025) (stating that its "methodology also informs the potential use of DOE's emergency authority under Section 202(c) of the Federal Power Act").

Due to numerous significant flaws in DOE's resource adequacy report that render it arbitrary and capricious, a number of states including Washington submitted a rehearing request to DOE on August 6, 2025. Ex. 35 (August 6, 2025 Rehearing Request). Among other things, the rehearing request pointed out that the Report was based on flawed and arbitrary assumptions and unsupported by substantial evidence because it failed to reasonably support its load growth assumptions and arbitrarily assumed 104 GW of retiring capacity by 2030 but only 22 GW of additions in the same period, lacked sufficient regional granularity and suffered from other analytical flaws, and established an arbitrary and unlawful preference for fossil fuel plants over other methods to preserve grid reliability, contrary to the Federal Power Act. *Id*. at 18–29. In addition, the report does not point to any sudden, unforeseen, or imminent circumstances that describe an "emergency" under the Federal Power Act to justify 202(c) orders, the report fails to consider existing reliability mechanisms, intrudes on state authority over generation facilities and non-emergency resource adequacy planning, and was adopted

34

subject to critical procedural flaws including failing to provide public notice and comment. *Id*. at 29–39.

DOE did not respond to the critiques raised by the States and other entities of its resource adequacy report and continues to rely on the resource adequacy report to justify emergency 202(c) orders. Rather, DOE denied the States' and other entities' requests for rehearing based on its assertion that the resource adequacy report was not an "'order' by which the State AGs are 'aggrieved' within the meaning of section 313 of the FPA." 313*l*. Ex. 35-2 (2025 State AG's Request for Rehearing of DOE Report).

**G.      DOE's 202(c) Emergency Order to TransAlta Requiring It To Continue To Be Available as a Coal-Fired Power Plant**

On December 16, 2025, DOE issued a 202(c) order to TransAlta, requiring that Centralia remain ready to run as a coal-fired power plant beyond its scheduled closure date of December 31, 2025. Ex. 1. This Order, issued only 15 days before Centralia's scheduled closure as a coal plant, directs TransAlta to "take all measures necessary to ensure that Centralia Unit 2 is available to operate" at the direction of either the Balancing Authority or Reliability Coordinators for the region—which the Order identifies as Bonneville Power Administration (BPA) and the California Independent System Operator Corporation (CAISO), respectively. Ex. 1 at 3. While this suggests that the plant should be kept on standby at the ready to run as needed, the Order also confusingly states in footnote 11 that "continuous operation is required . . . so long as Secretary determines a shortage exists and is likely to persist," to avoid the complications that could result from starting and stopping operations intermittently. Ex. 1 at 2, n. 11.

35

The order justifies DOE's invocation of its emergency authority under section 202(c) of the Federal Power Act due to the Secretary's determination of an "emergency situation" within the Western Electricity Coordinating Council (WECC) Northwest assessment area due to "a shortage of electric energy, a shortage of facilities for the generation of electric energy, and other causes[.]" Ex. 1 at 1. Specifically, DOE's determination of an "emergency" is based on the NERC's 2025-2026 Winter Reliability Assessment, a September 2025 Power Point presentation on resource adequacy by Energy + Environmental Economics (E3), and DOE's July 2025 Resource Adequacy Report and two executive orders. *Id*. While the Order acknowledges that these sources found that "there is sufficient capacity for expected peak conditions," DOE asserts that there is a present emergency anyway due to an "elevated risk during periods of extreme weather." *Id*. That "elevated risk" contemplates a scenario in which, during a period of peak demand, extreme weather causes the outage of thermal power plants as well as adverse wind turbine conditions and, on top of that, similar extreme weather extends to neighboring regions so that the Northwest Region cannot import power. *Id*. The Order also cites accelerated load growth estimates out to 2030 and a shortfall in the development of adequate new capacity to meet this forecast demand. *Id*.

Finally, the Order cites the president's Executive Orders declaring a national energy emergency and on grid reliability for additional support and cites DOE's July 2025 resource adequacy report conducted under those executive orders for the proposition that "decisive intervention" to the Nation's power grid is necessary "to meet projected demand for manufacturing, re-industrialization, and data centers driving artificial intelligence (AI) innovation." Ex. 1 at 2-3 (citing Ex. 4).

36

**H.      Impacts of Continued Coal Operations at Centralia**

**1.      Deferred maintenance and upgrades make running Centralia as a coal plant difficult, expensive, and less reliable**

TransAlta Centralia is an old facility and has not been maintained for continued operations beyond 2025 due to its planned retirement. Moreover, in recent years Centralia has been subject to frequent forced shutdowns due to breakdowns. For example, from 2023 through 2025 Centralia shutdown 29 times, 25 of which were forced outages, for issues such as needed "tube leak repairs." Ex. 11 at ¶ 7; Exs. 11-1 through 11-11 (Centralia Plant's quarterly reports submitted to SWCCA from 2023 through 2025).

Centralia's electrostatic precipitators (ESPs) that control its coal fly ash particulate matter emissions are failing—causing the plant's plume to register opacity levels approaching its 30% permit limit, even when operating below full load. Ex. 11 at ¶¶ 9–10; Ex. 11-12 (photograph of opacity readings on Oct. 23, 2025). In addition, Centralia has not been able to maintain the required control of its carbon monoxide (CO) emissions. Ex. 11 at ¶ 11; Ex. 11-3 (TransAlta Most Recent Quarterly Report). As described by TransAlta in its 2022 U2 Boiler Tune-up Report, this could be due to air leakage associated with cracks and holes that is impairing operation of fan components. Ex. 11 at ¶ 11; Ex. 11-13 (Centralia Plant's 2022 U2 Boiler Tune-up Report).

Skeleton crew staffing has and will further exacerbate the plant's proper functioning. For example, TransAlta's local air regulator, which conducts regular inspections, issued it two Notices of Violation in December 2025 for issues that may have been related to reduced staffing and/or maintenance. Ex. 11 at ¶ 12. The first was related to excess emissions from the fly ash unloading baghouse and the second was for not fully engaging all relevant pollution

control equipment prior to firing coal on startups. Exs. 11-14, 11-15 (SWCAA Notices of Violation No. 10642 and No. 10643).

TransAlta Centralia's coal-fired power also costs more, so ratepayers are likely to pay higher electricity bills to the extent there are continued coal-fired operations. Centralia power is priced significantly higher than the wholesale energy market price: $62.04 per MWh for Centralia versus the wholesale market price of $54.32 per MWh. Ex. 41 at ¶ 15.

And DOE's order disrupts plans to strengthen reliability by converting Centralia to natural gas As discussed above, TransAlta has announced plans and submitted permit applications to convert its plant from coal to natural gas in order to operate as a peaking plant under a commercial agreement with Puget Sound Energy. This conversion is in danger of being disrupted and delayed by DOE's order to continue operating Centralia as a coal plant. The risk of delay will compound over time if DOE continues to extend its Order repeatedly, as it has done for other plants such as the J.H. Campbell Generating Station in Michigan and the Eddystone Plant in Pennsylvania.[9] DOE's interference thus harms the ability of utilities to take steps they see as necessary to improve reliability—TransAlta Centralia as a natural gas peaker plant will provide grid services that an outdated coal plant cannot. Ex. 49 at ¶¶ 5–7 (Declaration of David Gomez).

---

[9] *See* Ex. 58 (Campbell Order First Extension, DOE No. 202-25-7, August 20, 2025); Ex. 36 (Campbell Order, Second Extension, DOE No. 202-25-9, November 18, 2025); Ex. 59 (Eddystone Order, First Extension, DOE No. 202-25-8, August 28, 2025); Ex. 63 (Eddystone Order, Second Extension, DOE No. 202-25-10, November 25, 2025).

**2.      Running Centralia results in health and environmental impacts**

Continuing coal operations at Centralia will increase air pollution in Washington, harm Washingtonian's health (imposing direct harms on the State and its agencies), and impair visibility at Washington's iconic natural areas such as the Mount Rainer National Park. *See supra* pp. 13–18; *see also* Ex. 10. Centralia has been a significant source of air pollution in Washington including for particulate matter, sulfur dioxide, nitrogen oxides, dioxin and furans, mercury, heavy metals, and polycyclic aromatic hydrocarbons. Ex. 10 at ¶ 7; Ex. 52 at ¶ 8.

Those emissions are known to adversely impact human health. For example, dioxins and furans are highly toxic persistent environmental pollutants that can cause cancer, reproductive and developmental problems, damage to the immune system, and hormone disruption. Ex. 52 at ¶ 11. Mercury exposure poses especially significant health risks for pregnant women and infants because of its impacts on fetal development and infant health. *Id.*; Ex. 10 at ¶ 14. Polycyclic aromatic hydrocarbons (PAHs) cause a range of serious health risks including various cancers, respiratory and cardiovascular diseases, and reproductive health problems. Ex. 52 at ¶ 11.

A series of investigations at Centralia found six hazardous substances in the soil, nine contaminants for groundwater, and nine substances in the sediment at the Site above cleanup levels. *Id.* at ¶ 7. Continued aerial emissions of hazardous substances associated with TransAlta's coal operations have the potential to settle on and contaminate thousands of properties and create thousands of PLPs. *Id.* at ¶ 14. And the Centralia Coal Plant uses settling

ponds containing byproducts from burning coal, many of which are also hazardous substances subject to MTCA. *Id.* at ¶ 15.

Based on estimates from the EPA's CO-Benefits Risk Assessment Health Impacts Screening and Mapping Tool (COBRA), the continued operations at Centralia will contribute to an estimated 9-13 premature deaths, 3 nonfatal heart attacks, 53 cases of asthma onset, and $140-210 million annually in Washington. Ex. 10 at ¶ 10. Moreover, even after the plant is converted to natural gas and begins operating again in 2028, the cleaner performance of the natural gas plant compared to coal-fired operations is expected to prevent an estimated 4–7 premature deaths, 2 nonfatal heart attacks, 24 cases of asthma onset, with an economic value of $68-110 million annually in Washington. Ex. 10 at ¶ 12. Children are acutely prone to these health risks because their bodies are still developing, and they have more exposure to airborne contaminants that settle on lawns, parks, and schoolyards. Ex. 52 at ¶ 10.

These health impact estimates are based on the assumption that Centralia continues to abide by the requirements of its environmental permits. Ex. 10 at ¶ 7. However, Centralia's most recent quarterly report and recent inspections of the facility indicate that maintenance on Centralia's pollution control equipment is due or overdue. Ex. 11 at ¶¶ 10-11. A local clean air agency also issued Centralia two notices of violation for exceeding emissions limits in December 2025. *Id*. at ¶ 12; Ex. 11-14 and Ex. 11-15. Therefore, emissions under emergency coal-fired operations may be even higher if TransAlta Centralia cannot operate at a lower load or make necessary repairs. *Id*. at ¶ 11.

In addition to these health impacts, TransAlta Centralia's emissions of particulate matter, $SO_2$, and nitrogen oxides (NOx) also impair visibility in Washington's iconic natural

areas, including at Mount Rainer National Park, located only 50 miles from the plant. And, because Centralia is the largest source of greenhouse gas emissions in Washington, Ex. 12, the continued coal-fired operations will also make it harder for Washington to achieve its statutory greenhouse gas emissions reduction requirements. *See* RCW 70A.45.020.

### V.      MOTION FOR CLARIFICATION

As set out in detail in Washington's Request for Rehearing below, because the Order exceeds DOE's authority, is unnecessary, and is harmful both to the grid and consumers it seeks to protect, Washington requests that DOE withdraw the Order in its entirety. If DOE retains the Order, however, Washington alternatively requests that DOE clarify that the Order directs readiness only and that TransAlta Centralia not operate in any capacity unless and until there is an actual energy shortage where existing resources operated by Wester Resource Adequacy Program participants, or imports from other regions, cannot meet demand.

The Order inconsistently states that Centralia Unit 2 "shall not be considered a capacity resource," but also purports to order Centralia's "continued operation." Ex. 1 at 2-4. The Order also purports to require Centralia to comply with environmental requirements "to the maximum extent feasible while operating consistent with the emergency conditions." *Id*. at 4. The Order is based in large part, if not entirely, on a rare and hypothetical scenario set out in the NERC Winter Reliability Assessment report: a region-wide "extreme" weather event that knocks thermal generating sources off the grid for a period of time.[10] Ex. 2 at 37

---

[10] As discussed in Section VI.D.-E., the very fact that DOE's purported "emergency" is based on rare and potential *future* events that Balancing Authorities are actively mitigating against makes clear just how far outside the bounds of section 202(c) DOE is operating.

(NERC 2025-2026 Winter Reliability Assessment). Allegedly to counter this hypothetical occurrence, and among other measures, the Order at p. 4 states: "[b]ecause this Order is predicated on the shortage of facilities for generation of electric energy and other causes, Centralia Unit 2 shall not be considered a *capacity resource.*" (emphasis added). This language first appeared in Order No. 202-25-4, directed at PJM and the Eddystone Facility in Pennsylvania. Ex. 28. The language was omitted from DOE's earlier Order No. 202-25-3, directed at MISO and the J.H. Campbell Facility in Michigan. Ex. 27. But the language was inserted when DOE renewed the Campbell Order via Order No. 202-25-9. Ex. 36. The language also appears in two additional orders again directed at MISO: Order No. 202-25-12 related to the R.M. Schahfer Facility and Order No. 202-25-13 related to the F.B. Culley Facility, both in Indiana. Ex. 37 (U.S. Dep't of Energy, Order No. 202-25-12, Dec. 23, 2025) (Schahfer Order); Ex. 38 (U.S. Dep't of Energy, Order No. 202-25-13, Dec. 23, 2025) (Culley Order).

But "capacity resource" does not appear to have any discernable meaning relevant to either Washington or the WECC. This is likely due to the fact that, as with the Second Campbell, plus the Schahfer and Culley Orders, DOE apparently copied this requirement verbatim from the Eddystone Order. And the reference *does* have a context and meaning as related to Eddystone. Specifically, the PJM Capacity Market Manual expressly defines "capacity resource" in terms unique to PJM: i.e., it refers to identified megawatts of capacity pursuant to the PJM Reliability Assurance Agreement. *See* Ex. 39 at 236 (PJM Manual). As the public interest organizations pointed out in section IV.A of their request for rehearing, Eddystone units were not selected in PJM's capacity market because other resources were

available and less expensive to run. Ex. 40 at 14-17 (Eddystone Request for Rehearing). DOE ordered Eddystone to run anyway despite economic dispatch obligations, and, to do so, DOE needed to specify that the Eddystone Units would not participate in the capacity market.

It is not clear what DOE means by "capacity resource," as TransAlta Centralia is a merchant plant, not a resource operated at the direction of an ISO or RSO. Presumably, DOE means the balancing authority and/or reliability coordinator may call upon Centralia's operation only in the case of an actual energy shortage and where existing resources operated by Western Resource Adequacy Program participants cannot meet demand. This would also satisfy the issue raised in footnote 11 of the Order, referencing concerns about starting and stopping the facility leading to a potential breakdown. Ex. 1 at 2, fn. 11. Those concerns are mollified to the extent that Centralia simply prepares to operate, but is not called upon to actually run, unless and until there is an emergency loss of regional capacity that cannot be addressed by other resources, including power imports. As discussed in Section VI below, this is in fact the only logical way to read the Order given that mandating continuous operation of Centralia will have destabilizing impacts to the grid, unnecessarily violate applicable environmental limitations in conflict with the Federal Power Act, and ultimately cause negative impacts on ratepayers.

Because the Order is unclear on when Centralia may operate, Washington requests that DOE, if it does not rescind the Order in its entirety, clarify that Centralia may run only when necessary to meet an actual energy shortage and no other resources or imports are able to meet demand.

## VI.    REQUEST FOR REHEARING

**A.    DOE's Order Is Unlawful Because It Fails to Establish the Predicate Existence of an Emergency as Defined by Section 202(c) of the Federal Power Act or DOE's Own Section 202(c) Regulations**

**1.    Because section 202(c) authority is extraordinary, Congress carefully cabined its use to wartime and *actual* "emergencies"**

Enacted in 1935, section 202(c) of the Federal Power Act, 16 U.S.C. § 824a(c), confers on the federal government an extraordinary authority in times of crisis. During times of war or similar "sudden" emergency circumstances, section 202(c) grants DOE power over in-state energy production and to command that market participants take actions necessary to address the emergency.[11] 16 U.S.C. § 824a(c)(1). Specifically, section 202(c) provides, in pertinent part:

> During the continuance of any war in which the United States is engaged, or whenever the Commission determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy . . . the Commission shall have authority . . . with or without notice, hearing, or report, to require by order such temporary connections of facilities and such generation, deliver, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest.

*Id*. This is an exception to the Federal Power Act's policy of retaining to states those decisions related to energy resources. *See* 16 U.S.C. 824(b)(1). But Congress bounded this authority in critical ways. Section 202(c) empowers action *only* in cases of war or during an "emergency"; i.e., circumstances that are both imminent and unforeseen.

---

[11] Section 202(c)'s reference to the "Commission" now refers to DOE under the Department of Energy Organization Act. *See* 42 U.S.C. § 7151(b).

First, as Michigan and others have pointed out to DOE in relation to recent orders, while the statute does not define what constitutes an "emergency," the word has a very specific and narrow meaning, both now and at the time section 202(c) was enacted. In 1935, an "emergency" meant "a sudden or unexpected appearance or occurrence . . . [a]n unforeseen occurrence or combination of circumstances which calls for immediate action or remedy; pressing necessity; exigency." Webster's New International Dictionary of the English Language (1930). That understanding has not changed in the intervening years. *See* Webster's Dictionary 407 (9th ed. 2009) (defining "emergency" as "an unforeseen combination of circumstances which calls for immediate action or remedy; pressing necessity; exigency"); *see also* Benjamin Rolsma, *The New Reliability Override*, 57 Conn. L. Rev. 789, 812 n. 147 (2025) (the definition of "emergency" has been static for "many years").

Section 202(c) also requires imminence. As expected of authority springing to life only in emergency circumstances, the plain text speaks of situations arising in the *present* tense, not hypothetical circumstances that might arise in the future. Section 202(c) references "*[d]uring* the continuance of any war" and "whenever … an emergency *exists*.") 16 U.S.C. § 824a(c)(1) (emphasis added). This is reinforced by Congress limiting DOE to those actions that "best meet the emergency" and limiting the temporal reach of section 202(c) orders to a maximum of 90 days unless an additional period of time is necessary to "meet the emergency and serve the public interest." 16 U.S.C. § 824a(c)(1), (3).

Likewise, where section 202(c) orders conflict with federal, state, or local environmental laws, Congress requires DOE to limit its order to "only during hours necessary to meet the emergency and serve the public interest." *Id.* § 824a(c)(2). But here, the Order's

45

claimed emergency authority rests on a speculative series of future events—not any actual or imminent emergency. The Order contemplates that there may be (1) a peak period of demand for power; *and* (2) extreme weather causing the outage of thermal power plants; *and* (3) adverse wind turbine conditions; *and* (4) extreme weather extending to neighboring regions, preventing the Northwest Region from importing power. *See* Ex. 1 at 1, 3 (speculating that increased energy demand "*could* lead to the potential loss of power") (emphasis added).

Section 202(c) authority also does not extend to the *future* resource adequacy concerns the Order purports to address, as the Federal Power Act reserves jurisdiction over electricity generation and resource adequacy planning to the States. *See* 16 U.S.C. § 824; *see also Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 154 (2016). Notably, Congress granted other authority, under section 202(b), to order the sale of electricity when necessary to avoid future emergencies, but only upon application to the Commission and after a full hearing—none of which has occurred here. *See* 16 U.S.C. 824a(b); *Otter Tail Power Co. v. Fed. Power Comm'n*, 429 F.2d 232, 234 (8th Cir. 1970) (explaining that, unlike section 202(c), section 202(b) applies to a crisis which is likely to develop in the foreseeable future but which does not necessitate immediate action on the part of the Commission).

Taken together, the statutory text makes clear that section 202(c) limits DOE's emergency authority to just that: events that are imminent, certain to occur, and unexpected. *Otter Tail Power*, 429 F.3d at 234. It does not grant authority to look years into the future to regulate long-term resource adequacy.

## 2. DOE's own section 202(c) regulations and prior actions make clear that a 202(c) order is limited to true emergencies

DOE's section 202(c) regulations make clear that DOE has also long understood its section 202(c) authority to be limited to imminent, certain, and unexpected power shortages, not generalized and long-term concerns about resource adequacy. Those regulations narrowly define "emergency" as an "unexpected inadequate supply" of electricity caused by "the unexpected outage or breakdown of facilities for the generation, transmission or distribution of power" that may be caused by unforeseen events such as "weather conditions, acts of God, or *unforeseen* occurrences not reasonably within the power of the affected 'entity' to prevent." 10 C.F.R. § 205.371 (emphasis added). Even then, actions taken pursuant to section 202(c) are only those "envisioned as meeting a *specific* inadequate power supply situation." *Id.* (emphasis added). DOE itself provides gloss on just how specific, suggesting that an emergency exists only when projected energy deficiencies "without emergency action by [DOE] will equal or exceed 10 percent of the applicant's then normal daily net energy for load." 10 C.F.R. § 205.375. And while true that DOE's regulations indicate that an emergency can spring from "inadequate planning or the failure to construct necessary facilities," the fact that an emergency power shortfall *can* result from inadequate planning does not change the fact that the shortfall itself must be imminent. *See* 10 C.F.R. § 205.371.

This is a narrow lane, designed to allow DOE to step in only where conditions that could not be anticipated beforehand result in an existing or imminent loss of power, not where—as is the case here—the Administration simply disagrees with the market forces driving state and private actors' shift away from coal to other sources of electricity like natural gas. *See id.* Indeed, in the preamble to DOE's section 202(c) rules, DOE expressly disavowed

47

any intent to "replace prudent utility planning and system expansion" or supplant state and regional regulators' obligations to "solve long-term problems." Energy, *Emergency Interconnection of Electric Facilities and the Transfer of Electricity to Alleviate an Emergency Shortage of Power*, 46 Fed. Reg. 39,984, 39,985 (Aug. 6, 1981).

History bears this out. As discussed above, until DOE's recent orders, section 202(c) authority has been sparingly deployed to address actual emergencies. Since assuming section 202(c) authority, DOE's pre-2025 use of section 202(c) involved circumstances like hurricanes, extreme heat and cold events, lightning strikes, and the Enron energy crisis. Benjamin Rolsma, *The New Reliability Override*, 57 Conn. L. Rev. 789, 839 (2025). While some of these events necessitated a longer timeframe, most lasted only a period of *days*, not the rolling 90-day orders DOE now deploys to end-run planned retirements or conversions of coal facilities.[12] *See id*. And in each invocation of section 202(c) prior to 2025, the emergency order was predicated on a request by the related system operator or utility, not unilateral action. *Id*. DOE's use of 202(c) to meddle with long-range planning Congress expressly left to the states flies in the face of DOE's regulations, which delineate a restrained view of section 202(c) authority.

---

[12] DOE has re-upped its section 202(c) orders related to coal facilities in Michigan and Pennsylvania, despite the fact that the NERC winter reliability report no longer identifies the region as under any elevated risk for power shortages during extreme weather events. Ex. 2 at 26. Washington anticipates DOE will not deviate from this pattern here, and intends to force TransAlta to remain operating as a coal facility indefinitely as part of the Administration's ongoing efforts to end the alleged "war" on coal.

### 3. DOE lacks discretion to bypass congressionally-imposed limits on section 202(c) authority

It should be beyond dispute that, in exercising "emergency" authority under section 202(c), DOE is bound by the definition of the word "emergency." *Contra* Ex. 34 at 7; (Campbell Rehearing Order, Sept. 8, 2025). DOE's prior assertion, *see id.*, that the Secretary is not bound by the actual definition of the word "emergency" is simply incorrect. *See* Ex. 34 at 7 (Campbell Rehearing Order, Sept. 8, 2025).

Section 202(c) is subject to judicial review, indicating that Congress clearly understood the potential risk of section 202(c) authority being stretched beyond the bounds of what it intended and demonstrating that DOE is accountable to the courts for adhering to the law. 16 U.S.C. § 824a(c)(5); 16 U.S.C. § 825*l*. And, no less so than the courts, when the Secretary is construing a statutory term, the "task is to apply the law's terms as a reasonable reader would have understood them at the time Congress enacted them" because "only the words on the page constitute the law adopted by Congress and approved by the President." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023) (Gorsuch J., concurring) (citation modified); *citing Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 654 (2020). This is critical because if the Secretary could "remodel, update, or detract from old statutory terms inspired only by [his] own imagination[]," he risks "amending statutes outside of the legislative process reserved for the people's representatives." *Bostock*, 590 U.S. at 654–55. DOE's prior statements in another coal "emergency" order demonstrate that this risk is effectuated by DOE's current approach to section 202(c). Ex. 34 at 7 (asserting that the plain meaning definition of the key term in the statute is immaterial to the

determination of a section 202(c) "emergency"). That alone is basis for DOE to withdraw its recent spate of section 202(c) orders—including this one—as unlawful.

In short, while the Secretary has some discretion to determine when an emergency exists, he does not have the discretion to ignore the plain meaning of the word "emergency" in doing so—especially when that construction flies in the face of the Federal Power Act's narrow grant of federal authority. Under the clear statutory text, an emergency under section 202(c) is just that: a temporary, unforeseen, and extraordinary circumstance that requires an extraordinary response. *See, e.g., Richmond Power and Light v. FERC*, 574 F.2d 610, 615 (D.C. Cir. 1978) (noting that section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances"); *Otter Tail Power,* 429 F.2d at 234. Congress did not intend this authority to cover circumstances like this one: remote and wholly speculative *future* weather phenomena and long-range energy planning goals over which the Federal Power Act expressly denies to DOE. *See La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").

**B.      DOE's Order Violates Section 202(c) Which Does Not Allow DOE to Usurp Local Authority to Address Both Short- and Long-Term Resource Planning**

DOE's Order also violates clear Federal Power Act prohibitions against the federal government dictating long-range power planning to the States, because that is precisely what the Order attempts.

Despite the narrow scope of section 202(c), it is clear from both this Order, the President's Executive Order on Grid Reliability and DOE's response to it,[13] including its methodology report published in July 2025 and other section 202(c) orders issued this year, that DOE is using its section 202(c) authority for circumstances beyond actual emergencies and instead seeks to override local planning authorities when it comes to generalized short- and long-term concerns regarding resource adequacy. For instance, the Order itself speaks of "energy challenges *facing the Nation* due to growing resource adequacy concerns." Ex. 1 at 2 (emphasis added). Citing DOE's July 2025 Resource Adequacy Report, the Order further references addressing problems with "*the Nation's* power grid … to meet projected demand for manufacturing, re-industrialization, and data centers." *Id*. at 3-4 (emphasis added). And DOE's press release touting the Order focuses almost entirely on long-range concerns, including broad claims regarding "blackouts *in the coming years*" and "blackouts … potentially increas[ing] 100 times *by 2030* if the U.S. continued to take reliable power offline as it did during the Biden administration." Ex. 42 (Dec. 17th press release) (emphasis added). The Winter Reliability Assessment appears in the press release merely as window dressing. *See id*.

Indeed, DOE has directly claimed to have such sweeping authority. In addressing arguments raised by rehearing requests related to the Campbell Order, DOE expressed the view that its section 202(c) authority is essentially unbounded. Ex. 34 at 6-7. At base, DOE

---

[13] *See* Ex. 33 at 35-36 (explaining that, pursuant to the President's Executive Order on Grid Reliability, DOE developed a new methodology and protocol to guide its emergency section 202(c) orders across the country).

claims that, despite what the statute or its own regulations provide, an "emergency" is whatever the Secretary decides it is, including generalized and nationwide supply concerns. *Id*. And, while DOE's rehearing order claimed an "imminent" need to maintain the Campbell plant because of the NERC assessment and the fact that "retired generation facilities generally cannot be brought back online in a matter of days," *id.* at 7, that explanation has now been wholly belied by the fact that DOE extended both the Campbell and Eddystone Orders for additional 90-day terms despite the fact that neither region is identified as "at risk" for energy shortages this winter. Ex. 2 at 6.

In so doing, DOE says the quiet part out loud. As discussed in more detail in Section VI.D.5 below, DOE's coal-facility orders are now—and always have been—about one thing: claiming unfettered authority to use section 202(c) to override state and local plans to close or transition old and unreliable coal power plants in furtherance of the Administration's goal of "ENDING THE WAR ON BEAUTIFUL, CLEAN COAL" (emphasis original).[14] *See* Ex. 43 (*Promises Made, Promises Kept*, Department of Energy, Dec. 18, 2025). Indeed, and as if to underscore this already naked policy goal, just 48 hours after issuing the Centralia Order, DOE touted: "[t]hanks to President Trump, wages for coal workers are up and coal plants across the country *are reversing plans to shut down*." *Id*. (emphasis added). Issuing emergency orders based on a preference for coal-fired power over other sources of energy violates the Federal Power Act's prohibition on undue discrimination or preference in rates. *See* Ex. 35 at 27-29.

---

[14] That list includes Campbell, TransAlta Centralia, and now F.B. Culley and R.M. Schahfer.

52

DOE's assertion that general, nationwide concerns over power needs in the future are an "emergency" under section 202(c) are also meritless. For one, DOE's Order runs headlong into the Federal Power Act's carefully constructed balance between state and federal authority, reserving to states the ability to address long-term energy planning. These limitations permeate the Federal Power Act. *See, e.g.*, 16 U.S.C. §§ 824(a), (b)(1); 16 U.S.C. § 824o(1)-(2); 16 U.S.C. § 824a(c); 16 U.S.C. § 825*l*. But 2005 amendments to the Act powerfully reinforced them based, in part, on concerns that the Act as written did not allow the federal government to take steps ensuring bulk-system reliability. To remedy, Congress added section 215 to the Act, allowing the federal government to enforce those mechanisms. *See Rules Concerning Certification of the Elec. Reliab. Org.; and Procedures for the Establishment, Approval, and Enforcement of Elec. Reliab. Standards*, 70 Fed. Reg. 53,117, 53,118 (Sept. 7, 2005).

But Congress did so surgically and in line with existing limits on federal authority by making clear section 215 did not include the ability to order "the construction of additional generation" and explicitly refusing to preempt "*any* authority of *any* State to take action to ensure the safety, adequacy, and reliability of electric service within that State." 16 U.S.C. § 824o(i)(1)-(2) (emphasis added). Yet preempting state authority is precisely what DOE does here with its expansive read of section 202(c) as granting it authority to dictate which Washington specific resources DOE believes are necessary to satisfy long-term energy demands.

Moreover, DOE's Order does not address—much less provide any basis to override—existing state resource adequacy planning. As discussed below, Washington, like appropriate

state and regional authorities around the country, is already planning for and working to address long-range adequacy and reliability concerns. An important piece of that planning includes expanding TransAlta Centralia's capacity, ironically the very thing DOE's Order interferes with. Again, this interference comes despite the fact that the Federal Power Act provides DOE *no* authority "over facilities used for the generation of electric energy" except where expressly authorized. In so doing, Congress commanded that "Federal regulation … extend[s] only to those matters which are not subject to regulation by the States." 16 U.S.C. § 824(a). DOE's position that section 202(c) emergency authority is such an express authorization because it extends to general resource adequacy concerns makes a mockery of the Act. If, as DOE claims, its authority to declare an emergency is unfettered and reaches to generalized short- and long-term resource adequacy planning, the Federal Power Act's limitation on DOE's emergency authority is effectively meaningless. When everything is an emergency, nothing is.

To wit, and to the extent it could ever *per se* justify a section 202(c) order, even NERC assessments apparently no longer matter. *See* Ex. 36; Ex. 63; Ex. 38; Ex. 37; and Ex. 94 (U.S. Dep't of Energy, Order No. 202-25-14, Dec. 30, 2025) (Craig Station Order). Nor do "sudden," "unexpected," or "unforeseen" power shortages. *See* 16 U.S.C. § 824a(c); 10 C.F.R. § 205.371. As a result, it is difficult to view DOE's justification for these orders as anything other than a blanket determination that an ongoing, *nationwide* emergency exists and will continue through the rest of this administration. DOE, thus, turns significant limitations on what is essentially a wartime power into ongoing and unfettered authority to run roughshod over the power sector—but with none of the usual safeguards in place to ensure that American

consumers are protected.[15] This absurd and unlawful construction of the statutory text does not survive even the mildest scrutiny. *Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315 (1938) ("to construe statutes so as to avoid results glaringly absurd, has long been a judicial function"). And extra scrutiny is required here because DOE is claiming to "discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority." *W. Virginia v. EPA*, 597 U.S. 697, 724-25 (2022) (cleaned up).

Finally, assuming *arguendo* DOE could redefine "emergency" and adopt a new practice of using section 202(c) to prevent the retirement of power plants based on long-term energy needs, hypothetical scenarios, or DOE's new methodology for assessing grid reliability, DOE's Order is still unlawful because DOE never provided the public notice or an opportunity to comment on its new procedures. *See* 5 U.S.C. § 553. DOE has markedly changed its section 202(c) practice in response to President Trump's executive order on grid reliability. *See supra* § IV.C-E. That executive order directed DOE to establish a new methodology and "protocol" to use section 202(c) to prevent retirement of power plants in "at-risk region[s]" the methodology identifies. *See* 90 Fed. Reg. 15521; *see also* Ex. 35 at 12-13, 14-15, 34-36 (describing DOE's position that its methodology will guide future section 202(c) interventions). DOE now issues section 202(c) orders based on its new

---

[15] While the Order fails legal muster even as a stand-alone directive, it is especially egregious in light of a nationwide abuse of section 202(c) authority. As discussed in Section VI.E. below, these orders are decidedly *anti*-consumer. This is particularly illustrated by the Campbell order that, by some estimates, will ultimately cost impacted ratepayers over $100,000,000 and counting. *See, e.g.*, Ex 74 at 8 (Michael Goggin, *The Cost of Federal Mandates to Retain Fossil-Burning Power Plants*, August 2025).

methodology, projections of long-term needs, and generalized statements about energy trends, and with the intent to renew them on a prolonged, indefinite basis.

Such is the case here, DOE issued the Order pursuant to its methodology and the President's executive order, *see* Ex. 1 at 2-3, and makes a generalized finding of emergency across multiple states unmoored from any particular triggering emergency event. However, DOE has never publicized its protocol or responded to public comment on its methodology. However, as explained more fully in the States' earlier rehearing request, public comment is required under the APA because DOE's practice has concrete legal effects – this Order being one of them – and is inconsistent with DOE's existing regulations and past practice. *See* Ex. 35 at 34-38.

**C.    DOE's Order is Arbitrary and Lacks Substantial Evidence Supporting Its Determination That an Emergency Exists in the Northwest**

Under the Federal Power Act, substantial evidence and reasoned decisionmaking must support DOE's orders. 16 U.S.C. § 825*l*(b); 5 U.S.C. § 706(2)(E); *see also Emera Maine v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017) (noting that Federal Power Act orders must also be either "consistent with past practice or adequately justified"); *see also, e.g., Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). DOE's Order fails in this regard and should be withdrawn.

**1.    Generalized, unsupported statements in executive orders do not support DOE's finding of an emergency here**

The Order cites Executive Order 14156 and 14262 as apparent bases for its determination that an emergency exists pursuant to section 202(c). This reliance is grossly misplaced.

For one, a generalized, unsupported statement that the nation faces a dire energy situation or is experiencing a surge in electric demand, is insufficient as a matter of law to justify a section 202(c) order. The Federal Power Act requires the DOE Secretary to independently determine that emergency action is required in a given circumstance based on evidence. *See* 16 U.S.C. § 824a(c)(1) (authorizing action "whenever the Commission determines" an emergency exists). Generalized, unsupported findings in executive orders, which broadly state the president's views on energy matters, cannot support an emergency order under section 202(c).

Further, as discussed above, the emergency under the Federal Power Act and DOE's regulations must involve a war or "sudden" and "unexpected" inadequate energy supply. 16 U.S.C. § 824a(c); 10 C.F.R. § 205.371. Neither executive order comes near this standard, much less the substantial evidence required by the Federal Power Act. For instance, EO 14156 makes only generalized claims and grievances about "policies of the prior administration" related to energy prices and capacities, as well as broad statements about future energy needs. Ex. 44 at 1 (Executive Order 14156). While it does make statements about "inadequate and intermittent energy supply, and an increasingly unreliable grid," the EO does not substantiate those claims. *Id*. at 1-2.

EO 14156 is also internally inconsistent in a way that completely belies any alleged energy emergency. It claims a massive need for increased energy production, yet it excludes nearly all sources of renewable energy. In fact, since January 2025, the Trump Administration has aggressively targeted critical energy projects around the nation for cancellation. One recent estimate stated that, culminating with the President's "One Big Beautiful Bill," "[f]ifty-two large-scale clean energy projects were cancelled, closed, or downsized in 2025—more than any other year since [the study's authors] began tracking." Ex. 45 at 1 (E2 Clean Economy Works: November 2025 Analysis). This represents a loss of "$32 billion in clean energy investments and 40,000 jobs." *Id*. In fact, the Secretary bragged in October of this year that DOE alone terminated $7.52 billion in financial awards for clean energy projects in 2025. Ex. 46 at 1 (*Energy Department Announces Termination of 223 Projects*, U.S. Dep't of Energy, Oct. 2, 2025). This comes despite the fact that DOE itself has acknowledged "[t]he rise of renewable power, which comes from unlimited energy resources, like wind, sunlight, water, and the Earth's natural heat, has the potential to vastly improve the reliability of the American energy system." Ex. 47 at 3 (*Energy Reliability and Resilience*, U.S. Dep't of Energy (Archive)).

In no way does EO 14156 justify the Order.

**2.      DOE misreads and misrepresents the sources it cites to conclude an emergency exists pursuant to section 202(c)**

As noted, the Order cites two sources to support its allegation that "an emergency exists within the Western Electricity Coordinating Council (WECC) Northwest assessment area." Ex. 1 at 1. The Order first cites to NERC's 2025-2026 Winter Reliability Assessment to support the assertion that WECC Northwest "is at elevated risk during periods of extreme

58

weather." *Id*. (citing Ex. 2 at 6). The Order next cites to a PowerPoint presentation from Energy + Environmental Economics (E3), Ex. 1 at 1, which states that a there will be a "resource gap" starting in 2026 which will grow until 2030 and that "[l]oad growth and retirements mean the region faces a power supply shortfall in 2026." *Id*. (citing Ex. 3 at 10). As described below, DOE makes a fundamental error by equating these out-of-context statements with a conclusion that there is an emergency in the Northwest over the next three months because the cited studies do not support the conclusion that there is an emergency, or even that an emergency is likely to occur soon.

### a. The 2025-2026 Winter Resource Reliability Assessment

The Order's citation to the NERC 2025-2026 Winter Reliability Assessment does not support the conclusion that there is an emergency.

While the Winter Reliability Assessment states that WECC Northwest "is at elevated risk during periods of extreme weather," the analysis also predicts zero hours and zero energy going unserved this winter. Ex. 51 ¶ 14 (Declaration of Joel Nightingale) (citing Ex. 2 at 15, Table 5). The explanation for this is simple: the NERC criteria for "elevated risk," which is a step below the "high" risk category, is a far cry from forecasting an imminent emergency.[16] On page 15, the Winter Resource Assessment concludes that "the results of the probabilistic

---

[16] *See* Ex. 2 at 11 (Outlining the criteria for "elevated risk" as: "Probabilistic indices are low but not negligible (e.g., LOLH above 0.1 hours over the season); or Analysis of the risk hour(s) indicates resources will not be sufficient to meet operating reserves under extreme peak-day demand with normal resource scenarios (i.e., typical or expected outage and derate scenarios for conditions); or Analysis of the risk hour(s) indicates resources will not be sufficient to meet operating reserves under normal peak-day demand with reduced resources (i.e., extreme outage and derate scenarios)") (citations omitted).

59

assessment reveal *no* [Expected Unserved Energy] or [Loss of Load Hours] for Winter 2025–2026." Ex. 2 at 15, Table 5 (emphasis added).

Moreover, the Order cites the Winter Reliability Assessment's estimate of a 9.3% increase in winter peak demand as justification for delaying the retirement of Centralia. Ex. 1 at 1. But it fails to mention that the Winter Reliability Assessment also estimates a 12.2% *increase* in prospective winter peaking resources. Ex. 2 at 49. This increase in resources more than offsets the cited increase in winter peak demand. Ex. 51 ¶ 16; Ex. 53 ¶ 11. To be clear: the Winter Reliability Assessment predicts a 3.3% increase in the Northwest's reserve margin compared to the previous year, even presuming retirements, including Centralia. Ex. 51 ¶ 16; Ex. 2 at 37, 49. There is no emergency.

### b.     The E3 PowerPoint presentation

DOE similarly misconstrues the E3 resource adequacy PowerPoint. This presentation, and the forthcoming report it summarizes, was commissioned by an array of Pacific Northwest electric utilities, essentially representing the entirety of power supply in the WECC Northwest. Ex. 3 at 2. E3's goal is to evaluate the state of resource adequacy in the Pacific Northwest and present specific recommendations to the region as to how to address those needs in the coming years. *Id*.

E3's engagement on this effort is direct confirmation that the process actually envisioned by the Federal Power Act is fully functioning here—i.e., states, regional planning authorities, and local utilities assessing power needs and executing on long-range planning goals. *See, generally,* Ex. 3. But, like the Winter Reliability Assessment, this document does not support the assertion that there is any emergency. Ex. 53 ¶ 12. Resource adequacy

evaluations such as these are focused on assessing the ability to provide electricity in worst case scenarios, but do not necessarily purport to predict whether those scenarios will occur. Ex. 3 at 11-13, 19. And, critically, the E3 report specifically indicates that any general "shortfall" in 2026 can be addressed through imports, a fact that the Order completely ignores. Ex. 3 at 10 (stating clearly that the rather small shortfall of 1,321 MW out of a total need of 50,737 MW, i.e., 2.6 percent, can be met through imports); *see also* Ex. 99 (Sylvan Energy Analytics, *Near-term winter resource adequacy challenges in the Pacific Northwest*, January 2026).

Putting this aside, the shortcomings in DOE's reliance on a PowerPoint presentation of a yet-to-be-released *draft* report are now readily apparent. For one, the deficit margin for 2026 is now estimated to only be a fraction of that already small deficit set out in the presentation once in-development resources coming online in 2026 are included.. E3 indicates the loss of load expectation for 2026 is 0.15 days per year. Ex. 91 ¶ 4 (Declaration of Arne Olson); *see also* Ex. 41 at ¶ 6.

Second, the Order also ignores E3's observation that resource adequacy *events* (i.e., actual emergencies or near-emergencies) usually take place in the northwest when there are "[e]nergy shortfalls that occur during low hydro years" Ex. 3 at 11-13, 19. The report does not make any prediction that 2026 will be a low hydro year. In fact, according to the EIA's short-term energy outlook published on December 9, 2025, all indications point to winter 2025-2026 having *better* hydro conditions than winter 2024-2025. Ex. 51 at 5, Table 1 (*citing* the U.S. Energy Information Administration's (EIA) Short-Term Energy Outlook published on December 9, 2025). *See* Ex. 61 (EIA Short-Term Energy Outlook). When combined with

the EIA's short-term outlook, E3's analysis set out in the PowerPoint supports the conclusion that a resource adequacy event is unlikely this winter. *See* Exs. 51, 61.

The E3 analysis also serves to highlight the Order's negative impact on resource adequacy over the next five years. Specifically, the Order cites the E3 estimate of a nearly 9 GW shortfall in 2030 as a concern DOE seeks to address. Ex. 1 at 1. But, as discussed in detail in Section VI.E.2, the Order impacts and, if continued, will prevent TransAlta from beginning the planned transition of Centralia to natural gas that would help address that very shortfall— a fact that alone renders the Order arbitrary and capricious. Ex. 51 at ¶ 17. Indeed, the E3 PowerPoint was presented in September of 2025, before TransAlta publicly announced plans to convert the Centralia site into a natural gas facility. The conversion of Centralia would therefore have added to the planned conversions noted on slide 10 of the PowerPoint. E3's presentation also specifically highlights that "[n]atural gas is the only viable near-term firm capacity option, yet siting new gas plants is extremely challenging and may create stranded asset risks." Ex. 3 at 22. If DOE is concerned about the Northwest's resource adequacy over the next 5 years and trusts the analysis presented in E3's report, then it could not have picked a worse course of action. The Order effectively prevents or delays the addition of a natural gas facility in 2028 that would not have needed new siting and would add capacity.

**3. DOE's July Resource Adequacy Report, even with significant flaws, directly contradicts the Order**

DOE's July 2025 Resource Adequacy Report, Ex. 4, also fails to provide substantial evidence of an emergency here, regardless of how DOE chooses to define that "emergency."

As DOE is aware, on August 6, 2025, Washington and several other states filed a Motion to Intervene and Protective Request for Rehearing regarding the 2025 Resource

Adequacy Report. Ex. 35. In that request, the States noted, "[g]iven that DOE has not yet applied the report to issue future emergency orders, the States do not concede that the Federal Power Act requires the States to request rehearing at this time." *Id*. at 1 (*citing* 16 U.S.C. § 825*l*). The States further "reserve[d] all rights to present these objections, or any other objection or legal challenge to the Report or DOE's reliance on this report going forward." *Id*. DOE responded to the Resource Adequacy Report Rehearing by stating that the Report was not an order under the Federal Power Act and, therefore, not subject to rehearing. Ex. 48 (*Dep't of Energy Response to State Rehearing Request of Aug 6*, Sept. 5, 2025). DOE never modified its report or responded to critiques the States and others raised about the report.

Because DOE relies on the Resource Adequacy Report as a basis for the TransAlta Centralia Order, Washington fully incorporates by reference the Resource Adequacy Report Rehearing request herein. For the reasons set out in our prior filing, and summarized below, the flaws in the Resource Adequacy Report undercut DOE's attempt to rely on it to further justify the TransAlta Centralia Order, and DOE's reliance on the Report provides yet an additional reason why the Order should be withdrawn.

As set out in the Resource Adequacy Report Rehearing, the Report suffers from a host of infirmities. The Report contains numerous analytical, mathematical, and empirical flaws. Its assumptions about load, growth, retirements, and capacity additions are unreasonable and unsupported by evidence or logic. *See* Ex. 35 at 21-25. Far from the only example, DOE unreasonably presumes that the market, grid operators, and state regulations will allow unrestrained load growth through 2030 regardless of its impact on reliability. *See id*. 22-23. The Resource Adequacy Report further: (1) acknowledged that data and input from other

states and regional entities could improve the analysis, but failed to consult with those entities or seek to obtain that data; (2) selected non-traditional and non-standardized resource adequacy metrics; and (3) arbitrarily relied on geographic groupings that fail to match the actual boundaries used by utilities, balancing authority areas, transmission planning regions, regional wholesale markets, NERC regional entities, or NERC Reliability Coordinators to reliably operate the Nation's electric grid. *See id*. 25-27.

Moreover, the Report rests on a transparently arbitrary definition of "firm capacity" that includes only fossil-fuel power plants. *See id*. 17, 21. This and other analytical flaws indicate that DOE seems to have prejudged the Report's outcome in order to pursue an extra-statutory motive, namely preserving aging and uneconomic fossil fuel power plants at consumer expense in direct contravention of the Federal Power Act's express goal of preserving just and reasonable rates and preventing undue discrimination or preference. *See id*. 27-29.

The Report also fails to consider reasonable alternatives. Specifically, the Report ignores, with no explanation, alternatives like: expanding interregional transmission, installing batteries and other energy storage technologies, deploying renewable energy, and requiring data centers to meet flexibility standards. *See id*. 20 – 25. Most glaringly, the Report ignores the existing resource adequacy mechanisms that are used by state and regional grid operators to assess reliability and respond to resource adequacy needs. *See id*. 4-10, 31-32. That is a convenient omission as the Report is now being used to justify 202(c) orders that intrude on matters reserved for the States. *See* 16 U.S.C. § 824(b)(1); *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

64

Yet, even under DOE's biased projections, the July Assessment fully contradicts any finding of an emergency, reinforcing the arbitrary nature of the Order. The Resource Adequacy Report concluded that the WECC Northwest meets reliability standards. Ex. 4 at 7. Per DOE, any potential reliability issues would occur years in the future, and only if DOE's speculative assumptions about future supply and demand prove accurate. Forcing ratepayers to pay to keep generation online that is not needed, simply because technology companies *may* be building more data centers in the future that *may* need that power is arbitrary and violates the Federal Power Act's requirement that rates be just and reasonable, especially as other analyses indicate that data center projections may be overblown. Ex. 96 (*PJM to Ratchet Down Projected AI Power Demand For Eastern US*, EnergyWire, January 6, 2026); *see also* Ex. 35-3 at 23, (Rehearing Ex. C Institute for Policy Integrity Report); Ex. 35-5 (Rehearing Ex. E London Economics International Report). And assuming *arguendo* that DOE could base an emergency finding on speculative conditions to occur years in the future, DOE's own analysis found that, if power plants retire as planned, there is still no reliability issue in the Washington subregion. Ex. 4 at 8. In fact, even not looking solely at the Washington sub-region, the West Non-CAISO region identified in the Report fares better than any other region in the country assessed, save CAISO. *See* Ex. 4 at 37.

The July Resource Adequacy Report fails to establish substantial evidence of an "emergency" and justifies DOE's withdrawal of the Order.

**4.      WECC Northwest has sufficient existing capacity resources to cover the winter months without Centralia**

As noted, the retirement of coal generation at TransAlta Centralia has been in the works for well over a decade. It is no surprise, therefore, that regional utilities conducted their

planning for the upcoming peak winter months with that shut down in mind. As described below, both state and federal reporting demonstrates that WECC Northwest has adequate generation to maintain capacity during the upcoming winter peak season without Centralia. Any long-term uncertainty about capacity will be exacerbated, not aided, by DOE's current emergency order stalling the shutdown of coal generation at Centralia and potentially delaying conversion to natural gas.

First, both NERC and WECC "indicate the Northwest's electric grid meets national resource adequacy criteria under normal conditions." Ex. 22. While extreme weather poses an "elevated risk of short-duration outages absent additional measures" (such as backup generators or power imports) both BPA and Washington's utilities "do not forecast outages this winter." *Id*. This is partly because the "[m]ost constraining reliability conditions are extended wintertime cold weather events during very low water years" and, unsurprisingly, that "[l]oss of load events are concentrated during the lowest hydro years." Ex. 3 at 11-12. In other words, reliability depends on the "ability to supply energy during multi-day cold snaps under low hydro conditions." *Id.* at 19. But this year, the National Oceanic and Atmospheric Administration's 2025-2026 Winter Outlook predicts "above-average precipitation" in the Pacific Northwest, *see* Ex. 64 at 4 (NOAA, *Winter Outlook 2025-2026*, Nat'l Weather Serv.), and drought improvement is also expected in the region. *Id*. at 5. According to the Northwest River Forecast Center's 120-day hydrology forecast, which "is a leading indicator of near-term expected hydro generation," the region's rivers are at 114 percent of average. Ex. 49 at ¶ 8.

Next, other available studies show that capacity reliability for the upcoming winter season is sufficient for WECC Northwest. NERC's Winter Reliability Assessment gauged WECC Northwest's reliability in the coming months, spanning the 2025-2026 winter season. Ex. 2 at 4. Per NERC, "[o]perating reserve margins are expected to be met after imports in *all winter scenarios*." Ex. 2 at 37 (emphasis added). This is *after* taking into account the closure of Centralia. While acknowledging "[l]arge coal unit retirements and conventional hydro unit retirements" result in a ten percent reduction in capacity, the report states that "Tier 1 resources have soared over 580% . . . to over 3 GW." *Id*. NERC's assessment on WECC Northwest concludes with a statement that there is sufficient reliability in the region, asserting that the increase in firm imports (amounting to 6.1 GW) "absorbs" the reduction of 4 GW of "existing certain capacity."[17] *Id*. In simple terms, NERC's analysis "showed zero hours and zero energy going unserved this winter" in the Northwest region. Ex. 51 at ¶ 14.

Washington's investor-owned utilities have also concluded in their integrated resource plans that resource needs are met even when assuming the short-term loss of Centralia power. For example, Washington's largest utility, Puget Sound Energy, has filed seven integrated resource plans or resource plan progress reports since 2010, required filings for all Washington utilities that must include information about load forecast in the utility's service area and how that load will be met through distributed energy resources, supply-side resources, and renewable resources. WAC 480-100-620(2)-(5). None of Puget Sound

---

[17] This is in accord with DOE's own work. Washington disagrees that DOE's Resource Adequacy Report is a reliable source. *See* Section VI.C.3 *supra*. But, in that Report, DOE itself found "all regions except ERCOT have less than 2.4 hours of average loss of load per year[.]" *Id*. at 7.

Energy's integrated resource plans include TransAlta Centralia as a coal resource past December 31, 2025. Ex. 51 at ¶ 8. This indicates that, for well over a decade, Puget Sound Energy has been planning on meeting demands—including peak capacity needs—without Centralia. *Id*. Indeed, Puget Sound Energy recently confirmed to the Washington Utilities and Transportation Commission that its existing gas-fired generation is expected to fill the resource adequacy requirement gap left by TransAlta Centralia in the coming winter months. *Id*. at ¶ 11; Ex. 51-1 at 19:2–4.

Additionally, E3 discussed resource adequacy in its latest study presented to the Washington Utilities and Transportation Commission. *See* Ex. 3. The E3 study also excluded coal as a solution to the region's long-term resource adequacy concerns and instead focusses on three alternatives: (1) demand response, (2) battery storage, and (3) *natural gas*. Ex. 51 at ¶ 17. This last resource is critical. As E3 notes, "[n]atural gas is the only viable near-term firm capacity option." Ex. 3 at 22. This is because even the least agile natural gas plant is much more agile than a coal plant for start-up time and output time to meet load. Ex. 3 at 22; Ex. 51 at ¶ 20. Coal plants are also more likely to trip out of service than their gas counterparts. *Id*. at ¶ 21, Figure 1 Per NERC, the average weighted equivalent forced outage rate for coal is 11.7 percent as opposed to 7.7 percent for natural gas. *Id*. More than that, simple economics heavily favor operating this plant as a natural gas versus coal-fired unit. Ex. 49 at ¶¶ 5, 8.

Finally, these resources—and more—lead to one conclusion: extending Centralia's coal generating life is not a long-term solution for Pacific Northwest resource adequacy. A short-term extension of Centralia does not actually resolve capacity needs created by a "surge in electricity demand," Ex. 1 at 2, from sources like data centers and domestic manufacturing.

These are long-term increases in demand and will not go away after three months. Ex. 51 at ¶ 23. However, converting TransAlta to natural gas, with a planned capacity of 700 MW, supports that growth. Ex. 65 (*TransAlta Signs Long-Term Agreement for 700 MW at Centralia Facility Enabling Coal to Natural Gas Conversion*, TransAlta, December 31, 2025). Centralia cannot operate as a coal-fired plant while conversion takes place as construction is required to convert the facility from coal to gas fuel use. Ex. 51 at ¶ 24. To the extent that DOE is concerned about insufficient supply, postponing construction of a resource with operational capabilities better suited to meeting future load growth will be highly detrimental to mid-term resource adequacy in the region. *Id*.

In short, the available studies, and the fact the retirement of this facility as a coal-filed resource has been planned and expected for an extended timeframe, contradict the Order's assertion that the 2025-2026 winter season represents an "emergency" that warrants Centralia's continued operation as a coal plant. The Order does not contest the validity of state and utility planning identifying that adequate resources exist to cover the region's power needs for the foreseeable future, even without Centralia.

## D.     DOE's Order is Arbitrary and Capricious and Contrary to Law

Agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted). In doing so, the agency cannot rely on "factors which Congress has not intended it to consider[.]" *Id*. The "reasoned explanation requirement of administrative

law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) (*Dep't of Commerce v. New York*).

In addition, when an agency "rescinds a prior policy," the agency must, at minimum, "consider the 'alternatives' that are within the ambit of the existing policy[,]" "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30, 33 (2020). An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem before" it. *Regents*, 591 U.S. 1 at 25 (citation omitted); *see also id.* at 30. An agency must "pay[] attention to the advantages *and* the disadvantages" of its decision. *Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015).

DOE's Order fails all of these benchmarks.

### 1. The Order directs entities to act that have no authority to order TransAlta Centralia to run

DOE's Order is arbitrary and capricious because it is unclear who has authority to direct TransAlta Centralia's operation. Specifically, the Order states that TransAlta Centralia will be "available to operate at the direction of either the Bonneville Power Administration (BPA) (in its role as Balancing Authority) or the California Independent System Operator Corporation Reliability Coordinator West (in its role as the Reliability Coordinator)." Ex. 1 at 4. In support of this statement, footnote 18 of the Order cites to the NERC "list of acronyms for Reliability Coordinators" and the "NERC Compliance Registry." *Id*. n. 18.

But, in reality, it is entirely unclear whether BPA or CAISO actually serve in those roles. For one, Washington utilities have identified to counsel for the State that, in

70

conversations with BPA, BPA does not believe it has the authority to direct Centralia's operation. Other sources indicate that the Southwest Power Pool may operate as the Reliability Coordinator for TransAlta Centralia as part of its Western RC Services. Ex. 92 (Southwest Power Pool Map); Ex. 93 at 6 (GRID Compliance Audit), and that Gridforce Energy Management, LLC, is the Balancing Authority. *Id*. The Southwest Power Pool has separately identified to the State that they do serve as Reliability Coordinator for Gridforce relative to Centralia.

Either way, this renders DOE's Order arbitrary. Washington disagrees that there is even an emergency problem to be solved here. But, even if there were, DOE entirely fails to "consider an important aspect of the problem" by potentially naming the wrong entities who can even order Centralia to run—or at least failing to understand the complexities at play and the resulting confusion that would result. This renders the Order "so implausible that it [cannot] be ascribed" to any rational view or expertise. *Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This confusion illustrates the danger in DOE claiming "emergency" authority to exercise unfettered control over the Nation's power grids from now until some unspecified point in the future. In any event, this justifies immediate withdrawal of the Order.

2. **The Order fails to comply with section 202(c)'s requirement to craft terms that "best meet the emergency and serve the public interest" and arbitrarily fails to consider reasonable alternatives**

Washington disagrees that a legitimate section 202(c) emergency exists. But even if there was an emergency, section 202(c) mandates that DOE implement only those measures that "will best meet the emergency and serve the public interest. 16 U.S.C. § 824a(c)(1). This

requires energy to perform at least some analysis of available options and then select the option that is "most advantageous." *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (defining "best" in the context of the Clean Water Act's "best technology available" standard). The APA also requires DOE to consider reasonable alternatives as a hallmark of reasoned decision-making. *See Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (reviewing cases).

Thus, at a minimum, DOE must evaluate competing approaches and assess how effectively each would resolve the purported emergency and advance the public interest, accounting for the benefits and drawbacks of each option. *See, e.g., Michigan v. EPA*, 576 U.S. 743, 750-51(2015) (noting minimum requirements of "reasoned decisionmaking" by administrative agencies). While DOE need not analyze every conceivable option, it must examine approaches that fall within the regulatory framework, as well as options that are significant, feasible, or self-evident. *See Dep't of Homeland Security v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020). The scope of required alternatives analysis will vary with the nature of the crisis. A genuine emergency demanding action within hours would justify more limited analysis than a situation allowing days or months for deliberation. *See* 16 U.S.C. § 824a(c) (directing the exercise of judgment).

Here, DOE fails to exercise reasoned judgment on multiple levels. First, it does not appear that DOE engaged in *any* alternatives analysis, much less a reasoned one. The Order contains no explanation whatsoever for DOE's determination that ordering an aging coal plant with no workforce, no customers, and no coal is the option that "best meets" both the alleged emergency and the public interest. *See* Ex. 1. DOE's omission of an alternatives analysis

72

directly violates section 202(c)'s mandate to implement only those measures most effective in addressing the emergency.

The failure to address alternatives is particularly troubling when it comes to power imports because DOE's own regulations reinforce that a *lack* of available imports is one of the lynchpins that must undergird a section 202(c) order.[18] Specifically, DOE's rules identify categories of information applicants for a section 202(c) order must submit, and DOE must weigh when determining whether to issue, and how to craft, a section 202(c) order. 10 C.F.R. § 205.373. That required information encompasses "conservation or load reduction actions," "efforts … to obtain additional power through voluntary means," and that "*adequate electric service cannot be maintained without additional power transfers*." *Id*. (emphasis added). Yet the Order fails to address any of these issues, including the availability of imports to meet demand. *See* Ex. 1.

That failure is especially baffling here. The closest DOE comes to identifying any emergency need within the 90-day period of the Order is the hypothetical—and admittedly "extreme"—scenario identified in the NERC reliability assessment.[19] That very assessment

---

[18] DOE's failure to evaluate *exports* is also troubling. In October 2025, DOE authorized entities within the NERC Northwest region—and elsewhere—to export power into Canada. *See, e.g.,* Ex. 95 (Order EA-365-C, October 21, 2025). In doing so, DOE specifically found that "wholesale energy markets are sufficiently robust to make supplies available to exporters." *Id*. at 4. DOE's October actions directly contradict the Order and further illustrate its arbitrary nature.

[19] Washington again disputes that these assessments constitute an "emergency" as contemplated by section 202(c). In any event, the NERC assessment was crafted *before* actual conditions in the Pacific Northwest were known, a fact that DOE fails to address. The Pacific Northwest has experienced historic rain events throughout the fall and now early winter. Ex. 41 at ¶¶ 8-9. Reservoirs are at capacity and hydropower capacity is expected to operate well above demand for the foreseeable future. *Id*.

explicitly acknowledges imported power could meet WECC Northwest's needs in the unlikely event of such a weather event knocking local resources offline. *See* Ex. 2 at 37 (acknowledging that "external assistance" can be used to maintain reserves in the event of "[a]bove-normal peak demand combined with high generator outages in extreme conditions"). As discussed above, imports have been highly successful in meeting the Pacific Northwest's power needs during adverse weather conditions, including an extreme cold weather event in 2024. Ex. 50 at ¶ 13. By disregarding imports, despite NERC's express recognition of this solution, the Department abandoned its statutory duty to choose the most effective emergency response.

And the failure to evaluate imports is difficult to understand given DOE's recent order permitting *exports* to Canada. *See, e.g.,* Ex. 95 (Order EA-365-C, October 21, 2025). For one, in doing so DOE specifically found that "wholesale energy markets are sufficiently robust to make supplies available to exporters." *Id*. at 4. Moreover, DOE also acknowledged that there are "always entities with broader responsibilities … such as reliability coordinators and balancing authorities, to keep a constant watch over the domestic transmission system. *Id*. at 7; *see also* Ex. 50 at ¶ 15 (noting western reliability coordinators have authority to "alert all other balancing authorities and market participants of the status, and evaluate mitigation options such as re-dispatching generate, cancelling or recalling transmission and generation outages, and managing generation to address capacity"). DOE's October actions directly contradict the Order and further illustrate its arbitrary nature.

Furthermore, picking TransAlta Centralia to remain available to operate cannot constitute the most effective emergency response given the facility's operational constraints and performance record. On operational constraints, coal plants like TransAlta Centralia need

anywhere from 12 to 18 hours for startup—a timeframe fundamentally at odds with addressing any crisis requiring prompt action. Ex. 11 at ¶ 8. But even beyond these inherent limitations, TransAlta Centralia is a poor choice. The facility's boilers are nearly 60 years old. Since 2023, TransAlta Centralia has had 29 shut-downs, all but three of which were forced outages. Ex. 11 at ¶ 7. The facility's age and history of repeated unplanned outages in recent years severely undercut any claim that it represents a dependable emergency resource.

Finally, forcing TransAlta Centralia out of coal retirement cannot be the "best" choice for addressing the emergency and public interest even if DOE's general longer-term power supply concerns could be viewed as a valid basis for an emergency order, which they cannot. As noted, TransAlta Centralia is not shutting down—it is *expanding*. This years-in-the-making plan for the facility, that DOE's Order now threatens to disrupt, calls for a natural gas conversion of Unit 2 that will increase TransAlta Centralia's capacity by 30 megawatts and allow it to operate as a "peaker" plant—capacity and functionality that is necessary to prevent the type of emergency DOE's Order allegedly addresses. While the conversion of TransAlta Centralia might not be substantially impacted if the Order is limited to a 90-day period, DOE's practice in other states has been, citing long-term power needs, to roll the orders over for additional terms. Ex. 58 (Campbell Extension Order); Ex. 59 (Eddystone Extension Order). If that occurs here, DOE's Order will substantially worsen the region's power capacity, not improve it. *See, e.g.,* Ex. 41 at ¶¶ 9-13.

3. **The Order's statement regarding "continuous operation" is arbitrary, capricious, and contrary to law**

Citing reliability and other concerns, footnote 11 of the Order references TransAlta Centralia's "continuous operation … so long as the Secretary determines a shortage exists and

75

is likely to persist." Ex. 1 at 2, n. 11. As noted in Section V. above, DOE should clarify this statement to confirm that TransAlta Centralia simply maintain operational readiness, but not be directed to run unless and until there is an emergency loss of regional capacity that cannot be addressed by other resources, including power imports. In the absence of that clarification, however, DOE's order is arbitrary and capricious and contrary to section 202(c)'s express limitations on emergency orders.

First, any command that TransAlta Centralia generate power—at any level—is senseless and would constitute the apex of arbitrary administrative action. Putting aside the fact, as set out in Section VI.D.1, that the entities DOE identifies in the Order as directing Centralia's operation do not actually have the authority to direct that operation, any entity directing Centralia to fire up absent the actual need for that power would be, *at best*, a waste of resources and, *at worst*, potentially harmful to the regional grid.

This is because, absent an actual emergency loss of power, TransAlta Centralia power has nowhere to go in the area within which DOE claims to be mitigating the alleged emergency without shutting off other more economical and readily available sources. Section 202(c) does not authorize DOE to force any entity to purchase power involuntarily, and Centralia's contracts with Puget Sound Energy have terminated. Regional planning authorities have long presumed, and based forecasted needs on, not having Centralia capacity until it resumes operation as a natural gas facility in 2028. Washington's utilities are statutorily prohibited from providing coal power to their customers. *See, generally,* Chapter 19.405 RCW. And the BPA, by far the largest power provider in the Pacific Northwest, has no contracts with TransAlta Centralia and cannot take its power absent an *actual* emergency

76

power loss or other circumstances not applicable to Centralia. *See* 16 U.S.C. § 832d (setting out contracting limitations and authorizing purchases from public or private power systems only for "the mutual exchange of unused excess power … for the purpose of economical operation or of providing emergency or break-down relief"). Moreover, the price of Centralia's coal power is significantly higher than the wholesale energy market price. Ex. 41 at ¶¶ 14-15. This clearly indicates that, if Centralia is ordered to operate in the absence of an *actual* emergency, it will not be economical to dispatch in relation to other resources, and whomever is forced to purchase Centralia power will pay a higher price. *Id*.

Whatever energy needs DOE thinks it would alleviate, they are certainly not in the WECC Northwest. Rather, it appears the real beneficiary of these orders, per the President's direction, is the coal industry, not consumers or grid reliability. DOE's failure to consider the rate impacts to consumers from its Order, or whether the resulting rate will be just and reasonable, arbitrarily ignores an important aspect of the problem. *See* 16 U.S.C. § 824d(a) (stating unjust or unreasonable rates are unlawful).

Second, an order of continuous operation is also contrary to clear limitations on DOE's exercise of section 202(c) authority. Congress understood the danger of having section 202(c) orders providing blanket and long-term exemptions from environmental laws. As a result, Congress placed two important limits on section 202(c) orders, both of which are violated by the Order here.

The first of those is a time restraint. Section 202(c) requires that DOE ensure that any electric generation under an emergency order occurs "only during *hours* necessary to meet the emergency and serve the public interest." 16 U.S.C. § 824a(c)(2) (emphasis added). If

77

TransAlta Centralia was required to generate power, DOE's Order violates this statutory limit because operating Centralia in any capacity when it is not needed cannot possibly meet the requirement to only order those "*hours*" necessary to meet the emergency and serve the public interest. DOE cannot transform an hour-by-hour limitation into a blanket waiver through alleging "elevated risk" of tight operating reserves and "*potential* loss of power." Ex. 1 at 1, 3.

DOE's Order also violates section 202(c)'s environmental limitations. Section 202(c)(2) requires 202(c) orders comply with environmental laws and minimize any adverse environmental impacts "to the maximum extent practicable." 16 U.S.C. § 824a(c)(2). While DOE's Order makes no attempt to even identify those impacts here, they are evident. TransAlta Centralia is subject to air operating permits regulating a host of contaminants dangerous to both human health and the environment. Ex. 11 at ¶ 5. Significantly, Centralia has had documented issues with both carbon monoxide and particulate emissions, regularly requiring the plant to operate at limited capacity in order to meet safe emission requirements. *Id*. at ¶ 9. As discussed in Section III above, operating Centralia will also directly violate Washington and federal law and enforcement orders issued by the Department of Ecology. This includes controls required to meet visibility and regional haze requirements under the Federal Clean Air Act. *See, e.g.*, Ex. 7 at 4; Ex. 8 at 3.

To be sure, the Order makes gestures towards "minimizing environmental impacts" by limiting operation to whenever Centralia is "available to operate" at the direction of the Balancing Authority or the Reliability Coordinator. Ex. 1 at 3-4. But if DOE intends "available to operate" as a command that Centralia operates continuously—regardless of any actual need for Centralia power—DOE's Order violates the requirement to ensure environmental impacts

78

are "minimized." 16 U.S.C. § 824a(c)(2). In other words, it is impossible for an order requiring Centralia to run continuously *and for no apparent reason* to be seen as minimizing environmental impacts "to the maximum extent practicable." *Id*. Any command otherwise violates section 202(c)(2). *See* 16 U.S.C. § 824a(c)(2).

**4.     The Order will destabilize the very energy grid it purports to protect.**

Washington utilities are subject to significant reporting and planning requirements. Under Washington law, utilities with 25,00 customers or more, like Puget Sound Energy, must develop, and periodically update integrated resource plans and file updates to those plans every two years. RCW 19.280.030; Ex. 51 at ¶ 7. All Washington's electric utilities must file their integrated resource plans with the Washington UTC, which may approve, reject, or approve plans with conditions. RCW. 19.280.040(1).

Integrated resource plans are subject to substantial vetting prior to filing. No later than fifteen months before the plans are due to the Commission, the utility must file a work plan that includes input from its advisory groups. WAC 408-100-625(2). Four months prior to the due date, the utility must file a draft plan, including its preferred portfolio, supporting analyses, and all potential scenarios and sensitivities. WAC 480-07-625(3). Once a final plan is filed, a diverse group of stakeholders analyze, review, and comment on these plans.

The content of integrated resource plans in Washington is robust, with an eye toward keeping the lights on in periods of high demand. Utilities must develop a long-term "preferred" portfolio and support that portfolio with an analysis of how it plans to meet hourly load, with all available resources, in a cost-effective manner while ensuring reliability and resource adequacy. WAC 480-100-620(11). In Washington, integrated resource planning

79

takes place over a twenty-year time horizon. RCW 19.280.030; Ex. 51 at ¶ 7. The objective of an IRP is to ensure a utility's resource portfolio is the least cost, least risk option. Robust resource planning is critical for utilities to make investment decisions that are reasonable, prudent, and in the public interest. *Id* . The planned retirement of TransAlta's Centralia coal plant occurs in this resource planning context.

As noted, Puget Sound Energy—and the region as a whole—has long planned for the retirement of the Centralia coal plant. In 2012, Puget Sound Energy entered a "coal transition" power purchase agreement with TransAlta pursuant to S.B. 5769. RCW 80.80.010(5). Puget Sound Energy entered this agreement with an understanding that Centralia would leave its resource stack after December 31, 2025. Puget Sound Energy petitioned the Washington UTC for approval of this agreement. After robust litigation, the UTC concluded the coal-transition agreement—set to expire on December 31, 2025—was in the public interest. *Id.*, *See* Ex. 98 (*In the Matter of the Petition of Puget Sound Energy, Inc.*, 304 P.U.R.4th 42, 2013 WL 139618 (Jan. 9, 2013)).

After the entry of the UTC's order, the retirement of TransAlta became a planning assumption for Puget Sound Energy. As set out in Section VI.C.4 *supra*, Puget Sound Energy has filed *five* integrated resource plans or progress reports since the original Centralia plan was approved. Ex. 51 at ¶ 8. None of Puget Sound Energy's IRPs contemplated a long-term coal contract post-2025. *Id*. Each IRP was reviewed and approved as described above. Puget Sound Energy, the Commission, and interested stakeholders reviewed these plans to ensure that, among other things, resource adequacy standards were met. The resource planning process worked as it was supposed to do. *See* Ex. 53 at ¶ 8.

To that very point, the Puget Sound Energy/TransAlta deal to convert the retiring plant to a simple cycle natural gas plant to meet the future needs of the region's renewable-heavy resource mix has been finalized. Ex. 66 (TransAlta Centralia to Transition from Coal to Natural Gas, December 10, 2025). This has long been Puget Sound Energy's plan to replace the coal power that was being removed from its system. In the company's 2024 General Rate Case, a Puget Sound Energy witness testified that the company would meet any potential resource adequacy challenges, in part, using its existing gas-fired generation fleet to meet reliability and resource adequacy deficits for the region as a whole caused by the removal of coal-fired generation. Ex. 51 at ¶ 121. The closure of Centralia is not a loss of needed power, but the replacement of one firm power resource for another, as part of a larger, region-wide resource adequacy plan.

Yet, in its Order, DOE has thrown this entire process into chaos and displaced the judgment of local regulators in favor of coal-fired generation. In doing so, DOE has needlessly injected uncertainty into the local energy market, risking the destabilization of the Northwest's energy grid. This is particularly troubling given that a failure in resource planning leads to high costs and, critically, over- or under-procurement.

This concern is immediately apparent in the Order. Setting aside the fact that the Northwest is experiencing an energy *surplus* this winter due to historic rains, the Order cites the NERC Winter Reliability Assessment finding that winter peak demand is forecast to be 2.9 GW higher this year compared to last year. Ex. 1 at 1. As currently configured, however, Centralia is a coal baseload generating facility operating on entirely different economic principles than a plant intended to meet peak demand. Allowing for the planned retirement

81

*and conversion* represents a far greater contribution to resource adequacy than the forced operation of an expensive, aging coal plant.

As currently operating, Centralia is also ill-suited to meet Washington's peak resource needs for several additional reasons, including its status as a merchant plant. This means Centralia operates only when it is profitable to do so—i.e., when there is a buyer in the market. Ex. 11 at ¶ 6. As noted above, Washington utilities cannot include coal resources in rates after December 31, 2025, and other states functionally exclude coal power or are in the process of a phase-out. This significantly limits the number of purchasers in the region. RCW 19.405.030(1). Centralia is also less efficient and more unreliable than the gas plant it will ultimately become. Between 2023 and 2025, the plant was offline for nearly 5,000 hours—over 10% of its hours over a three-year period. Ex. 11 at ¶¶ 6-7. Most of these outages were forced outages. *Id.*

Centralia's merchant status also contributes to the plant's inflexibility. The plant will spend most of its time offline and will need to be restarted each time an entity purchases power. Ex. 11 at ¶ 6. In such an event, the plant will take up to eighteen hours from startup to a load of just 300 MW. *Id.* at ¶ 7. By ordering the unit to continue to run, DOE effectively deprives the region of a much-needed, efficient, 700 MW gas peaking resource. Ex. 50 at ¶ 11, n.1. It is also unclear how well Centralia could operate as a coal plant in a manner that can meet peak demand given the significant ramp-up time associated with coal plants. While the planned conversion to a natural gas plant may not fully alleviate the ramp-up issues for Centralia, those issues can be addressed over the next two years to maximize the ability of Centralia to enhance reliability in the region.

82

Put simply, the region did not plan for Centralia to continue operating past December 31, 2025. Washington electric utilities anticipated the plant's retirement and planned for it in their IRPs. In the case of Puget Sound Energy, its IRPs anticipated replacing Centralia's power with power from other sources. As stated above, these plans were vetted by local stakeholders and approved by regulators.

DOE has ignored this process and has now called every electric utility's integrated resource plan into question. As coal is phased out of Washington rates, coal plants will be retired. Utilities must be allowed to plan for coal retirements and regulators must have the flexibility to approve those plans. Ultimately, DOE's actions in this case are more than simply disruptive, they are destructive. They undermine prudent utility practice and disregard local decision making. The Order is a recipe for chaos in the local power system and, indeed, has the potential to destabilize the very grid it seeks to protect by denying the region a needed resource. The Order does not contend the region lacks sufficient baseload capacity, and indeed it recognizes the region has "sufficient capacity in the area for expected peak conditions." Ex. 1 at 1. However, ordering the Centralia plant to remain open as a coal plant threatens the creation of a much-needed resource necessary to meet the challenges the Order contends the Northwest is ill equipped to face—extreme weather or a sudden increase in demand. *Id.* In doing so, the Order recklessly puts the region in jeopardy.

**5.      The Order is an unlawful pretext for buttressing the President's policy goal of supporting the coal industry**

The Order is not merely a questionable policy choice. It is a naked effort to boost demand for the coal industry that the Trump Administration favors, resting on the false pretext of an emergency. The Order is unrooted in any emergency and its actual endgame—coal

boosterism—cannot withstand legal scrutiny. Because the Order is pretextual, it should be withdrawn.

Agency action should be set aside as arbitrary and capricious when it rests on a "pretextual" reason that is "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Commerce v. New York*, 588 U.S. at 782. Courts are "not required to exhibit a naiveté from which ordinary citizens are free," and they must "ensure that agencies offer genuine justifications for important decisions." *Id.* at 785. For example, in *Department of Commerce v. New York*, the Supreme Court invalidated the administration's attempt to add a citizenship question to the 2020 census. *Id.* The Court held that the justification proffered by the administration—to help enforce the Voting Rights Act, not to suppress population counts in districts with larger numbers of noncitizens—was mere pretext and a "distraction," not an explanation of the "reasoned decisionmaking" that the administration claimed. *Id.* "[D]ecisions featuring unjustifiable bias or partisanship are precisely the types of agency actions that 'would work a violation of the arbitrary-and-capricious standard.'" *Level the Playing Field v. FEC*, 961 F.3d 462, 464 (D.C. Cir. 2020) (quoting *Hagelin v. FEC*, 411 F.3d 237, 242 (D.C. Cir. 2005)); *see also Rhode Island State Council of Churches v. Rollins*, 25-CV-569-JJM-AEM, 2025 WL 3111213, at *10 (D.R.I. Nov. 6, 2025) (issuing a restraining order because stated reason seemed "entirely 'pretextual'" in light of "numerous statements" making clear that agency action was "for political reasons").

As explained above, the "emergency" invoked by DOE does not exist. Even if it did, continuing TransAlta Centralia operations is not the remedy. A brief examination of the Trump Administration's public statements from 2025 alone shows the "emergency" is mere

84

pretext for the true objective, unstated in the Order: to promote the coal mining industry by stoking demand for coal. This disconnect between the invoked emergency and the real goal requires the same scrutiny applied in *Department of Commerce* and subsequent cases. Just as the Commerce Department's rationale masked an attempt to suppress census counts in certain districts, DOE's grid "emergency" rationale finds its true lodestar in an attempt to spur demand for one of the Trump Administration's favored industries.

Coal production in the United States has steadily fallen from 2008 to 2024, with coal-fired power declining by 67% over the same period as it faced increasing competition from natural gas and renewable energy. Ex. 68 (E&E News, *Trump has vowed to make coal king again. How's it going?*, September 26, 2025). Trump sought to reverse the trend—not just by expanding coal mining, but also by juicing demand for coal. On April 8, 2025, and among other orders purporting to address energy needs, President Trump issued an Executive Order that removed barriers to coal mining and rescinded policies that impede the consumption of coal. *See* 90 Fed. Reg. 15517. At the signing ceremony, President Trump proclaimed an energy policy aimed at "bringing back an industry that was abandoned" and "ending Joe Biden's war on beautiful clean coal once and for all," promising that "[a]ll those plants that have been closed are going to be opened." Fox 29 Philadelphia, *FULL SIGNING: President Trump signs executive orders on coal mining* (YouTube, April 8, 2025).[20] This requires not only increasing production but also boosting demand, and that is what the President has set

---

[20] https://www.youtube.com/watch?v=1TfJUn2VxM4.

out to do in no uncertain terms: "We're going to guarantee that we have a strong [coal] business for many years to come."[21]

This boosterism is precisely what the administration is engaged in with its current section 202(c) orders. Since April 2025, the Trump Administration has issued multiple orders expanding coal mining and cancelling long-planned closures of coal-burning power plants, all while denigrating competitors of coal (e.g., renewable energy) that could add more electricity to the grid. *See, e.g.*, Ex. 69 (U.S. Dept. of Interior Press Release, *Interior Approves Mining Plan to Unlock 14.5 Million Tons of Coal*, August 8, 2025); Ex. 27; *see also* Forbes Breaking News, *Trump Goes on Sudden Tirade Against Windmills During Meeting With EU President Ursula Von Der Leyen,* (YouTube, July 27, 2025) ("we will not allow a windmill to be built in the United States").[22]

The administration's policies do not spring from nowhere but were instead designed to prop up an industry that donated millions of dollars to Mr. Trump's campaign. Ex. 70 at 20 (New York Times, *Hundreds of Big Post-Election Donors Have Benefited From Trump's Return to Office*, December 22, 2025) ("About two dozen companies with interests in oil, gas and coal donated at least $41 million."). And so, at the coal industry's behest, the Trump Administration is offering "white glove service" and "concierge service" to companies interested in "keeping coal plants open" via a "little tiger team . . . put together very particularly with the president's priorities in mind on energy," namely "keeping coal plants open." Ex. 71 (Washington Post, *White House offers "concierge" service to fossil fuel firms,*

---

[21] *Id.* at 19:58.
[22] https://www.youtube.com/watch?v=1Asznj3uWKA at 0:06.

86

*official says*, October 7, 2025). At the expense of the health of coal miners, the Trump Administration has given owners of the coal industry a windfall and eradicated programs within HHS designed to research and protect the health and safety of coal miners—including NIOSH's Spokane Mining Research Division in Washington State—or stalled regulatory efforts to limit miners' exposure to toxic silica dust. Ex. 72 (The Hill, *Trump admin will reconsider part of rule to protect miners from lung diseases*, December 1, 2025); *See also* Ex. 75 (Notice to Stakeholders). The President has gone so far as to require staffers to always precede every utterance of the word "coal" with "clean and beautiful" because he feels the coal industry "needs a little help public relations wise." Ex. 73 (E&E News, *Trump wants mining. Federal mine safety workers are on the chopping block*, September 5, 2025); *See also State of New York v. Kennedy*, 1:25-cv-00196, (D.R.I. May 09, 2025) ECF Nos. 44, 55, 84 (declarations from NIOSH employees detailing the Trump Administration's destruction of NIOSH's Mining Research Divisions in Spokane and Pittsburgh).

Finally, the Order also advances the Administration's policy of discriminating against alternative energy sources to advance the extra-statutory motive of protecting the coal industry at consumer expense, which is contrary to express goals of the Federal Power Act. *See* 16 U.S.C. §§ 824d, 824e; *see also* Ex. 35 at 27-29. Sections 205 and 206 of the Federal Power Act require rates to be just and reasonable and not unduly discriminatory or preferential. *See id*. Purporting to justify a section 202(c) order for a coal plant that is not needed and ignoring other viable, cheaper methods to preserve grid reliability is likely to result in unjust and unreasonable rates.

Ultimately, the Order is founded in the Trump Administration's desire to boost the consumption of coal. Knowing that favoritism toward the coal mining industry would not qualify as an emergency under section 202(c), DOE contrived an electrical grid emergency. But "contrived reasons . . . defeat the purpose" of the "reasoned explanation requirement." *Dep't of Commerce v. New York*, 588 U.S. at 785. Moreover, even the Trump Administration's contrived reasons do not make sense as the continued operation of Centralia will most likely do nothing to abate the supposed emergency. The Order is based on a pretext, in violation of both the APA and multiple sections of the Federal Power Act. It should be withdrawn on those grounds.

**E.      The Order Will Undermine the Northwest's Energy Market, Increase Electricity Rates, and Harm Consumers**

As noted, Congress explicitly limited DOE to actions under 202(c) to "meet the emergency and *serve the public interest*." 16 U.S.C. § 824a(c)(1). Here, the public interest is further not served by destabilizing the regional energy market in the short and long term, unnecessarily increasing customer rates amid an ever more dire affordability crisis and refiring a heavily polluting plant on the eve of its retirement. The true impact of DOE's Order will create future energy shortages that may have otherwise been mitigated—all while forcing the American public to foot the bill. DOE's Order serves the private coal industry, not the public interest. To use Secretary Wright's words, DOE's 202(c) Order here and elsewhere are "radical nonsense policies that dramatically raise prices on the American people." Ex. 90 (White House, *What They Are Saying: President Trump Stops Radical Environmentalism to Generate Power for the Columbia River Basin,* June 13, 2025). This further renders the order arbitrary and capricious because it utterly fails to consider the immediate disruption it causes

88

to the Northwest energy market. *See Michigan*, 576 U.S. at 753 (an agency must "pay attention to the advantages *and* the disadvantages of [its] decisions").

**1.      DOE's Order will cause immediate disruption to the Northwest energy market because it could force curtailment of cheaper and abundant hydropower.**

The Northwest is characterized by water—coming down as rain in the western lowlands and snow in the mountains—all of which eventually flows through the Columbia River Basin, the fourth largest river basin in North America. Ex. 76 (Columbia River Basin Dams). The Columbia River produces more hydropower than any other river in North America. Ex. 77 (Bonneville Power Administration, Resources). Thanks to this rich natural resource, hydropower is the region's single largest source of power. Ex. 78 (Bonneville Power Administration, Hydropower Flows Here). The Army Corps of Engineers and Bureau of Reclamation operate 31 federally-owned hydroelectric dams throughout the region, which the BPA markets to utility companies as a wholesaler. 16 U.S.C. § 832, 838. BPA provides this power at cost to utilities, prioritizing sales to public and cooperative customers. 16 U.S.C. § 832.

When water flow is low, BPA may purchase power on the market to supplement its portfolio and meet the demands of its preference customers—primarily public entities. 16 U.S.C. § 832c-d. As with hydropower generated by the federally-owed dams, power purchased by BPA from the market is also provided to utilities at cost. 16 U.S.C. § 832d. That cost, however, is often much higher than power the federal government can generate from its own dams using low-cost renewable resources like water. Ex. 79 (Newsroom, *BPA maintains strong financial position despite challenging water year*, November 13, 2025). If water flow

is high, purchases from the market are minimal or unnecessary. And, as of January 1, 2026, purchases of coal-fired power are prohibited in Washington State. RCW 19.405.030(1).

In December 2025, Washington State experienced historic rainfall and flooding. Ex. 80 (NASA, *Pacific Moisture Drenches the U.S. Northwest*, December 12, 2025). In response, the Federal Emergency Management Agency (FEMA) issued an emergency declaration for Washington State on December 12, 2025. Ex 54 (FEMA emergency declaration for WA floods). FEMA and the U.S. Coast Guard sent teams to Washington to assist emergency response to "some of the most significant storms, heavy rain and flooding in the state's history." Ex. 82 (FEMA, *Federal Teams Support State-Led Response to Historic Washington Severe Storms and Flooding*, December 23, 2025). As a result of the historic rainfall, the capacity for production of hydroelectric power in December 2025 was high, with most dams under BPA's control full and many over their spillway level. Ex. 41 at ¶¶ 9,10.

Yet, just four days later, DOE issued the current Order, effectively seeking to compel an additional energy source into a market that is currently oversaturated. *See* Ex. 1. When the regional energy market is over resourced, some resources must be curtailed to prevent grid overload which can lead to equipment failures and blackouts. Collin Wilfong, Robert Bullington, *Charging Forward: Accelerating Long-Term Energy Storage Development*, 23 Vt. J. Envtl L. 156 at 163 (2022) ("When there is a surplus of electric power on the grid, grid operators sometimes issue curtailment orders compelling wind or solar generators to temporarily reduce the amount of power they are feeding onto the grid to help avoid grid overloads.")Here, it appears that DOE's order would prioritize coal over hydropower. *See* Ex. 1. This both undermines the Northwest energy market and favors ramping up private fossil

fuel production over maintaining operation of federally-owned hydropower dams operated by the Army Corps of Engineers.

This move is not even consistent with the Administration's own policy statements and actions. For example, on June 12, 2025, the President Trump revoked a Presidential Memorandum issued by then-President Joe Biden intended to restore native fish populations in the Columbia River Basin. Ex. 83 (Stopping Radical Environmentalism to Generate Power for the Columbia River Basin). A principal concern cited by President Trump was the "secure, reliable, and affordable hydroelectric generating capacity" for the Columbia River Basin. *Id.* The Secretary lauded the action, referring to the "tremendous assets" and "high-value electricity" hydropower brought to the region while decrying the "radical nonsense policies [of the prior administration] that dramatically raise prices on the American people." In direct contradiction of that June 2025 revocation, DOE now seeks to displace low-cost hydropower that can be produced with existing infrastructure in favor of expensive coal.

Simply put, if coal fired power is somehow forced into the energy market it will upset the balance of what is available from BPA and could force the Army Corps of Engineers to shut off perfectly functioning hydropower resources to prevent grid failure. These hydropower resources cost less money to produce and, because they are sold at cost to utility customers, those customers may not have access to the same allocation of lower cost resources. Adding coal fired power to the energy market unnecessarily drives up prices and undermines the balance of the regional energy market. And, as discussed above, there may not be any willing buyers of coal power. This could lead to a regional energy market crisis where low-cost hydroelectricity is curtailed to allow coal-fired electricity onto the grid, but with no purchasers

91

of coal, the respective supply and demand of hydropower and coal would be unstable and imbalanced.

> **2.** **The Order will cause long-term disruption to the Northwest energy market because it will delay conversion of the TransAlta plant to natural gas which is integral to the region's long term resource planning**

As noted, the careful planning behind the transition of TransAlta's Centralia plant from coal to natural gas has been a decade in the planning. Ex. 51 at ¶ 9. Centralia's transition, scheduled to come online in late 2028, aligned with the region's expected increased energy needs for the winter 2028–29 season. Ex. 41 at ¶¶ 4, 6; Ex. 3. DOE's Order threatens to indefinitely delay this transition, disrupting the planned conversion to natural gas that all participants in energy market would have benefitted from. Ex. 51 at ¶¶ 23, 25.

Moreover, because the state of the emergency the order is premised upon is unclear, participants in the northwest energy market are left to speculate when and under what circumstances there would cease to be an "emergency." Pushing back the timeline of the plant's transition to natural gas even 90 days risks the plant not being ready to produce electricity as a natural gas plant for the winter 2028-29 season that the E3 PowerPoint identified as critical. Ex. 41 at ¶¶ 4, 6. Any delays beyond the initial 90-day order will all but guarantee it. TransAlta's Centralia plant coal operations must wind down in order for the plant to begin retrofits to transition to natural gas. Ex. 51 at ¶¶ 23, 25. That retrofit process is now on hold indefinitely. *Id*.

The full impact of delaying or losing a future natural gas resource that has been expected for over a decade is difficult to measure. What is known is this: the future energy market in the Northwest for years to come, particularly in the winter 2028–29, is now

unbalanced and disrupted by DOE's unlawful meddling with markets it apparently does not even fully understand.

**3.    The inevitable outcome of DOE's Order is increased electricity rates that will be borne by Americans already facing an affordability crisis**

A necessary corollary to ordering the operation of a coal plant that was days away from retirement is unexpected costs. Regulated utilities pass on most costs to consumers through increased rates. The Order directs TransAlta to file tariff revisions or waivers with the Federal Energy Regulatory Commission (FERC) for rate recovery pursuant to 16 U.S.C. § 824a(c). Though a precise amount or date of customer rate impact is not known, for the reasons described above, the costs are expected to be high. Whether coal fired power is placed onto the grid and forces the curtailment of cheaper hydropower, or the coal plant is simply standing by with workers, machines, and coal at the ready, both will generate significant costs.

This is especially troubling given the fact that utility bills are an increasing burden on ratepayers in Washington State and beyond. According to the U.S. Energy Information Administration (EIA), Ex. 84 (EIA, *Electricity Data Browser*), Washington retail electricity prices increased by 12.3 percent for residential customers between August 2024 and August 2025, significantly higher than the 3.1 percent rate of inflation for all items less food and energy over the same period. Ex. 85 (U.S. Bureau of Labor Statistics, *Consumer prices up 2.9 percent from August 2024 to August 2025*, September 17, 2025). This rise in utility prices, paired with the rising housing prices and lack of affordable housing options, Ex. 86 (Washington State Dept. of Commerce, *Report: Lack of affordable housing options reaches critical levels in communities throughout Washington state*, May 13, 2024), details a worsening affordability crisis for Washington families. A recent non-profit report states that

in 2023, 38 percent of Washington families were unable to afford basic needs, up 4 percentage points from 2022. Ex. 87 (Trends in Financial Hardship). Adding superfluous expenses to Washingtonians' bills will only deepen the crisis, even while cheap hydropower is ready and available. And TransAlta Centralia's conversion to natural gas—now potentially indefinitely derailed by DOE's Order—was intended as a low-cost, high-reward method of supplying "peaker" capacity and utility without the usual impacts to ratepayers that constructing a new peaker plant would otherwise entail. *See* Ex. 20; Ex. 49 at ¶ 5.

Rate increases and inflation will force utility customers to make affordability choices that impact their ability to sustain a decent lifestyle, particularly at lower income levels. DOE's Order is a wholly-avoidable impact to consumers. DOE's failure to consider these rate impacts and weigh them against its perceived reliability needs, especially those based on uncertain projections of demand far into the future, is arbitrary, capricious, and contrary to the Federal Power Act's intent to protect consumers from unreasonable costs.

**4.      Continuing to run Centralia will release toxic air pollutants that otherwise would not have been released, resulting in negative human health impacts**

TransAlta Centralia is a significant source of pollution in Washington State. Coal-fired power plants like Centralia are major sources of air pollutants that are known or suspected to cause cancer or other serious health effects like respiratory illness and premature death. Ex. 10 at ¶ 5; Ex. 52 at ¶ 9; *see* 42 U.S.C. § 7412. Common pollutants from coal-fired power plants include sulfur dioxide ($SO_2$), fine particulate matter ($PM_{2.5}$), nitrogen oxides ($NO_x$), dioxins, polycyclic aromatic hydrocarbons, and mercury and other heavy metals. Ex. 10 at ¶ 5; Ex. 52 at ¶ 9; *see also* Ex. 89. And, when the Washington State Legislature ordered the phasing out of the Plant via the TransAlta Energy Transition Bill, S.B. 5769 (2011), Centralia was the

largest single source greenhouse gas emissions in Washington. S.B. 5769 § 101(2). Moreover, pollution concerns are not limited to aerial emissions. Recent remedial investigations of the Plant conducted by TransAlta found six heavy metal contaminants in the soil of concern, nine heavy metal contaminants in the groundwater of concern, and six heavy metal contaminants of concern in the sediment at the Plant that were above applicable cleanup levels. *See* Ex. 52-2 (In the Matter of Remedial Action by: TransAlta Centralia Generation LLC for: TransAlta Centralia Agreed Order, No. DE 24235, December 29, 2025) at 5.12; Ex. 52 at ¶ 7.

As a result, the continued operation of Centralia will have direct negative human health impacts. By preventing the Centralia from ceasing operations, will directly cause emissions impacts that otherwise would have been avoided. For example, it is estimated that ceasing operations of the Plant would have reduced emissions for $PM_{2.5}$, $SO_2$, and $NO_x$ by hundreds and thousands of tons per year. Ex. 10 at ¶ 7. Impacts from these emissions have been assessed by the EPA's CO-Benefits Risk Assessment Health Impacts Screening and Mapping Tool (COBRA). Ex. 10 at ¶ 9. COBRA estimated that the continued operation of Centralia Unit 2 using coal would contribute to:

- 9 to 13 early deaths;

- 3 nonfatal heart attacks;

- 53 cases of asthma onset;

- 8,400 symptoms of asthma;

- 3,500 minor restricted activity days for Washingtonians;

- 3,800 school loss days for Washington children;

- 590 work loss days for Washington workers; and

- $140 million to $210 million cost to society.

Ex. 10 at ¶ 10. These estimates do not account for emissions resulting from requisite transport of coal to TransAlta Centralia or the public health impacts on the miners who produce that coal. Ex. 10 at ¶ 7; *see also*, supra Section VI.C.5. While there will be emissions from the planned conversion operation from coal to natural gas, those emissions would be significantly less than the baseline rate emissions if the plant continued to operate using coal. Ex. 10 at ¶¶ 11, 12.

And the harms and costs estimated by COBRA do not account for emissions due to Centralia operating outside the bounds of its environmental permits. For example, in December 2025, the Plant received two Notices of Violation (NOV) related to excess emissions. Ex. 11 at ¶ 12. The first NOV was related to excess emissions from the fly ash unloading baghouse and the second NOV for not fully engaging all relevant pollution control equipment prior to firing coal on startups. Ex. 11 at ¶ 12. These violations are a result of reduced staffing or maintenance in anticipation of the December 31, 2025, shutdown. *Id*. The Order creates uncertainty that may make it difficult to retain sufficient qualified staff to prevent future oversights. *Id*. There is a high chance these problems, and more, will continue should Centralia run per the Order, exacerbating negative environmental health impacts.

The harms and costs from operating the Plant per the Order will lead to unnecessary harms to human health. These harms are completely preventable and can be avoided if the Order is withdrawn.

**F. DOE's Order Fails to Comply With NEPA**

NEPA requires all federal agencies to develop an environmental impact statement for any major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C). As described above, continued operation of Centralia will result in significantly higher emissions of particulate matter, sulfur dioxide, nitrogen oxides, and other greenhouse gases with expected adverse health impacts to the surrounding communities. *See, e.g.,* Ex. 10 at ¶¶ 7, 10. Thus, the Order here constitutes a major federal action that will significantly affect the human environment. 42 U.S.C. § 4336e(10). To comply with NEPA, DOE must develop an environmental impact statement, or if it's not obvious whether the action will have a significant impact on the environment, an environmental assessment. 42 U.S.C. § 4336(2). DOE did neither.

Moreover, no categorical exclusion applies to the Order. In the past, DOE has pointed to categorical exclusion B4.4 for "power management activities" to avoid performing an environmental analysis under NEPA. 10 C.F.R. § Pt. 1021, App. B. However, categorical exclusion B4.4 is only available when the "operations of generating projects would remain within normal operating limits." 10 C.F.R. § Pt. 1021, App. B4.4. The Order here mandates that Centralia operate beyond its normal permitted limits—limits that, at this point, would otherwise be *zero*.

Finally, while DOE's rules permit it to take emergency actions without first complying with NEPA, that is only so long as it immediately consults with the Council on Environmental Quality to make alternative arrangements for emergency actions that have significant environmental impacts. 10 C.F.R. § 1021.103. When DOE issued 202(c) orders in the past, it

prepared Special Environmental Analyses after the fact. Ex. 91 (Special Environmental Analysis of BANC during 202(c) Emergency Order Operations between Sept. 4, 2022 and Sept. 8, 2022). However, those cases involved sudden emergencies where DOE did not have notice to develop environmental analyses. Here, the Order is in reaction to the perceived capacity challenges caused by the retirement of the Centralia Coal Plant on December 31, 2025. The retirement of Centralia was planned in 2011. S.B. 5769; Ex. 5. Energy had ample time to conduct an environmental analysis to comply with NEPA. Therefore, the Order unjustifiably violates NEPA.

## VII.   REQUEST FOR STAY

Washington State further moves DOE for a stay of the Order until judicial review has concluded. 18 C.F.R. § 385,212,132. DOE has the authority to issue a stay under the Administrative Procedure Act where "justice so requires." 5 U.S.C. § 705.

To determine whether to grant a request for stay, agencies consider: (1) whether the requesting party will suffer irreparable injury without a stay; (2) whether issuing a stay may substantially harm other parties; and (3) whether a stay is in the public interest. *See Nken v. Holder*, 556 U.S. 418, 434, 436 (2009); *Ohio v. EPA*, 603 U.S. 279, 291 (2024); *see, e.g., Midcontinent Indep. Sys. Operator, Inc.*, 184 FERC ¶ 61,020, at P 41 (2023); *ISO New Eng. Inc.*, 178 FERC ¶ 61,063, at P 13 (2022), *rev'd on other grounds sub nom. In re NTE Conn., LLC*, 26 F.4th 980, 987-88 (D.C. Cir. 2022).

### A.      Washington State Will Suffer Irreparable Injury Without A Stay

A stay is necessary to prevent irreparable harm to Washington State caused by the Order. Injuries must be actual, certain, imminent, and beyond remediation. *Mexichem*

98

*Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *ANR Pipeline Co.*, 91 FERC ¶ 61,252, at 61,887 (2000); *City of Tacoma*, 89 FERC ¶ 61,273, at 61,795 (1999) (identifying that, absent a stay, options for "meaningful judicial review would be effectively foreclosed").

Economic injury is irreparable only where no "adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Wis. Gas Co.*, 758 F.2d at 674 (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958). Environmental injury, however, "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

The Order imposes costs on Washington ratepayers that may not be recoverable through future litigation and would not have otherwise been expended absent the Order. Assuming TransAlta complies with the Order,[23] it will expend considerable costs preparing the plant for refiring—if the plant is idle but available to operate *or* actively producing coal-fired power. *See supra* Section III at 10-11, Section IV.H.1. TransAlta will generate staffing and overhead expenses under either scenario. Firing up the plant and transmitting electricity will further increase expenses. And plainly, coal is more expensive. Ex. 41 at ¶ 15 ("Under its current Purchase Power Agreement (PPA), the energy price from Centralia's coal is

---

[23] There is no indication that TransAlta will not comply with the Order, to the extent it understands what the Order requires it to do.

significantly higher than the wholesale energy market price. Specifically, under the current contract, Puget Sound Energy pays $62.04 per MWh, while the wholesale market price is $54.32 per MWh."). The Order directs TransAlta to recover its expenses through a FERC tariff revision. Order at 4; 16 U.S.C. § 824a(c). Neither the Order nor the statute identify a mechanism for "corrective relief" should the Order be found unlawful. As there is no clear recourse to recovering these costs should Washington State prevail in its challenge, a stay pending judicial review is necessary to protect ratepayers from unwarranted energy cost increases.

Environmental injury is inevitable whether the Order requires TransAlta to immediately operate Centralia as a coal plant, or it operates intermittently from a stand-by posture. As described in the Rehearing Request, Washington residents will suffer environmental health and environmental harms because of the Order. *See supra* Section III at 8, Section IV.H.3. TransAlta's Centralia Coal Plant is a significant source of particulate matter, sulfur dioxide, and nitrogen oxides. Ex. 10 at ¶ 7. Those emissions are known to adversely impact human health. Based on estimates from the EPA's CO-Benefits Risk Assessment Health Impacts Screening and Mapping Tool (COBRA), the failure to cease operations at Centralia will contribute to an estimated 9-13 premature deaths, 3 nonfatal heart attacks, 53 cases of asthma onset, and $140-210 million in health care costs and lost economic activity in Washington annually. Ex. 10 at ¶ 10. Further, Centralia is the highest source of greenhouse gas emissions in Washington. Ex. 12; Ex. 13. A local clean air agency issued Centralia two notices of violation for exceeding emissions limits in December 2025. Ex. 11 at ¶ 12. Emissions are expected to be even higher if Centralia cannot operate at a lower load

or make necessary repairs, or cease operations entirely as it had planned to do prior to the Order. Ex. 11 at ¶ 11. Because the environmental injury to Washington State and its residents cannot be adequately remedied and may be permanent or long duration and is sufficiently likely, a stay pending judicial review is necessary.

## B.      A Stay Would Not Substantially Harm Other Parties

No parties would be harmed by a stay of the Order because no emergency exists and the Order was never needed to begin with. As detailed above, an order under 202(c) must be limited to circumstances that are imminent and unforeseen. *See supra* VI.A. DOE's Order's provides no evidence to support a claim of an imminent emergency and references potential *future* grid unreliability. *See supra* VI.C.1. The State supplies substantial evidence to support the absence of an energy emergency. Because no current emergency exists, no other party could be harmed. Not forcing the deployment of coal plant that is not needed harms no one. A stay would not disrupt the local energy market or impair the provision of electricity to customers.

## C.      A Stay is in the Public Interest

DOE's Order is contrary to the public interest. A stay will prevent any potential harm to the public that will be caused by the Order. Principally, the Order fails to meet the public interest standard under the Act DOE relies upon, i.e., 16 U.S.C. § 824a(c)(1), in bringing the Order. *See supra* VI.D.2. Further, if a true energy emergency existed, the public interest would not be served by an aging, unreliable coal plant that requires 12-18 hours to start up. Ex. 11 at ¶¶ 7, 8. DOE's Order has the potential to throw the regional energy market into short-term

101

and long-term uncertainty, both of which could have adverse consequences for energy users—the public. *See supra* VI.E.1. A stay is in the public interest.

## VIII.  CONCLUSION

For the reasons set forth above, Washington respectfully requests that DOE grant intervention, grant rehearing, and rescind the Order in its entirety. In the alternative, Washington requests that DOE clarify that the Order directs readiness only and that TransAlta Centralia not operate in any capacity unless and until there is an actual energy shortage and where existing resources operated by WRAP participants, or imports from other regions, cannot meet demand.

Dated this 13th day of January, 2026.

NICHOLAS W. BROWN
Attorney General of Washington


/s *Kelly T. Wood*
KELLY T. WOOD, WSBA #40067
Senior Counsel
NASH CALLAGHAN, WSBA #49682
ALEXANDRA KORY, WSBA #49889
TAD GUY O'NEILL, WSBA #37153
CHRISTOPHER H. REITZ, WSBA #45566
MEGAN SALLOMI, WSBA #58016
ROBERT D. SYKES, WSBA #49635
TALIA O. THUET, WSBA #62793
RACHEL BRESLIN, WSBA #64639
JOSEPHINE STRAUSS, WSBA #58283
Assistant Attorneys General
1125 Washington St. SE
P.O. Box 40100
Olympia, Washington 98504
kelly.wood@atg.wa.gov

**State of Washington**

**Request for Rehearing of Order No. 202-25-11**

**Amended Index of Exhibits**

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1 | DOE Order No. 202-25-11 | Department of Energy (DOE), Washington DC 20585, Order No. 202-25-11 (Dec. 16, 2025) | |
| 2 | NERC 2025–2026 Winter Reliability Assessment | North American Electric Reliability Corporation, 2025–2026 Winter Reliability Assessment (Nov. 2025) | |
| 3 | E3 Slide Deck | Resource Adequacy and the Energy Transition in the Pacific Northwest: Phase 1 Results, dated September 22, 2025 | |
| 4 | DOE Resource Adequacy Report | DOE Resource Adequacy Report, Evaluating the Reiliability and Security of the U.S. Electric Grid (July 2025) | |
| 5 | Memorandum of Agreement | Memorandum of Agreement, TransAlta-State of Washington (fully executed) (Dec. 23, 2011) | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 6 | 2017 Amended Memorandum of Agreement | First Amendment to Memorandum of Agreement, TransAlta-State of Washington (fully executed)<br><br>(Jul. 13, 2017) | |
| 7 | 2011 BART Order | Dep't of Ecology Administrative Order, First Revision: Order No. 6426<br>(Dec. 13, 2011) | |
| 8 | 2020 BART Order | Dep't of Ecology Administrative Order, Second Revision: Order No. 6426<br><br>(Jul. 29, 2020) | |
| 9 | Technical Support Data-2020 BART Order | Dep't of Ecology Technical Support Document for Second BART Order Revision, TransAlta Centralia Generation Plant (July 2020) | |
| 10 | Palcisko Declaration | Declaration of Gary Palcisko in Support of Request for Rehearing by State of Washington | |
| 10-1 | COBRA Data Coal v. Cease Operations | Total Health Benefits, Lewis County, Washington | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 10-2 | COBRA Data Coal v. Natural Gas | Total Health Benefits, Lewis County, Washington | |
| 10-3 | 2023 Emissions Inventory | 2023 Emissions Inventory | |
| 11 | Lamoreaux Declaration | Declaration of Clinton Lamoreaux in Support of Request for Rehearing by State of Washington | |
| 11-1 | TransAlta Centralia Title V Quarterly Report First Quarter 2025 | Title V Report Certification Form, TransAlta Centralia Generation LLC, First Quarter, Jan. 1 - March 31, 2025 | |
| 11-2 | TransAlta Centralia Title V Quarterly Report Second Quarter 2025 | Title V Report Certification Form, TransAlta Centralia Generation LLC, Second Quarter, April 1-June 30, 2025 | |
| 11-3 | TransAlta Centralia Title V Quarterly Report Third Quarter 2025 | Title V Report Certification Form, TransAlta Centralia Generation LLC, Third Quarter, Jul. 1 – Sep. 30, 2025 | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 11-4 | TransAlta Centralia Title V Quarterly Report First Quarter 2024 | Title V Report Certification Form, TransAlta Centralia Generation LLC, First Quarter, Jan 1 – March 31, 2024 | |
| 11-5 | TransAlta Centralia Title V Quarterly Report Second Quarter 2024 | Title V Report Certification Form, TransAlta Centralia Generation LLC, Second Quarter, Apr. 1 – June 30, 2024 | |
| 11-6 | TransAlta Centralia Title V Quarterly Report Third Quarter 2024 | Title V Report Certification Form, TransAlta Centralia Generation LLC, Third Quarter, Jul. 1 – Sep. 30, 2024 | |
| 11-7 | TransAlta Centralia Title V Quarterly Report Fourth Quarter 2024 | Title V Report Certification Form, TransAlta Centralia Generation LLC, Fourth Quarter, Oct. 1 – Dec. 31, 2024 | |
| 11-8 | TransAlta Centralia Title V Quarterly Report First Quarter 2023 | Title V Report Certification Form, TransAlta Centralia Generation LLC, First Quarter, Jan. 1 – Mar. 31, 2023 | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 11-9 | TransAlta Centralia Title V Quarterly Report Second Quarter 2023 | Title V Report Certification Form, TransAlta Centralia Generation LLC, Second Quarter, Apr. 1 – Jun 30, 2023 | |
| 11-10 | TransAlta Centralia Title V Quarterly Report Third Quarter 2023 | Title V Report Certification Form, TransAlta Centralia Generation LLC, Third Quarter, Jul. 1 – Sep. 30, 2023 | |
| 11-11 | TransAlta Centralia Title V Quarterly Report Fourth Quarter 2023 | Title V Report Certification Form, TransAlta Centralia Generation LLC, Fourth Quarter, Oct. 1 – Dec. 31, 2023 | |
| 11-12 | Photograph of opacity readings | Photograph of opacity readings on Oct. 23, 2025 | |
| 11-13 | Centralia Plant's 2022 U2 Boiler Tune-up Report | TransAlta Centralia U2 Boiler, 40 CFR 63 DDDDD Tune-Up Report (Oct. 3, 2022) | |
| 11-14 | Notice of Violation No. 10642, TransAlta | Southwest Clean Air Agency, Notice of Violation, No. 10643, TransAlta, Oct. 23, 2025 | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 11-15 | Notice of Violation No. 10643, TransAlta | Southwest Clean Air Agency, Notice of Violation, No. 10643, TransAlta, Jan 11, Mar. 4, Jun. 6, Jun. 11, Aug. 26, 2025 | |
| 12 | Top 10 Stationary Sources of GHG Emissions in WA – 2022 | Dep't of Ecology Data Base: Top 10 Stationary Sources of Greenhouse Emissions in Washington (2022) | |
| 13 | 2023 EPA Top CO2 Emissions | U.S. Env't Prot. Agency, Greenhouse Gas Reporting Program (GHGRP), Top Washington Greenhouse Gas emissions sources for 2023, *GHGRP State and Tribal Fact Sheet* (last visited Jan. 6, 2026) | https://www.epa.gov/ghgreporting/ghgrp-state-and-tribal-fact-sheet |
| 14 | U.S. Energy Information – Start Up | U.S. Energy Information Administration, Owen Comstock, *About 25% of U.S. power plants can start up within an hour* (Nov. 19, 2020) | https://www.eia.gov/todayinenergy/detail.php?id=45956) |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 15 | Plant Job Underway | Centralia Daily Chronicle, *Plant Job Underway*<br><br>(Jun. 14, 1968) | |
| 16 | 2021 Title V Air Operating Permit | TransAlta Centralia Generation, LLC, Centralia Plant, Air Operating Permit SW-98-8-R5A, Southwest Clean Air Agency (Sep. 22, 2021) | |
| 17 | 2021 Title V Air Operating Permit - Basis Statement | | |
| 18 | U.S. Energy Information Administration, Form EIA-860, Schedule 3: Generator Data (2024) (2024 Form EIA-860) | | https://www.eia.gov/electricity/data/eia860/ |
| 19 | 2022 Visibility SIP | Washington Dep't of Ecology, Air Quality Program, *State Implementation Plan Revision, Second Regional Haze Plan* (2018 – 2028)<br><br>(Jan. 2022) | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 20 | TransAlta News Release Announcing Coal to Gas Conversion Project | TransAlta, Alberta Calgary, News Release, *TransAlta Signs Long-Term Agreement for 700 MW at Centralia Facility Enabling Coal to Natural Gas Conversion* (Dec. 9, 2025) | https://transalta.com/newsroom/transalta-signs-long-term-agreement-for-700-mw-at-centralia-facility-enabling-coal-to-natural-gas-conversion/ |
| 21 | TransAlta Permit Application | TransAlta Centralia Generation, LLC, *Prevention of Significant Deterioration Permit Application* (Dec. 2025) | |
| 22 | Letter Re: Summary of the 2025 Long-term Resource Adequacy Meeting | Brian Rybarik, WA Utilities and Transportation Commission, Jennifer Grove, WA Dep't of Commerce, *Re: Summary of the 2025 Long-term Resource Adequacy Meeting* (Nov. 19, 2025) | |
| 23 | 2025 DOE 202(c) Orders | 2025 DOE 202(c) Orders | https://www.energy.gov/ceser/2025-doe-202c-orders |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 23-1 | Order (Dec. 14, 2000) | U.S. Dep't of Energy, Order Pursuant to Section 202(c) of the Federal Power Act (Dec. 14, 2000) (California Energy Crisis in 2000) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 23-2 | DOE Order No. 202-05-1 (Sep. 8, 2005) (Hurricane Rita) | DOE Order No. 202-05-1 (Sep. 8, 2005) (Hurricane Rita) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 23-3 | DOE Order No. 202-05-2 (Sep. 8, 2005) | DOE Order No. 202-05-2 (Sep. 8, 2005) (Hurricane Rita) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 23-4 | DOE Order No. 202-08-1 (Sep. 14, 2008) | DOE Order No. 202-08-1 (Sep. 14, 2008) (Hurricane Ike) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 23-5 | DOE Order No. 202-20-1 (Aug. 27, 2020) | Ex. 23-9 (DOE Order No. 202-20-1 (Aug. 27, 2020) (Hurricane Laura) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 23-6 | DOE Order No. 202-20-2 (Sep. 6, 2020) | DOE Order No. 202-20-2 (Sept. 6, 2020) (extreme heat in California) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 23-7 | DOE Order No. 202-21-1 (Feb. 14, 2021) | DOE Order No. 202-21-1 (Feb. 14, 2021) (extreme cold) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 23-8 | DOE Order No. 202-21-2 | DOE Order No. 202-21-2) (extreme heat, wildfires and drought in California) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 23-9 | DOE Order No. 202-22-1 | DOE Order No. 202-22-1 (extreme heat, wildfires and drought in California) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 23-10 | DOE Order No. 202-22-2 | Exs. 23-13 and 23-14 (DOE Order Nos. 202-22-1 & 2 and amendments) (same) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 23-11 | DOE Order No. 202-22-3 (Dec. 23, 2022) | DOE Order No. 202-22-3 (Dec. 23, 2022) (extreme cold) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 23-12 | DOE Order No. 202-22-4 (Dec. 24, 2022) | DOE Order No. 202-22-4 (Dec. 24, 2022) (extreme cold) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 23-13 | DOE Order No. 202-24-1 (Oct. 9, 2024) | Ex. 23-20 (DOE Order No. 202-24-1 (Oct. 9, 2024)) (Hurricane Milton) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 23-14 | DOE Order No. 202-05-3 (Dec. 20, 2005) | DOE Order No. 202-05-3 (Dec. 20, 2005) (Mirant, DC) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 23-15 | DOE Order No. 202-17-1 | DOE Order No. 202-17-1 (GRDA) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 23-16 | DOE Order No. 202-17-2 | DOE Order No. 202-17-2 (Yorktown Power Station) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 23-17 | DOE Order No. 202-17-4 (Sept. 14, 2017) | DOE Order No. 202-17-4 (Sept. 14, 2017) (Yorktown Power Station – extension) | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 24 | Grand River Dam Authority Request for Emergency Order | Daniel S. Sullivan, Grand River Dam Authority, *Re: Request for Emergency Order Pursuant to Section 202(c) of the Federal Power Act* (April 11, 2017) | https://www.energy.gov/sites/default/files/2017/05/f34/GRDA%20public%202202%28c%29%20letter.pdf |
| 25 | Wagner Order No. 202-25-6 | U.S. Dep't of Energy, Order No. 202-25-6 (Jul 28, 2025) | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 26 | Puerto Rico Electric Power Authority, Order No. 202-25-1 | U.S. Dep't of Energy, Order No. 202-25-1 (May 16, 2025) | |
| 27 | Campbell Order | U.S. Dep't of Energy, Order No. 202-25-3 (May 23, 2025) | https://www.energy.gov/sites/default/files/2025-05/Midcontinent%20Independent%20System%20Operator%20%28MISO%29%20202%28c%29%20Order_1.pdf  https://perma.cc/Q7P7-TDTX |
| 28 | Eddystone Order | U.S. Dep't of Energy, Order No. 202-25-4 (May 30, 2025) | https://perma.cc/PS3M-6CJA |
| 29 | Trump Admin Ordered Coal Plan Stay Open | Ella Nilsen, CNN, *The Trump Admin Ordered a Coal Power Plant to Stay On Past Retirement. Customers in 15 States Will Foot the Bill* (June 6, 2025) | https://www.cnn.com/2025/06/06/climate/michigan-coal-plant-energy-cost-wright |
| 30 | CMS Energy Quarterly Report | U.S. Securities and Exchange Commission, Form 10-Q, *Quarterly Report for CMS Energy Corp.* (Jul. 31, 2025) | https://www.sec.gov/ix?doc=/Archives/edgar/data/0000201533/000081115625000071/cms-20250630.htm |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 31 | Trump Administration Forcing Coal Plants to Stay Open | NRDC, *Trump Administration's DOE Is Forcing Coal Plants to Stay Open. Michigan Is the First Target* (June 16, 2025) | https://www.nrdc.org/bio/derrell-e-slaughter/trump-administrations-doe-forcing-coal-plants-stay-open-michigan-first |
| 32 | U.S. Dep't of Energy Fact Sheet | U.S. Dep't of Energy, *Fact Sheet: The Department of Energy's Resource Adequacy Report Affirms The Energy Emergency Facing The U.S. Power Grid* (2025) | https://www.energy.gov/sites/default/files/2025-07/DOE_Fact_Sheet_Grid_Report_July_2025.pdf  https://perma.cc/YLX7-8G7T |
| 33 | Press Release Dep't of Energy U.S. Grid Report | Press Release, U.S. Dep't of Energy, *Department of Energy Releases Report on Evaluating U.S. Grid Reliability and Security* (July 7, 2025) | https://www.energy.gov/articles/department-energy-releases-report-evaluating-us-grid-reliability-and-security  https://perma.cc/8TEJ-AGH6 |
| 34 | Campbell Rehearing Order | U.S. Dep't of Energy, Order No. 202-25-3B, Order Addressing Arguments Raised on Rehearing (Sep. 8, 2025 | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 35 | August 6, 2025 State Request for Rehearing | Before the U.S. Dep't of Energy, In Re: Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid, July 2025, Motion to Intervene and Protective Request for Rehearing<br><br>(Aug. 6, 2025) | |
| 35-1 | August 6 Rehearing Request Exhibit A | North American Electric Reliability Corp (NERC) *Interregional Transfer Capability Study (ITCS)*, Final Report, Nov. 2024 | |
| 35-2 | August 6 Rehearing Request Exhibit B | GridLab Analysis: Department of Energy Resource Adequacy Report<br><br>(July 15, 2025) | |
| 35-3 | August 6 Rehearing Request Exhibit C | New York University School of Law, Institute for Policy Integrity, *Enough Energy A Rieview of DOE's Resource Adequacy Metholdology*<br><br>(July 2025) | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 35-4 | August 6 Rehearing Request Exhibit D | Nicholas Institute for Energy, Environment & Sustainability, *Rethinking Load Growth* (2025) | |
| 35-5 | August 6 Rehearing Request Exhibit E | London Economics Internat'l, *Uncertainty and Upward Bias Are Inherent in Data Center Electricity Demand Projections* (Jul 7, 2025) | |
| 35-6 | August 6 Rehearing Request Exhibit F | Grid Strategies, *Resource Adequacy Value of Interregional Transmission* (Jun. 2025) | |
| 36 | Second Campbell Order | U.S. Dep't of Energy, Order No. 202-25-9 (Nov. 18, 2025) | |
| 37 | Schahfer Order | U.S. Dep't of Energy, Order No. 202-25-12 (Dec. 23, 2025) | |
| 38 | Culley Order | U.S. Dep't of Energy, Order No. 202-25-13 (Dec. 23, 2025) | |

| No. | Exhibit Name | Document Name | URL |
|-----|--------------|---------------|-----|
| 39 | PJM Manual | Capacity Market & Demand Response Operations, *PJM Manuel 18: PJM Capacity Market* (Effective Date: Jul. 23, 2025) | |
| 40 | Eddystone Request for Rehearing | Before the U.S. Dep't of Energy, Order No. 202-25-4, Motion to Intervene and Request for Rehearing | |
| 41 | Moriyasu Declaration | Declaration of Callahan Moriyasu in Support of Request for Rehearing by State of Washington | |
| 41-1 | Historic Trends in Energy Use | Northwest Power and Conservation Council, *Historic Trends in Energy Use* | |
| 41-2 | Northwest Heat Wave | U.S. Energy Information Administration, *Northwest heat wave leads to record levels of summer electricity demand* (Aug. 23, 2017) | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 41-3 | Ancillary Services Definitions and Capability Study | GE Energy Consulting, Ancillary Services Definitions and Capability Study<br><br>(Dec. 2012) | |
| 41-4 | Optimizing Reserves | Electricity Advisory Committee, *Optimizing Reserves*<br><br>(Oct. 2019) | |
| 41-5 | Historical Data | Bureau of Reclamation, Historical Data Access, Grand Coulee Dam<br><br>(2020-2025) | https://www.usbr.gov/pn/hydromet/arcread.html |
| 41-6 | Washington Water Conditions | USGS Water Data for the Nation, *Washington Water Conditions*<br><br>(Dec. 31, 2025) | |
| 41-7 | Water Management Data | U.S. Army Corps of Engineers, *Water Management Data*<br><br>(Dec. 31, 2025) | |
| 41-8 | Grand Coulee Dam Levels Dec. 2025 | U.S. Army Corps of Engineers, Water Management Data, Grand Coulee Dam, Pacific Northwest Region, Dec. 2025 | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 41-9 | Chief Joseph Dam Levels Dec. 2025 | U.S. Army Corps of Engineers, Water Management Data, Chief Joseph Dam, Pacific Northwest Region, Dec. 2025 | |
| 41-10 | Lower Granite Lock and Dam Levels Dec. 2025 | U.S. Army Corps of Engineers, Water Management Data, Lower Granite Lock and Dam, Walla Walla District, Dec. 2025 | |
| 41-11 | Little Goose Lock and Dam Levels Dec. 2025 | U.S. Army Corps of Engineers, Water Management Data, Little Goose Lock and Dam, Walla Walla District, Dec. 2025 | |
| 41-12 | Lower Monumental Lock and Dam Levels Dec. 2025 | U.S. Army Corps of Engineers, Water Management Data, Lower Monumental Lock and Dam, Walla Walla District, Dec. 2025 | |
| 41-13 | Ice Harbor Lock and Dam Levels Dec. 2025 | U.S. Army Corps of Engineers, Water Management Data, Ice Harbor Lock and Dam, Walla Walla District, Dec. 2025 | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 41-14 | McNary Lock and Dam Levels Dec. 2025 | U.S. Army Corps of Engineers, Water Management Data, McNary Lock and Dam, Pacific Northwest Region, Dec. 2025 | |
| 41-15 | John Day Lock and Dam Levels Dec 2025 | U.S. Army Corps of Engineers, Water Management Data, John Day Lock and Dam, Pacific Northwest Region, Dec. 2025 | |
| 41-16 | The Dalles Lock and Dam Levels Dec 2025 | U.S. Army Corps of Engineers, Water Management Data, The Dalles Lock and Dam, Pacific Northwest Region, Dec. 2025 | |
| 41-17 | Bonneville Lock and Dam Levels Dec. 2025 | U.S. Army Corps of Engineers, Water Management Data, Bonneville Lock and Dam, Pacific Northwest Region, Dec. 2025 | |
| 41-18 | Priest Rapids Dam Levels, Dec. 2025 | U.S. Army Corps of Engineers, Water Management Data, Priest Rapids Dam, Pacific Northwest Region, Dec. 2025 | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 41-19 | Wanapum Dam Levels, Dec. 2025 | U.S. Army Corps of Engineers, Water Management Data, Wanapum Dam, Pacific Northwest Region, Dec. 2025 | |
| 41-20 | Rock Island Dam Levels Dec. 2025 | U.S. Army Corps of Engineers, Water Management Data, Rock Island Dam, Pacific Northwest Region, Dec. 2025 | |
| 41-21 | NOAA NWS Three Month Outlook | NOAA, Nat'l Weather Service, *Three-Month Outlooks*, Official Forecasts Jan-Feb-Mar 2026 | |
| 41-22 | Centralia Coal PPA (R) | Puget Sound Energy, Docket UE-250747, Attachment B (Impact of portfolio updates), *Sheet "Centralia Coal PPA(R)"* (Oct. 1, 2025) | |
| 41-23 | E3 NW RA Data for Washington | E3, Greater Northwest System Metrics 2025–2030 | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 42 | Press Release Re: Executive Order | U.S. Dep't of Energy, *Energy Secretary Ensures Washington Coal Plant Remains Open to Ensure Affordable, Reliable and Secure Power Heading into Winter* (Dec. 17, 2025) | |
| 43 | Promises Made Promises Kept | U.S. Dep't of Energy, *Promises Made, Promises Kept, Unleashing the Golden Era of Energy Dominance and Lowering Prices* (Dec. 18, 2025) | |
| 44 | Executive Order 14156 | Administration of Donald J. Trump, 2025, Executive Order 14156-Declaring a National Energy Emergency (Jan. 20, 2025) | |
| 45 | E2 Clean Economy Works: Nov. 2025 Analysis | Michael Timberlake, E2 Economy + Environment, Clean Economy Works: November 2025 Analysis (Dec. 12, 2025) | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 46 | Energy Department Announces Termination of 223 Projects | U.S. Dep't of Energy, *Energy Department Announces Termination of 223 Projects, Saving Over $7.5 Billion* (Oct. 2, 2025) | |
| 47 | Archive of Energy Reliability and Resilience | U.S. Dep't of Energy, Office of Energy Efficiency & Renewable Energy, *Energy Reliability and Resilience* | |
| 48 | Dep't of Energy Response to State Rehearing Request of August 6 | U.S. Dep't of Energy, *Re: August 6, 2025 Submission* (Sep. 5, 2025) | |
| 49 | Gomez Declaration | Declaration of David C. Gomez in Support of Request for Rehearing by State of Washington | |
| 49-1 | Centralia Power Plant Profile | S&P Capital IQ, Centralia Power Plant Profile | |
| 49-2 | Centralia Power Plant Financials | S&P Capital IQ, Centralia Power Plant Financials | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 50 | Reeves Declaration | Declaration of Andrew Reeves in Support of Request for Rehearing by State of Washington | |
| 50-1 | Puget Sound Energy 2023 Electric Progress Report | Puget Sound Energy, *2023 Electric Progress Report*, Chapters 1-9 (2023) | |
| 50-2 | 2025 Avista Electric Integrated Resource Plan | Avista, *Electric Integrated Resource Plan* (2025) | |
| 50-3 | Puget Sound Energy 2021 Integrated Resource Plan | Puget Sound Energy, *2021 PSE Integrated Resource Plan,* Chapters 1-9 (Apr. 2021) | |
| 50-4 | Letter Re: Summary of the 2025 Winter Preparedness Resource Adequacy Meeting | Brian Rybarik, WA Utilities and Transportation Commission, Jennifer Grove, WA Dep't of Commerce, *Re: Summary of the 2025 Winter Preparedness Resource Adequacy Meeting* (Dec. 31, 2025) | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 50-5 | Jan 2024 Month In Review | Nat'l Weather Service, Pendleton OR, *The Month In Review, January 2024* | |
| 50-6 | WRAP Assessment of January 2024 | WRAP, *Assessment of January 2024 Cold Weather Event* | |
| 50-7 | Reliability Coordinator Procedure, No. RC-410 | California ISO, RC West, Reliability Coordinator Procedure, RC0410 (May 1, 2025) | |
| 50-8 | Western Energy Imbalance Market (WEIM) | Western Energy Markets | https://www.westernenergymarkets.com/western-energy-imbalance-market-weim |
| 50-9 | CAISO WEIM Fact Sheet | California Independent System Operator (CAISO) Fact Sheet, *Western Energy Imbalance Market* (WEIM) | https://www.caiso.com/Documents/western-energy-imbalance-market-fact-sheet.pdf |
| 50-10 | Pennington WRAP Area Map | David Pennington, WPP, Western Resource Adequacy Program (WRAP) Area Map (last modified Oct. 31, 2025) | https://www.westernpowerpool.org/news/wrap-area-map |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 50-11 | Avista Investor Overview | Avista, *Better energy for life*, Investor overview | https://investor.avistacorp.com/ |
| 50-12 | RC West California ISO | California ISO, RC West | https://www.caiso.com/market-operations/products-services/rc-west |
| 51 | Nightingale Declaration | Declaration of Joel Nightingale in Support of Request for Rehearing by State of Washington | |
| 51-1 | Testimony of Ronald J. Roberts, RJR-1T | Washington Utilities and Transportation Commission, Docket Nos. UE-240004 and UG-240005, Prefiled Direct Testimony of Ronald J. Roberts (Feb. 15, 2024) | |
| 51-2 | Winter Reliability and Electric-Gas Coordination Slides for WUTC Resource Adequacy Meeting | Zapotocky, Electric Reiability & Security for the West, *Winter Reiability and Electric-Gas Coordination*; North American Electric Reliability Corporation (NERC), *NERC's Winter Reliability Assessment* (Nov. 4, 2025) | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 51-3 | Short-Term Energy Outlook US EIA | U.S. Energy Information Administration, *Short-Term Energy Outlook* (Dec. 2025) | https://www.eia.gov/outlooks/steo/ |
| 51-4 | Levelized Costs of New Generation Resources in the Annual Energy Outlook 2025 | U.S. Energy Information Administration, *Levelized Costs of New Generation Resources in the Annual Energy Outlook in 2025* (Apr. 2025) | https://www.eia.gov/outlooks/aeo/electricity_generation/pdf/AEO2025_LCOE_report.pdf |
| 51-5 | Generating Resource Reference Plants: Natural Gas | Northwest Power and Conservation Council, *Generating Resource Reference Plants, Natural Gas* | https://www.nwcouncil.org/2021powerplan_natural-gas_generating-resource-reference-plants/ |
| 51-6 | Recent Changes to US Coal Plant Operations and Current Compensation Practices | National Association of Regulatory UtilityCommis-sioners, *Recent Changes to U.S. Coal Plant Operations and Current Compensation Practices* (Jan. 2020) | https://pubs.naruc.org/pub/7B762FE1-A71B-E947-04FB-D2154DE77D45 |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 51-7 | 2024 State of Reliability | North American Electric Reliability Corporation, 2024 State of Reliability (Jun. 2024) | https://www.nerc.com/globalassets/programs/rapa/pa/nerc_sor_2024_technical_assessment.pdf |
| 52 | Middleton Declaration | Declaration of Thomas Middleton in Support of Request for Rehearing by State of Washington | |
| 52-1 | Model Toxics Control Act | Washington Dep't of Ecology, Model Toxics Control Act | https://ecology.wa.gov/spills-cleanup/contamination-cleanup/rules-directing-our-cleanup-work/model-toxics-control-act (Last visited January 5, 2026) |
| 52-2 | TransAlta Agreed Order | Washington Dep't of Ecology, Agreed Order No. DE 24235 with TransAlta Centralia Generation LLC for TransAlta Centralia (Dec. 29, 2025) | |
| 52-3 | Quick Facts Centralia WA | U.S. Census Bureau, Quick Facts Centralia (last visited Jan. 8, 2026) | https://www.census.gov/quickfacts/fact/table/centraliacitywashington/RTN131222 |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 52-4 | Data USA | Data USA, Centralia WA, Metropolitan Statistical Area (last visited Jan. 8, 2026) | https://datausa.io/profile/geo/centralia-wa-31000US16500 |
| 52-5 | Emissions of Hazardous Air Pollutants | Environmental Health & Engineering, Inc. *Emissions of Hazardous Air Pollutants from Coal-Fired Power Plants* (Mar. 7, 2011) | |
| 53 | Rybarik Declaration | Declaration of Brian Rybarik in Support of Request for Rehearing by State of Washington | |
| 54 | FEMA Declaration of Emergency | U.S. Dep't of Homeland Security, FEMA, *Emergency Declaration*, FEMA-3629-EM (Dec. 9, 2025) | |
| 55 | Best Practices Resource Planning | Synapse Energy Economics, Lawrence Berkeley Nat'l Laboratory, *Best Practices in Integrated Resource Planning* (Nov. 2024, Revised Dec. 2024) | https://www.synapse-energy.com/sites/default/files/IRP_Best_Practices_2024_Synapse_LBNL_24-061_1.pdf<br><br>https://perma.cc/D68F-WHWQ |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 56 | Trump Signs Executive Orders | New York Times, *Trump Signs Orders Aimed at Reviving a Struggling Coal Industry* (April 8, 2025) | |
| 57 | Declared National Emergencies | Brennan Center for Justice, Declared National Emergencies under the National Emergencies Act | https://www.brennancenter.org/our-work/research-reports/declared-national-emergencies-under-national-emergencies-act |
| 58 | Campbell Order No. 202-25-7 | Dep't of Energy Order No. 202-25-7 (Aug 20, 2025) | |
| 59 | Eddystone Order No. 202-25-8 | Dep't of Energy Order No. 202-25-8 (Aug. 27, 2025) | |
| 60 | Trump Order Keep Michigan Power Plant Open | Tom Perkins, *Trump Order to Keep Michigan Power Plan Open Costs Taxpayers $113m* (Nov. 28, 2025) | https://www.theguardian.com/us-news/2025/nov/28/trump-michigan-power-plant |
| 61 | Short-Term Energy Outlook Browser | U.S. Energy Information Administration, Short-Term Energy Outlook Data Brower (Dec. 9, 2025) | https://www.eia.gov/outlooks/steo/data/browser |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 62 | U.S. Frackers and Saudi Officials Tell Trump They Won't Drill More | Wall Street Journal, *U.S. Frackers and Saudi Officials Tell Trump They Won't Drill More* (Feb. 3, 2025) | https://www.wsj.com/business/energy-oil/trump-oil-drilling-saudi-arabia-71c095ff?reflink=desktopwebshare_permalink |
| 63 | Eddystone Order No. 202-25-10 | Dep't of Energy Order No. 202-25-10 (Nov. 25, 2025) | |
| 64 | Winter Outlook 2025-2026 | US Dep't Commerce, Nat'l Oceanic and Atmospheric Admin., Nat'l Weather Service, *Winter Outlook 2025-2026*, at 4 (Last visited Jan. 6, 2025) | https://www.weather.gov/media/abr/sitreport/2025-2026WinterOutlook.pdf |
| 65 | TransAlta Signs Agreement | *TransAlta Signs Long-Term Agreement for 700 MW at Centralia Facility Enabling Coal to Natural Gas Conversion*, TransAlta (Dec. 31, 2025, 9:39 AM) | https://transalta.com/newsroom/transalta-signs-long-term-agreement-for-700-mw-at-centralia-facility-enabling-coal-to-natural-gas-conversion/. |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 66 | TransAlta Conversion | Jacob Moore, @chronline.com, *Announcement comes as company must take its coal-fired burner offline; 700 jobs expected at peak of construction, 40 to be employed permanently* (Dec. 10, 2025) | https://www.chronline.com/stories/transalta-centralia-to-transition-from-coal-to-natural-gas,392533 |
| 67 | Best Practices Resource Planning (PDF Exhibit Parts 1-7) | Synapse Energy Economics, Lawrence Berkeley Nat'l Laboratory, *Best Practices in Integrated Resource Planning* (Nov. 2024) | https://www.energy.gov/sites/default/files/2024-12/best_practices_irp_nov_2024_final_optimized.pdf |
| 68 | Trump Vowed Make Coal King | Hanna Northey, EE News, *Trump has vowed to make coal king again. How's it going?* (Sep. 24, 2025) | https://www.energy.gov/sites/default/files/2024-12/best_practices_irp_nov_2024_final_optimized.pdf |
| 69 | Interior Approves Mining Plan | U.S. Dep't of the Interior, *Interior Approves Mining Plan to Unlock 14.5 Million Tons of Coal at Antelope Mine* (Wyoming) (Aug. 2025) | https://www.doi.gov/pressreleases/interior-approves-mining-plan-unlock-145-million-tons-coal-antelope-mine |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 70 | Donors Benefit from Trump Return to Office | Karen Yourish, Kenneth Vogel, Charlie Smart, The New York Times, *Hundreds of Big Post-Election Donors Have Benefited from Trump's Return to Office* (Dec. 22, 2025) | https://www.nytimes.com/interactive/2025/12/22/us/politics/trump-donors-fundraising-benefits.html |
| 71 | White House Offers Concierge Service | Jake Spring, *White House offers 'concierge' service to fossil fuel firms, official says* (Updated Oct. 7, 2025) | https://www.washingtonpost.com/climate-environment/2025/10/07/white-house-fossil-fuel-concierge/ |
| 72 | Trump Admin. Reconsiders Rule | Rachel Frazin, The Hill, *Trump admin will reconsider part of rule to protect miners from lung diseases* (Dec. 1, 2025) | https://thehill.com/policy/energy-environment/5628531-miner-lung-disease-rule-silica/ |
| 73 | Trump Wants Mining | Hannah Northey, EENews, T*rump wants mining. Federal mine safety workers are on the chopping block* (Sep. 5, 2025) | . https://www.eenews.net/articles/trump-wants-mining-federal-mine-safety-workers-are-on-the-chopping-block/ |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 74 | Grid Strategies Report | Michael Goggin, Grid Strategies LLC, The Cost of Federal Mandates to Retain Fossil-Burning Power Plants (Aug. 2025) | |
| 75 | Notice to Stakeholders | U.S. Dep't of Labor, Mine Safety and Health Admin., *Notice to Stakeholders* | https://www.msha.gov/notice-stakeholders |
| 76 | Columbia River Basin Dams | U.S. Army Corps of Engineers, NW Division Website, *Columbia River Dams* accessed Dec. 30, 2025) | https://www.nwd.usace.army.mil/crwm/cr-dams/ |
| 77 | Hydropower Impact – Bonneville Power Admin. | Bonneville Power Administration, *Hydropower Impact; All About Federal Hydropower, the Largest Source of Clean Power in the U.S.* (Last accessed Dec. 30, 2025) | https://www.bpa.gov/energy-and-services/power/provider-of-choice/resources |
| 78 | Hydropower Flows Here – Bonneville Power Admin. | Bonneville Power Administration, *Hydropower Flows Here* (Last accessed Dec. 30, 2025) | https://www.bpa.gov/learn-and-participate/community-education/hydropower-flows-here |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 79 | BPA Maintains Strong Financial Position | Bonneville Power Administration, Newsroom, *BPA maintains strong financial position despite challenging water year* (Nov. 13, 2025) | https://www.bpa.gov/about/newsroom/news-articles/20251113-bpa-maintains-strong-financial-position-despite-challenging-water-year |
| 80 | Pacific Moisture Drenches the U.S. Northwest | NASA Earth Science, *Pacific Moisture Drenches the U.S. Northwest* (Dec. 12, 2025) | https://science.nasa.gov/earth/earth-observatory/pacific-moisture-drenches-the-u-s-northwest/ |
| 81 | President Approves Washington Emergency Declaration | U.S. Dep't of Homeland Security, FEMA, *President Donald J. Trump Approves Emergency Declaration for State of Washington* (Dec. 12, 2025) | https://www.fema.gov/press-release/20251212/president-donald-j-trump-approves-emergency-declaration-state-washington |
| 82 | Federal Teams Support State-Led Response to Washington Storms | U.S. Dep't of Homeland Security, FEMA, *Federal Teams Support State-Led Response to Historic Washington Severe Storms and Flooding* (Dec. 23, 2025) | https://www.fema.gov/blog/federal-teams-support-state-led-response-historic-washington-severe-storms-and-flooding |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 83 | Stopping Radical Environmentalism to Generate Power | Presidential Actions, Presidential Memoranda, *Stopping Radical Environmentalism to Generate Power for the Columbia River Basin*, (Jun. 12, 2025) | https://www.whitehouse.gov/presidential-actions/2025/06/stopping-radical-environmentalism-to-generate-power-for-the-columbia-river-basin/<br><br>(last accessed January 5, 2026) |
| 84 | Electricity Data Browser | U.S. Energy Info. Admin., *Electricity Data Browser*, EIA (last visited Nov. 4, 2025) | https://www.eia.gov/electricity/data/browser/#/topic/7 |
| 85 | Consumer Prices Up 2.9% August 2024 to August 2025 | U.S. Bureau of Labor Statistics, *Consumer prices up 2.9 percent from August 2024 to August 2025*, TED: The Economics Daily (Sept. 17, 2024) | https://www.bls.gov/opub/ted/2025/consumer-prices-up-2-9-percent-from-august-2024-to-auCogust-2025.htm |
| 86 | Report: Lack of Affordable Housing Options | Wash. State Dept. of Commerce, *Report: Lack of affordable housing options reaches critical levels in communities throughout Washington state* (May 13, 2024) | https://www.commerce.wa.gov/report-lack-of-affordable-housing-options-reaches-critical-levels-in-communities-throughout-washington-state/ |
| 87 | Trends in Financial Hardship | United for Alice, *The State of Alice in Washington*, United Way of Northern New Jersey | https://www.unitedforalice.org/trends-in-hardship/Washington |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 88 | Emission Performance Standard SB 1368 | California Energy Commission, Emission Performance Standards – SB 1368 | https://www.energy.ca.gov/rules-and-regulations/energy-suppliers-reporting/emission-performance-standard-sb-1368 |
| 89 | Coal and the Environment | U.S. Energy Information Administration, *Coal explained: Coal and the environment* (Last updated: Apr. 17, 2024) | https://www.eia.gov/energyexplained/coal/coal-and-the-environment.php |
| 90 | What They are Saying: President Trump Stops Radical Environ-mentalism | The White House Newsletter, *What They Are Saying: President Trump Stops Radical Environmentalism to Generate Power for the Columbia River Basin* (Jun. 13, 2025) | https://www.whitehouse.gov/articles/2025/06/what-they-are-saying-president-trump-stops-radical-environmentalism-to-generate-power-for-the-columbia-river-basin/ |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 91 | Special Environmental Analysis of Balancing Authority of Northern California | U.S. Dep't of Energy*, Special Environmental Analysis of Balancing Authority of Northern California (BANC) Operations during 202(c) Emergency Order Operations between September 4, 2022, and September 8, 2022* (Apr. 19, 2024) | https://www.energy.gov/sites/default/files/2024-08/sea-07-banc-special-environmental-analysis-2024-04-19.pdf |
| 92 | SPP Balancing Authority Map | Southwest Power Pool (SPP) Balancing Authority Map | https://www.spp.org/documents/62914/rto%20and%20western%20rc%20footprint%20w%20planned%20expansion.png |
| 93 | NCR11393 Compliance Audit | Gridforce Energy Management, LLC, Compliance Audit, NCR11393 (Dec. 20, 2019) | |
| 94 | Craig Order No. 202-25-14 | U.S. Dep't of Energy, Order No. 202-25-14 (Dec. 30, 2025) | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 95 | Research Power Corp. Order Authorizing Electricity Exports to Canada | U.S. Dep't of Energy, Grid Deployment Office, Research Power Corporation, GDO Docket No. EA-365-C, Order Authorizaing Electricity Exports to Canada | |
| 96 | PJM to Ratchet Down Projected AI Power Demand Eastern US | Peter Behr, Energywire, *PJM to ratchet down projected AI power demand for eastern US* (Jan. 6, 2026) | |
| 97 | Declaration of Arne Olson | U.S. of America, Before the Dep't of Energy, Re: Transalta Centralia Generation, Declaration of Arne Olson (Jan. 13, 2026) | |
| 97-1 | E3 NW RA Data for Washington | E3, Greater Northwest System Metrics 2025-2030 | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 98 | Final Order Granting Petition | Washington Utilities and Transportation Commission, Re: Puget Sound Energy, Docket UE-121373, Order 03, Final Order Granting Petition, Subject to Conditions (Jan. 9, 2013) | |
| 99 | E3 Northwest Resource Adequacy Study Review | Sylvan Energy Analytics, GridLab, *Near-term winter resource adequacy challenges in the Pacific Northwest, A review of E3's Northwest RA Study Phase 1 and independent evaluation of near-term winter challenges* (January 2026) | |

# EXHIBIT C

# UNITED STATES OF AMERICA
## Department of Energy
Washington, DC 20585

TransAlta Centralia Generation LLC          Order No. 202-25-11A
Regarding the Centralia Generating Station

## NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND PROVIDING FOR FURTHER CONSIDERATION
(February 19, 2026)

       Rehearing has been timely requested of the Department of Energy's order issued on December 16, 2025, in the above-captioned matter.[1] Thirty (30) days having passed from the date on which rehearing requests were filed, the requests for rehearing are deemed denied by operation of law.[2]

       As provided in 16 U.S.C. § 825*l*(a) and 16 U.S.C. § 824a(c), the requests for rehearing of the above-cited order may be addressed in a future order.[3]

_____

Chris Wright
Secretary of Energy

---

[1] *TransAlta Centralia Generation LLC*, Order No. 202-25-11 (2025) (regarding the Centralia Generating Station).

[2] 16 U.S.C. § 825*l*(a).

[3] 16 U.S.C. § 825*l*(a) (DOE may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper); 16 U.S.C. § 824a(c) (DOE may issue a supplemental order).

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov